(b)    From and after the Closing Date, Seller shall keep confidential, and cause its Affiliates and instruct its and their officers, directors, employees and advisors to keep confidential, all information relating to the Companies and the Business, except as required by law or administrative process and except for information that is available to the public on the Closing Date, or thereafter becomes available to the public other than as a result of a breach of this Section 4.06(b); provided that the foregoing shall not restrict Seller from disclosing historical information regarding the Companies as part of the preparation and distribution of its historical financial statements.

Section 4.07. <u>Certain Services and Benefits</u>.    Buyer acknowledges that the Companies currently receive from Seller and its Affiliates certain administrative and corporate services and benefits, including certain information technology support and insurance services. Buyer further acknowledges that all such services and benefits shall cease, and any agreement in respect thereof shall terminate, with respect to the Companies as of the Closing Date and thereafter Seller's sole obligation with respect to the provision of any services with respect to the Companies shall be as set forth in the Transition Services Agreement.

Section 4.08. <u>Access to Information</u>.    After the Closing Date, each of the parties shall grant to the other such access to financial records and other information in their possession related to their conduct of the Business and such cooperation and assistance as shall be reasonably required to enable each of them to complete their legal, regulatory and financial reporting requirements and to complete their Tax returns and for any other reasonable business purpose, including in respect of litigation and insurance matters.  In the event that any such Tax return becomes the subject of any audit or investigation, each of the parties shall give the other all reasonable cooperation, access and assistance as needed during normal business hours with respect to books and records and other financial data of the Companies to enable such first party to defend any such audit or investigation.  Buyer and its Affiliates shall, for a period of three years after the Closing Date (six years in the case of materials relating to Taxes) plus any additional time during which Seller advises Buyer that there is an ongoing Tax audit or investigation with respect to such periods, keep such materials reasonably accessible and not destroy or dispose of such materials without the written consent of Seller.  Each party shall promptly reimburse the other for such other party's reasonable out-of-pocket expenses associated with requests made by such first party under this Section 4.08, but no other charges shall be payable by the requesting party to the other party in connection with such requests.

Section 4.09. <u>Public Announcements</u>.  Neither party will issue any press release or other public announcement with respect to this Agreement or the transactions contemplated by this Agreement without the prior consent of the other party (which consent shall not be unreasonably withheld or delayed, it being acknowledged that Buyer has the right to refuse to consent to the disclosure of the Purchase Price), except as may be required by applicable Laws (in which case the party required to make the release or statement shall allow the other party reasonable time to comment on such release or statement in advance of such issuance); *provided, however*, that each of the parties may make internal announcements to their respective employees that are consistent with the parties' prior public disclosures regarding the transactions contemplated by this Agreement (*provided*, in any such case, that the Purchase Price shall not be disclosed).

Section 4.10. <u>Use of Coty Name</u>. Within 30 days following the Closing Date, Buyer shall, or shall cause YSK Shanghai to, submit an application to the applicable Chinese Approving Authority to effect a change of the name of YSK Shanghai such that it no longer contains the word "Coty" or any variation thereof. Buyer shall, and shall cause YSK Shanghai to, use commercially reasonable efforts to effect such name change on the earliest practicable date, but in any event not later than 90 days following the Closing Date.

Section 4.11. <u>Securities</u>. Except as set forth on <u>Schedule 4.11</u>, prior to the Closing Date, any and all kinds of guarantees or other forms of security provided by either Company in favor of any third party (including the Seller or any of its Affiliates) shall be duly released, terminated and discharged.

Section 4.12. <u>Use of Intellectual Property</u>. After the Closing Date, Seller agrees not to use, reproduce or employ any Company Intellectual Property; *provided, however,* that the foregoing shall not in any way prohibit Seller from using, reproducing or employing the "Stay Young" trademark or any intellectual property licensed to Buyer pursuant to the Technology License Agreement.

Section 4.13. <u>Transition Services</u>. Promptly after the date hereof Seller and Buyer shall negotiate in good faith certain economic terms of the Transition Services Agreement, including the fees to be paid to Buyer and any sharing of profits from the sale of products subject to the Transition Services Agreement. Such economic terms shall not result in the Companies incurring any loss as a result of the provision of the services under the Transition Services Agreement and the production volume shall not be materially different from that indicated in the Annex to the Transition Services Agreement.

ARTICLE V

CONDITIONS TO CLOSING

Section 5.01. <u>Conditions to Buyer's Obligation to Close</u>. The obligation of Buyer to purchase the Equity Interests and to assume the YSK License Agreement and the Transferred Contracts and otherwise consummate the transactions contemplated by this Agreement shall be subject to the satisfaction (or waiver by Buyer), at or before the Closing, of the following conditions:

(a)     No Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated or enforced any statute, rule, regulation, executive order, decree, judgment, preliminary or permanent injunction or other order that is in effect and that prohibits, enjoins or otherwise restrains the transfer of ownership of the Equity Interests or the assignment and assumption of the YSK License Agreement or any portion of the assumption of the Transferred Contracts.

(b)     Any waiting period imposed by any Governmental Authority under the Provisional M&A Rules with respect to the transfer of the Equity Interests to Buyer shall have expired or been terminated.

20

(c)     Seller's obligations under Section 1.03 shall have been satisfied.

(d)     The Chinese Approvals, which shall not be conditioned upon Buyer being required to take or agree to take any of the actions or accept any of the limitations referred to in Section 4.05(c)(i) or (ii), shall have been received.

(e)     Ms. Kan and Yue-Sai Kan Cosmetics, Ltd. (USA), a Delaware corporation ("*YSK Limited*"), shall have delivered duly executed counterparts to the License Assignment.

(f)     Ms. Kan shall have consented to the assignment to Buyer of the Service Agreement, dated as of May 14, 1996 (the "*Service Agreement*"), between Yue-Sai Kan and Coty Inc. (as successor to Lancaster Group Worldwide, Inc.), as amended by a letter agreement, dated April 30, 2003.

(g)     Seller shall have performed or complied with in all material respects the obligations required under this Agreement to be performed or complied with by it at or prior to the Closing.

(h)     The representations and warranties of Seller shall be true and correct in all material respects (except those representations and warranties of Seller that are qualified by materiality or Material Adverse Effect or similar qualifiers, which shall be true and correct in all respects) as of the date of this Agreement and as of the Closing Date as if made on and as of the Closing Date.

(i)     Seller shall have delivered to Buyer a certificate, dated the Closing Date and signed by an officer of Seller, as to the satisfaction of the conditions set forth in Sections 5.01(g) and 5.01(h).

(j)     Each Equity Transfer Agreement shall have become effective and the conditions to closing set forth in each such Agreement shall have been satisfied or waived.

(k)     Seller shall have received all third party consents listed on Schedule 2.03 (the "*Required Consents*").

(l)     The Sublicenses shall have been terminated effective as of the Closing Date.

Section 5.02.  Conditions to Seller's Obligation to Close.  The obligation of Seller to sell the Equity Interests and to assign the YSK License Agreement and the Transferred Contracts and otherwise consummate the transactions contemplated by this Agreement shall be subject to the satisfaction (or waiver by Seller), at or before the Closing, of the following conditions:

(a)     No Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated or enforced any statute, rule, regulation, executive order, decree, judgment, preliminary or permanent injunction or other order that is in effect and that prohibits, enjoins or otherwise restrains the transfer of ownership of the Equity Interests or the assignment and assumption of the YSK License Agreement or any portion of the Transferred Contracts.

(b)    Any waiting period imposed by any Governmental Authority under the Provisional M&A Rules with respect to the transfer of the Equity Interests to Buyer shall have expired or been terminated.

(c)    Buyer's obligations under Section 1.04 shall have been satisfied.

(d)    The Chinese Approvals, which shall not be conditioned upon Seller being required to take or agree to take any of the actions or accept any of the limitations referred to in Section 4.05(c)(i) or (iii), shall have been received.

(e)    Ms. Kan and YSK Limited shall have delivered duly executed counterparts to the License Assignment.

(f)    Ms. Kan shall have consented to the assignment of the Service Agreement to Buyer.

(g)    Buyer shall have performed or complied with in all material respects the obligations required under this Agreement to be performed or complied with by it at or prior to the Closing.

(h)    The representations and warranties of Buyer shall be true and correct in all material respects (except those representations and warranties of Buyer that are qualified by materiality or Material Adverse Effect or similar qualifiers, which shall be true and correct in all respects) as of the date of this Agreement and as of the Closing Date as if made on and as of the Closing Date.

(i)    Buyer shall have delivered to Seller a certificate, dated the Closing Date and signed by an officer of Buyer, as to the satisfaction of the conditions set forth in Sections 5.02(g) and 5.02(h).

(j)    Each Equity Transfer Agreement shall have become effective and the conditions to closing set forth in each such Agreement shall have been satisfied or waived.

(k)    Seller shall have received the Required Consents.

(l)    The Sublicenses shall have been terminated effective as of the Closing Date.

Section 5.03. <u>Frustration of Closing Conditions</u>.  Buyer and Seller may not rely on the failure of any condition set forth in this Article V to be satisfied if such failure was caused by such party's failure to act in good faith or to use commercially reasonable efforts to cause the satisfaction of such condition.

ARTICLE VI

TERMINATION

Section 6.01. <u>Termination</u>.

22

(a)    This Agreement may be terminated and the transactions contemplated by this Agreement abandoned at any time prior to the Closing:

(i)    by mutual written consent of Buyer and Seller;

(ii)    by Seller if any of the conditions set forth in Section 5.02 shall have become incapable of fulfillment, and shall not have been waived by Seller;

(iii)    by Buyer if any of the conditions set forth in Section 5.01 shall have become incapable of fulfillment, and shall not have been waived by Buyer;

(iv)    by either of the parties if the Closing shall not have occurred on or prior to May 31, 2004; *provided, however*, that such date shall be extended to August 31, 2004 if the Closing shall not have occurred due exclusively to the failure of the parties to receive the Chinese Approvals, including, without limitation, the approval of any Governmental Entity under any Antitrust Law prior to May 31, 2004;

(v)    if any Governmental Entity shall have issued an order, decree or ruling or taken any other action (which order, decree, ruling or other action the parties hereto shall use their best effort to lift), in each case permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such order, decree, ruling or other action shall have become final and not subject to appeal;

*provided, however*, that the party seeking termination pursuant to clause (ii), (iii), (iv) or (v) is not then in material breach of any of its representations, warranties, covenants or agreements contained in this Agreement.

(b)    In the event of termination by Seller or Buyer pursuant to this Section 6.01, written notice thereof shall forthwith be given to the other party and the transactions contemplated by this Agreement shall be terminated, without further action by any party.  If the transactions contemplated by this Agreement are terminated as provided in this Agreement:

(i)    each party shall, and shall cause each of its directors, officers, employees, agents, representatives and advisors to, return to the other party all documents and other material received from such other party or any of their respective Affiliates or representatives relating to the transactions contemplated by this Agreement, whether obtained before or after the execution hereof, except as provided under the Confidentiality Agreement;

(ii)    all confidential, proprietary or nonpublic information received by Buyer, its directors, officers, employees, agents, representatives or advisors with respect to the Business, Seller, the Companies, and their respective Affiliates, shall be treated in accordance with the Confidentiality Agreement, which shall remain in full force and effect notwithstanding the termination of this Agreement; and

(iii)    immediately following such termination, Buyer shall take all steps reasonably requested by Seller to again register Seller (or Seller's designee) as the sole foreign investor holding the Equity Interests.

Section 6.02. <u>Effect of Termination</u>.  Upon termination of this Agreement, the undertakings of the parties set forth in this Agreement shall forthwith be and become of no further force and effect; *provided, however,* that Sections 4.06, 6.01, 6.02 and 9.01 and rights and remedies for any breaches of this Agreement prior to its termination shall survive any such termination.

ARTICLE VII

INDEMNIFICATION

Section 7.01. <u>Obligation of Parties to Indemnify</u>.

(a)    <u>Indemnification by Seller</u>. Subject to the limitations set forth in Section 7.03, Seller shall indemnify, defend and hold Buyer and its Affiliates, officers and directors (the *"Buyer Indemnified Parties"*) harmless from and against any and all claims, losses, damages, liabilities, obligations or out-of-pocket costs or expenses, including reasonable legal fees and expenses, other than claims, losses, damages, liabilities, obligations, out-of-pocket costs or expenses relating to Taxes, which shall be governed solely by Section 8.03 (collectively, *"Losses"*), but net of any insurance recoveries received or receivable or tax benefits actually received by the Buyer Indemnified Parties because of such Losses, to the extent arising out of or resulting from any (i) breach of any representation or warranty (it being agreed that for the purposes of Buyer's right to indemnification pursuant to this Section 7.01(a) the representations and warranties of Seller contained herein shall not be deemed qualified by any materiality standard, including without limitation references to materiality generally or to whether or not any such breach results in a Material Adverse Effect), other than a representation or warranty contained in Section 2.17, made by Seller in this Agreement or (ii) breach of any covenant or undertaking, other than a covenant contained in Article VIII, of Seller contained in this Agreement.

(b)    <u>Indemnification by Buyer</u>.  Subject to the limitations set forth in Section 7.03, Buyer shall indemnify, defend and hold Seller and its Affiliates, officers and directors (the *"Seller Indemnified Parties"*) harmless from and against any and all Losses, but net of any insurance recoveries received or receivable or tax benefits actually received by the Seller Indemnified Parties because of such Losses, to the extent arising out of or resulting from any (i) breach of any representation or warranty made by Buyer contained in this Agreement or (ii) breach of any covenant, other than a covenant contained in Article VIII,  of Buyer contained in this Agreement that survives the Closing Date, including without limitation Buyer's obligations under Section 1.06(c).

Section 7.02. <u>Indemnification Procedures</u>. If any party (the *"Indemnified Party"*) receives written notice of the commencement of any action or proceeding or the assertion of any claim by a third party or the imposition of any penalty or assessment for which indemnity may be sought under this Article VII (a *"Third Party Claim"*) and such Indemnified Party intends to seek

24

indemnity pursuant to this Article VII, the Indemnified Party shall promptly provide the other party (the "*Indemnifying Party*") with written notice of such Third Party Claim (such Notice, a "*Claim Notice*") stating the nature, basis and the amount thereof, to the extent known, along with copies of the relevant documents evidencing such Third Party Claim and the basis for indemnification sought. If the Indemnified Party determines in good faith (and based on the opinion of its counsel) that immediate action by the Indemnified Party with respect to such Third Party Claim is required, then the Claim Notice shall also include (i) a detailed description of any action proposed to be taken by the Indemnified Party and (ii) a copy of any correspondence or any pleading, motion, appearance or other filing proposed to be sent, made or filed by the Indemnified Party in connection with such Third Party Claim. Failure of the Indemnified Party to give a complete and accurate Claim Notice will not relieve the Indemnifying Party of its indemnification obligations hereunder, except if and to the extent that the Indemnifying Party is actually prejudiced by either (i) the Indemnified Party's failure to give such a complete and accurate Claim Notice or (ii) any action taken by the Indemnified Party in connection with such Third Party Claim. The Indemnifying Party shall not be liable for any expenses incurred during the period prior to the Indemnified Party giving a Claim Notice. The Indemnifying Party will have 30 days from receipt of a Claim Notice to give notice to assume the defense, appeal or settlement proceedings thereof (such notice, an "*Assumption Notice*"). If an Assumption Notice is given by the Indemnifying Party, the Indemnifying Party will have the right to assume and control the defense, appeal or settlement proceedings of the Indemnified Party against the Third Party Claim, at its sole cost and expense, with counsel of the Indemnifying Party's choice. Should the Indemnifying Party so elect to assume the defense of a Third Party Claim, the Indemnifying Party shall not be liable to the Indemnified Party for expenses of legal counsel subsequently incurred by the Indemnified Party in connection with the defense thereof. In any case, the Indemnifying Party shall have the right to participate in such defense, appeal or settlement proceedings. So long as the Indemnifying Party has assumed the defense, appeal or settlement proceedings of the Third Party Claim in accordance with this Agreement, (i) the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense, appeal or settlement of the Third Party Claim, (ii) the Indemnified Party will not file any papers or consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party and (iii) the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed) if (A) such judgment or settlement does not include as an unconditional term thereof the giving by each claimant or plaintiff to such Indemnified Party of a release from all liability in respect of such claim, (B) such judgment or settlement would result in the finding against or admission by such Indemnified Party of any violation of Law, (C) as a result of such consent or settlement injunctive or other equitable relief would be imposed against the Indemnified Party or (D) such judgment or settlement would reasonably be expected to materially adversely affect the business, operations or assets of the Indemnified Party. The parties will use reasonable efforts to minimize Losses from Third Party Claims and will act in good faith in responding to, defending against, settling or otherwise dealing with such claims. The parties will also cooperate in any such defense, appeal or settlement proceedings and give each other reasonable access to all information relevant thereto. Whether or not the Indemnifying Party has assumed the defense, appeal or settlement proceedings, such Indemnifying Party will not be obligated to indemnify the

Indemnified Party hereunder for any settlement entered into or any judgment that was consented to without the Indemnifying Party's prior written consent.

Section 7.03. Limitations on Indemnification.

(a)     Notwithstanding anything in this Agreement to the contrary, (i) Seller shall not have any liability under Section 7.01(a) to the extent arising from a breach of any representation or warranty of Seller or a breach of any covenant contained in Section 4.02 (other than with respect to subsections (a)(ii), (iii), (iv) and (ix) of such section) or any liability under Article VIII (excluding, for purposes of this clause (i), any Losses that represent payments required to be made to Buyer by Seller in respect of Post-Closing Tax Returns pursuant to Section 8.01) unless the aggregate liability for Losses suffered by the Buyer Indemnified Parties exceeds in respect of such matters $1,500,000, and then only to the extent of the excess of such Losses over $750,000, (ii) the aggregate liability of Seller under Section 7.01, Article VIII and the other Transaction Agreements shall not in either case exceed $25,000,000, (iii) no party shall be responsible, pursuant to Sections 7.01(a) and (b), for any indemnifiable Losses suffered by the Buyer Indemnified Parties or the Seller Indemnified Parties, as applicable, to the extent arising out of any breach of any representation or warranty or covenant or agreement of such party in this Agreement unless a claim therefor is asserted with specificity in writing by the Indemnified Party, (iv) Seller shall not be responsible for any indemnifiable Loss suffered by the Buyer Indemnified Parties to the extent of that amount relating to such matter that has been specifically reserved or provided for in the Financial Statements or the Final Closing Statement of Consolidated Net Worth, (v) Seller shall not be liable for any indemnifiable Loss to the extent arising out of any action taken or omitted to be taken by any Buyer Indemnified Party, and Buyer shall not be liable for any indemnifiable Loss to the extent arising out of any action taken or omitted to be taken by any Seller Indemnified Party, (vi) no party shall be responsible for any indemnifiable Loss suffered by an Indemnified Party to the extent arising from (A) a change in accounting or taxation law, policy or practice made after Closing, other than a change required to comply with any Law, policy or practice in effect at the date hereof, or (B) any legislation not in force at Closing or any change of Law or administrative practice that takes effect retroactively or occurs as a result of any increase in the rates of taxation in force at the date hereof and (vii) no party shall be responsible for any indemnifiable Loss suffered by an Indemnified Party with respect to any claim that is contingent unless and until such contingent claim becomes an actual liability of the Indemnified Party and is due and payable, so long as such claim was timely submitted pursuant to the provisions of this Article VII. The foregoing limitations shall not apply to any breach of the representations and warranties set forth in Sections 2.01, 2.02, 2.04, 2.05(a) (first and third sentences) and 2.06 or in the case of fraud.

(b)     Buyer acknowledges and agrees that, other than the representations and warranties and covenants of Seller specifically contained in Article II and Article IV, there are no representations or warranties or covenants of Seller or any other person either expressed or implied with respect to the Business, the Companies, the transactions contemplated by this Agreement, the YSK License or the Transferred Contracts, individually or collectively. Without limiting the foregoing, Buyer acknowledges that it, together with its advisors, has made its own investigation of the Companies and the Business and is not relying on any implied warranties or upon any representation or warranty whatsoever as to the prospects (financial or otherwise), or the viability or likelihood of success, of the Business, except as expressly provided in this

Agreement. Buyer acknowledges that it and its representatives have been given access to (i) the data room and the documents presented therein, (ii) management presentations with respect to the Companies and (iii) site visits of the facilities of the Companies. Subject to Section 3.07, such access and any due diligence by Buyer shall not affect Buyer's entitlement to rely on the representations and warranties of Seller set forth in this Agreement.

(c)    Buyer further acknowledges and agrees that, should the Closing occur, its sole and exclusive remedy with respect to any and all claims relating to this Agreement, the Companies, the transactions contemplated by this Agreement, the Transaction Agreements and the Transferred Contracts (other than claims of, or causes of action arising from, fraud) shall be pursuant to the indemnification provisions set forth in this Article VII and Section 8.03. In furtherance of the foregoing, Buyer waives, from and after the Closing, any and all rights, claims and causes of action (other than claims of, or causes of action arising from, fraud) that it or any other Buyer Indemnified Party may have against Seller or any of its Affiliates arising under or based upon any Law including with respect to environmental matters generally and any matters under the Comprehensive Environmental Response, Compensation, and Liability Act (except pursuant to the indemnification provisions set forth in this Article VII and Section 8.03).

Section 7.04. Survival of Representations, Warranties and Covenants.    For purposes of Section 7.01(a) and 7.01(b) and Article VIII, the representations, warranties, covenants and undertakings contained in this Agreement shall survive the Closing, *provided* that such representations and warranties and the covenants contained in Section 4.02 (other than subsections (a)(ii), (iii), (iv) and (ix) of such section) shall terminate at the close of business two years following the Closing, except that any representations or warranties relating to Tax matters shall terminate at the close of business six years following the Closing. It is expressly agreed that any claim made under this Agreement by an Indemnified Party may be validly filed with the Indemnifying Party, notwithstanding the fact that the final amount of such claim may only be determined in a final manner after such time periods. No party shall have any liability or obligation of any nature with respect to any representation, warranty, agreement or covenant after the termination thereof unless a claim has been timely made prior to the applicable expiration date.

## ARTICLE VIII

## TAX MATTERS

Section 8.01. Tax Returns. Buyer will prepare any Tax return of a Company that includes a Pre-Closing Tax Period and that is required to be filed after the Closing Date (a "*Post-Closing Tax Return*") and pay any such Tax reflected thereon. Buyer shall provide Seller with a copy of each Post-Closing Tax Return no later than 30 days before the due date (or, if later, the filing date) of such Post-Closing Tax Return. All Post-Closing Tax Returns shall be filed in accordance with applicable Law and consistent with past practice. Buyer shall permit Seller to review and comment on each Post-Closing Tax Return and shall make any revisions reasonably requested by Seller. Subject to the foregoing, Seller shall pay to Buyer the portion of any Tax (except for Transfer Taxes described in Section 8.02 and Taxes resulting from any transaction that is out of the ordinary course of business that occurs on the Closing Date but after the Closing) reflected on any Post-Closing Tax Return that is attributable to a Pre-Closing Tax Period

calculated in accordance with the principles of Section 8.03(c) below but only to the extent in excess of the amount reflected as a current liability for Taxes on the Final Closing Statement of Consolidated Net Worth and for purposes of Section 7.03 and Section 7.04, amounts payable by Seller pursuant to this Section 8.01 shall be considered to be Losses. "*Pre-Closing Tax Period*" shall mean any taxable period or portion thereof ending on or before the Closing Date. If a taxable period begins on or before the Closing Date and ends after the Closing Date, then the portion of the taxable period that ends on the Closing Date shall constitute a Pre-Closing Tax Period.

Section 8.02. Transfer Taxes. Any registration, transfer, documentary, sales, use or other similar Taxes ("*Transfer Taxes*") imposed on either Company with respect to transfer of the Equity Interests as contemplated herein will be borne by such Company. Any stamp duty imposed by any P.R.C. Taxing Authorities on a contract, agreement or other document in connection with the transfer of the Equity Interests shall be paid and borne by Seller and Buyer, respectively, in accordance with the requirements of applicable Law. Any other Transfer Taxes imposed in connection with the transfer of the Equity Interests or the Equity Transfer Agreements shall be borne 50% by Buyer and 50% by Seller. For the avoidance of doubt, "Transfer Taxes" does not include FEI Tax.

Section 8.03. Tax Indemnification.

(a)    Subject to Section 8.04, Seller shall indemnify the Buyer Indemnified Parties from and against (i) all liability for Taxes of the Companies for any Pre-Closing Tax Period (except for Transfer Taxes described in Section 8.02, Taxes paid by Seller pursuant to Section 8.01, and Taxes resulting from any transaction that is out of the ordinary course of business that occurs on the Closing Date but after the Closing), calculated in accordance with the principles of Section 8.03(c) below but only to the extent in excess of the amount reflected as a liability for Taxes on the Final Closing Statement of Consolidated Net Worth and (ii) all liability for reasonable third party legal fees and expenses incurred in connection with any item in clause (i) (for purposes of Section 7.03 and Section 7.04, such items shall be considered to be Losses); *provided, however*, that any indemnity payments shall be net of any tax benefits actually received by the Buyer Indemnified Parties because of such indemnity payments.

(b)    Buyer shall, and shall cause the Companies to, indemnify the Seller Indemnified Parties from and against (i) all liability for Taxes of the Companies for any Post-Closing Tax Period (calculated in accordance with the principles of Section 8.03(c) below), (ii) a breach of any covenant contained in Section 8 by Buyer or any of its Affiliates (including, after the Closing Date, any of the Companies) and (iii) all liability for reasonable third party legal fees and expenses incurred in connection with any item in clause (i) or (ii) of this Section 8.03(b) (for purposes of Section 7.03 and 7.04, such items shall be considered to be Losses); *provided, however*, that any indemnity payments shall be net of any tax benefits actually received by the Seller Indemnified Parties because of such indemnity payments. "*Post-Closing Tax Period*" means any taxable period or portion thereof beginning after the Closing Date. If a taxable period begins on or before the Closing Date and ends after the Closing Date, then the portion of the taxable period that begins on the day after the Closing Date shall constitute a Post-Closing Tax Period.

28

(c)    In the case of any taxable period that includes (but does not end on) the Closing Date (a "*Straddle Period*"):

(i)    real, personal and intangible property Taxes ("*Property Taxes*") of the Companies for the Pre-Closing Tax Period shall be equal to the amount of such Property Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days during the Straddle Period that are in the Pre-Closing Tax Period and the denominator of which is the number of days in the Straddle Period; and

(ii)    the Taxes of the Companies (other than Property Taxes) for the Pre-Closing Tax Period shall be computed as if such taxable period ended as of the close of business on the Closing Date.

Section 8.04. <u>Tax Claims</u>.

(a)    In order for an Indemnified Party to be entitled to any indemnification provided for with respect to the items under Section 8.03(a) or Section 8.03(b) (each, a "*Tax Claim*"), the Indemnified Party must send reasonably prompt notice to the Indemnifying Party in writing of the Tax Claim (a "*Tax Claim Notice*"); *provided, however,* that failure to give such notification shall not affect the indemnification provided hereunder except to the extent the Indemnifying Parties have been actually prejudiced as a result of such failure.

(b)    With respect to any Tax Claim relating to a Pre-Closing Tax Period (other than a Tax Claim relating to Taxes of a Company for a Straddle Period), Seller may control all proceedings taken in connection with such Tax Claim (including selection of counsel) and, without limiting the foregoing, may in its sole discretion pursue or forego any and all administrative appeals, proceedings, hearings and conferences with any Taxing Authority with respect thereto, and may, in its sole discretion, either pay the Tax claimed and sue for a refund where applicable law permits such refund suits or contest the Tax Claim in any permissible manner.

(c)    The Seller shall control all proceedings taken in connection with any Tax Claim relating to Taxes of a Company for a Straddle Period; *provided, however,* that Seller shall not settle a Tax Claim relating to Taxes of a Company for a Straddle Period without Buyer's prior written consent, which consent shall not be unreasonably withheld or delayed.

(d)    Prior to the Indemnifying Party notifying the Indemnified Party of its intention to defend the Tax Claim, the Indemnified Party will defend against such Tax Claim as the Indemnified Party deems appropriate in good faith. Buyer, the Companies and each of their respective Affiliates shall cooperate with Seller in contesting any Tax Claim, which cooperation shall include, without limitation, the retention and (upon Seller's request) the provision to Seller of records and information or copies thereof that are reasonably relevant to such Tax Claim, and making employees available on a mutually convenient basis to provide additional information or explanation of any material provided hereunder or to testify at proceedings relating to such Tax Claim.

29

Section 8.05. <u>Refunds</u>. Buyer agrees to pay (and cause the Companies to pay) to the Seller all refunds of any Taxes with respect to any Pre-Closing Tax Period. At the expense of Seller, the parties shall cooperate in order to take all reasonably necessary steps to claim any such refund. Any such refund shall be paid to Seller ten days after such refund is received.

Section 8.06. <u>Termination</u>. Notwithstanding anything to the contrary in this Agreement, the provisions of this Article VIII shall terminate at the close of business six years following the Closing Date and the provisions of Section 7.04 shall apply to this Article VIII.

Section 8.07. <u>Post-Closing Elections</u>. Neither the Buyer nor any of its Affiliates (including, after the Closing, any of the Companies) shall make any election pursuant to Section 338 of the U.S. Internal Revenue Code with respect to any of the Companies.

ARTICLE IX

MISCELLANEOUS

Section 9.01. <u>Expenses</u>. Each of the parties hereto shall pay its own legal, accounting and other fees and expenses incurred in connection with the preparation, execution and delivery of this Agreement and all documents and instruments executed pursuant hereto and the consummation of the transactions contemplated by this Agreement and the Transaction Agreements and any other costs and expenses incurred by such party, except as otherwise expressly set forth in this Agreement. None of the foregoing expenses shall be borne by the Companies, except for incidental disbursements and other immaterial expenses.

Section 9.02. <u>Notices</u>. All notices, requests, permissions, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) five business days following sending by registered or certified mail, postage prepaid, (b) when sent, if sent by facsimile, provided that the facsimile transmission is promptly confirmed by telephone, (c) when delivered, if delivered personally to the intended recipient and (d) one business day following sending by overnight delivery via a national or international courier service and, in each case, addressed to a party at the following address for such party:

Notices to Seller:

Coty Inc.
1325 Avenue of the Americas
34th Floor
New York, NY 10019
Attention: Chief Financial Officer
Facsimile: (212) 479-4508

30

with copies to:

    Coty Inc.
    1325 Avenue of the Americas
    34th Floor
    New York, NY 10019
    Attention:  General Counsel
    Facsimile:  (212) 479-4328

    and

    Covington & Burling
    1330 Avenue of the Americas
    New York, New York  10019
    Attention:  Scott F. Smith
    Facsimile: (212) 841-1010

Notices to Buyer:

    L'Oréal S.A.
    41, rue Martre
    92117 Clichy
    Attention: Bruno Wirth, Finance Manager
    Facsimile: (33) 1.47.56.42.02

with copies to:

    L'Oréal S.A.
    41, rue Martre
    92117 Clichy
    Attention: Yannick Chalmé, General Counsel
    Facsimile: (33) 1.47.56.82.34

    and

    Coudert Brothers LLP
    1114 Avenue of the Americas
    New York, New York 10036
    Attention:  Andrew S. Hedden
    Facsimile:  (212) 626-4422

Either party may, by notice given in accordance with this Section 9.02, specify a new address for notices under this Agreement.

    Section 9.03.  Entire Agreement; Amendment; Waiver.  This Agreement and the Exhibits and Schedules and the Confidentiality Agreement constitute the entire understanding between the parties with respect to the subject matter hereof, and supersede all other understandings and negotiations with respect thereto.  This Agreement may be amended only in a

writing signed by the parties hereto. Any provision of this Agreement may be waived only in a writing, which writing may be signed only by the party granting such waiver. No course of dealing between the parties shall be effective to amend or waive any provision of this Agreement. Notwithstanding anything in the Equity Transfer Agreements to the contrary, in the event of any inconsistency or conflict between the terms of this Agreement and those of the Equity Transfer Agreements, the terms of this Agreement shall control.

Section 9.04. <u>Severability</u>.  In the event that any provision contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any jurisdiction, such provision shall be ineffective as to such jurisdiction to the extent of such invalidity, illegality or unenforceability without invalidating or affecting the remaining provisions hereof or affecting the validity, legality or enforceability of such provision in any other jurisdiction.

Section 9.05. <u>Assignment</u>.  Neither this Agreement nor any of the rights and obligations of the parties hereunder may be assigned by any party hereto without the prior written consent of the other parties hereto. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Any attempted assignment or transfer in violation of this Section 9.05 shall be void.

Section 9.06.  <u>Interpretation</u>. Any matter set forth on any of the Schedules hereto shall be deemed set forth for all purposes of the other Schedules to the extent relevant. Any capitalized terms used in any Schedule or Exhibit, but not otherwise defined therein, shall have the meanings as defined in this Agreement. References to defined terms in the singular shall include the plural and references to defined terms in the plural shall include the singular. The descriptive headings of the several Articles and Sections of this Agreement and the Exhibits, Schedules and Table of Contents to this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement. All references in this Agreement to "Articles," "Sections," "Exhibits" or "Schedules" shall be deemed to be references to Articles or Sections of this Agreement or Exhibits or Schedules to this Agreement, unless otherwise indicated.

For all purposes hereof:

"*Affiliate*" of any person means any person or entity controlling, controlled by or under common control with such person.

"*business day*" means any day on which banks are not required or authorized to close for business in New York City or Paris other than Saturday or Sunday.

"*Chinese Approving Authority*" means any competent governmental agencies of the P.R.C. charged by Law or delegated by the P.R.C. Ministry of Commerce (which has the authority to examine and approve the transactions contemplated by this Agreement in accordance with the relevant Laws concerning foreign investment) and by the State Administration for Industry and Commerce (which has the authority to duly register on the business licenses of the Companies any changes in connection with this Agreement and the transactions contemplated hereby in accordance with relevant Laws concerning foreign investment), respectively..

"*including*" means including, without limitation.

32

"*Income Taxes*" means income, finances or other taxes measured by or based upon income or profits.

"*knowledge*" of Seller means the actual knowledge of Michael Fishoff (Chief Financial Officer of Seller), Steven Danatos (Senior Vice President, Taxes and External Development of Seller), Stephen Ford (Senior Vice President, General Counsel and Secretary of Seller), Leo Lui (Chief Executive Officer of the Companies), Peter Ip (Finance Director of the Companies) and Hua Shan (General Manager, Operations of the Companies).

"*Material Adverse Effect*" means a material adverse effect on the financial condition or results of operations of the Business or the ability of Seller to consummate the transactions contemplated by this Agreement, excluding in any case any effects to the extent resulting from (i) changes in the economy in general, (ii) changes in the Chinese cosmetics industry in general and not specifically relating to the Companies or (iii) the execution of the Agreement (including the identity of Buyer) or any of the agreements or other documents contemplated by this Agreement and the consummation of the transactions contemplated by this Agreement.

"*party*" means a signatory to this Agreement, except there the context requires otherwise.

"*person*" means any individual, firm, corporation, partnership, limited liability company, trust, joint venture, Governmental Entity or other entity.

"*Tax*" means any Income Tax, corporate tax, capital gains tax, securities transfer tax, real estate transfer tax, other asset transfer tax, value added tax, social security taxes or charges, professional tax, salary tax, franchise tax, payroll tax, customs tax or charges, sales tax, use tax, registration tax, capital duty and all other forms of tax and all penalties, charges and interest relating to any of the foregoing either in the P.R.C. or in another country.

Section 9.07. <u>Limitations on Damages</u>. Notwithstanding anything to the contrary in this Agreement, in no event shall either party be liable for special, indirect, incidental, punitive or consequential damages of the other party (including, without limitation, damages for loss of business profits, lost opportunities business interruption or any other loss), whether or not caused by or resulting from the actions of such party or the breach of its covenants, agreements, representations or warranties hereunder, even if such party has been advised of the possibility of such damages; *provided* that nothing in this Section 9.07 shall affect the application of Section 1.05 or preclude any recovery by an Indemnified Party against an Indemnifying Party for third party claims.

Section 9.08. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, United States of America, without regard to principles of conflicts of law.

Section 9.09. <u>Jurisdiction</u>. Each party irrevocably agrees that any legal action, suit or proceeding against either of them with respect to its obligations or liability under or arising out of or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise) may be

brought only in the United States District Court for the Southern District of New York or, if such court does not have jurisdiction, the state courts of New York located within New York County, and irrevocably accepts and submits to the exclusive jurisdiction and venue of the aforesaid courts *in personam*, with respect to any such action, suit or proceeding.

Section 9.10. <u>Service of Process</u>. Each of the parties hereto irrevocably consents to the service of any and all legal process, summonses, notices and other documents that may be served in any action, suit or proceeding referred to in Section 9.09 above in the United States District Court for the Southern District of New York or the state courts of New York located in New York County, which service may be made by mailing a copy of such process by certified or registered mail, postage prepaid, to the party to be served at its address as provided in Section 9.02 hereof, with such service to be effective upon receipt.

Section 9.11. <u>WAIVER OF JURY TRIAL</u>. EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR DISPUTES RELATING HERETO. EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.11.

Section 9.12. <u>No Third Party Beneficiaries</u>. Except as provided in Article VII, this Agreement is for the sole benefit of the parties hereto, and nothing in this Agreement expressed or implied shall give or be construed to give to any person, other than the parties hereto, any legal or equitable rights hereunder.

Section 9.13. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

COTY INC.

By: _____
Name: Michael Fishoff
Title: CFO


L'ORÉAL S.A.

By: _____
Name:
Title:

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

COTY INC.

By: _____
　　Name:
　　Title:

L'ORÉAL S.A.

By: _____
　　Name: Christian Mulliez
　　Title: Executive Vice President
　　in charge of Administration
　　and Finances.

## SCHEDULE 2.07

## FINANCIAL STATEMENTS

See attached unaudited adjusted consolidated balance sheet of the Companies as of June 30, 2003.

See attached unaudited consolidated income statement of the Companies for the fiscal years ended June 30, 2003, 2002 and 2001.

See Schedule 2.17.

Consolidated China Balance Sheet as of June 2003
From the US GAAP Management accounts presented during the Manament Presentations
Excluding the YSK LP-Co 084 (USA) not included in the transaction
000 Rmb and 000 $ (1$ = 8.27715 Rmb)

| | Shenzhen in 000 Rmb | Shenzhen in 000$ | Shanghai in 000 Rmb | Shanghai in 0000$ | Intra - China elimination in 000 Rmb | Intra - China elimination in 000$ | Consolidated China in 000 Rmb | Consolidated China in 000$ |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | |
| **Current Assets** | | | | | | | | |
| Cash and Marketable Securities | 48,425 | 5,850 | 2,552 | 308 | | | 50,977 | 6,159 |
| Trade Recievables | 58,952 | 7,122 | | | | | 58,952 | 7,122 |
| Inventory | 36,945 | 4,463 | 903 | 109 | *-4796 | (579) | 33,052 | 3,993 |
| Intercompany - interest free | 6,421 | 776 | | | | | 6,421 | 776 |
| Intercompany - interest bearing | 95,500 | 11,538 | | | 95,500 | (11,538) | 0 | 0 |
| Current Deffered Tax Asset | 12,335 | 1,490 | | | | | 12,335 | 1,490 |
| Prepaid Expences and other Current Assets | 11,035 | 1,333 | 786 | 95 | | | 11,821 | 1,428 |
| **Total Current Assets** | 269,613 | 32,673 | 4,241 | 512 | (100,296) | (12,117) | 173,558 | 20,968 |
| Property Plant and Equipment | 41,882 | 5,060 | 102,238 | 12,352 | | | 144,120 | 17,412 |
| **Total Assets** | 311,495 | 37,633 | 106,479 | 12,864 | (100,296) | (12,117) | 317,678 | 38,380 |
| | | | | | | | | |
| **Liabilities and Stockholders Equity** | | | | | | | | |
| **Current Liability** | | | | | | | | |
| Accounts Payable | 51,607 | 6,235 | 1,321 | 160 | | | 52,928 | 6,394 |
| Income Taxes and Other Taxes Payables | 4,708 | 569 | | | | | 4,708 | 569 |
| Accrued Expenses and other Current Liabilities | 51,100 | 6,174 | 11,251 | 1,359 | | | 62,351 | 7,533 |
| **Total Current Liabilities** | 107,415 | 12,978 | 12,572 | 1,519 | | | 119,987 | 14,496 |
| | | | | | | | | |
| **Long Term Debt** | | | | | | | | |
| Intercompany-interest free | 48,003 | 5,799 | 4,891 | 591 | | | 52,894 | 6,390 |
| Intercompany-interest bearing | | | 95,500 | 11,538 | (95,500) | (11,538) | 0 | 0 |
| Intercompany-interest accruals | 7,335 | 886 | | | | | 7,335 | 886 |
| **Total Liabilities** | 162,753 | 19,663 | 112,963 | 13,648 | (95,500) | (11,538) | 180,216 | 21,773 |
| | | | | | | | | |
| **Stockholders Equity** | | | | | | | | |
| Common Shares | 40,795 | 4,929 | 60,687 | 7,332 | | | 101,482 | 12,261 |
| Retained Earnings | 105,488 | 12,744 | (67,087) | (8,105) | (4,796) | (579) | 33,605 | 4,060 |
| Accumulated Other Comprehensive Loss | 2,460 | 297 | (84) | (10) | | | 2,376 | 287 |
| **Total Stockholders Equity** | 148,743 | 17,970 | (6,484) | (783) | (4,796) | (579) | 137,463 | 16,608 |
| **Total Liabilities and Stockholders Equity** | 311,496 | 37,633 | 106,479 | 12,864 | (100,296) | (12,117) | 317,679 | 38,380 |
| **Balance Control** | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |

# SUMMARY NOTES TO FINANCIAL RECONCILIATION

Financial Data presented in the Descriptive Memorandum ("DM") was prepared to reflect the results of operations and financial condition of the Yue Sai Kan and Ma Promesse brands in China. Current legal entity results of Yue Sai Kan Cosmetics (Shenzhen) Co., Ltd. and Yue Sai Kan Coty Cosmetics (Shanghai) Ltd. include additional brand operations not included in the subject transaction. Certain adjustments were made to the reported results of these legal entities to arrive at the information presented in the DM.

Subsequent to preparation of the DM, certain additional adjustments were identified which affect both the reported earnings before interest and taxes ("EBIT") and earnings before interest, taxes, depreciation and amortization ("EBITDA"). The schedules included in this folder summarize the adjustments made to reported legal entity results to arrive at the DM as presented, as well as adjustments necessary to obtain the actual results for the businesses being sold.

## Description of legal entities consolidated:

**082LC:** Lancaster China (Shenzhen): includes results of sales to third parties for the Lancaster Division. In FY01 through FY03, this included the results of operations for the Yue-Sai and Ma Promesse branded products (except for in FY03, certain overhead costs related to Ma Promesse were reported in 082CC). Beginning in FY04, Ma Promesse branded products included in reporting entity 082CC in their entirety.

**082CC:** includes the results of sales to third parties for the Coty China Division. In FY01 through FY03, this included the results of operations for the Adidas and Rimmel branded products (except for in FY03, certain overhead costs related to Ma Promesse were reported in 082CC). Beginning in FY04, Ma Promesse branded products are also included in this reporting entity in their entirety. This entity is not included in the consolidated results for the DM or actual combined results.

**082MS:** Manufacturing Shenzhen: includes results of operations for the plant operations in Shenzhen (very limited production includes production of Yue-Sai and Ma Promesse only).

**061:** Manufacturing Shanghai: includes results of operations for the plant operations in Shanghai (includes production of Yue-Sai, Ma Promesse, Rimmel and Adidas).
- **061MM:** manufacturing results
- **061LD:** technical brand development
- **061MD:** technical support (R&D)

**Note: Financial statements as per reporting system can be found in A.1.12-14 and A.1.18-20**

# Reconciliation of FY03 to DM and actual results

| $ thousands | 002LC | 082MS | 061 | Consolidated | 1 | 2 | 3 | 4 | 5 | 6 | 7 | As per DM FY03 | 8 | 9 | 10 | Actual results FY03 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross sales | $48,361 | $0 | $0 | $48,361 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $48,361 | $0 | $0 | $0 | $48,361 |
| Intercompany sales | $0 | $11,371 | $3,280 | $14,651 | $0 | $0 | $0 | $0 | $0 | ($11,371) | ($3,280) | $0 | $0 | $0 | $0 | $0 |
| Returns | $749 | $0 | $0 | $749 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $749 | $0 | $0 | $0 | $749 |
| Discounts/allowances | $1,327 | $0 | $0 | $1,327 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,227 | $0 | $0 | $0 | $1,327 |
| Direct trade spending | $0 | $0 | $0 | $0 | ($107) | $0 | $0 | $0 | $0 | $0 | $0 | $107 | $0 | $0 | $0 | $108 |
| Net sales | $46,285 | $11,371 | $3,280 | $60,936 | ($107) | $0 | ($50) | $0 | $0 | ($11,371) | ($3,280) | $46,178 | ($50) | $0 | ($50) | $46,177 |
| COGS | $13,294 | $10,193 | $4,113 | $27,599 | $0 | ($488) | $0 | $1,047 | $0 | ($10,191) | ($4,113) | $12,806 | ($1,179) | $833 | $0 | $12,198 |
| Inventory obsolescence | $0 | $0 | $0 | $0 | $0 | $468 | $0 | $0 | $0 | $0 | $0 | $488 | $0 | $0 | $0 | $488 |
| Royalties | $0 | $0 | $0 | $0 | $0 | $0 | $1,846 | $0 | $0 | $0 | $0 | $1,846 | $0 | $0 | $0 | $1,846 |
| Gross profit | $32,991 | $1,179 | ($833) | $33,337 | ($107) | $0 | ($1,846) | ($1,804) | $0 | ($1,179) | $0 | $31,037 | $1,179 | ($833) | $0 | $31,645 |
| *% margin* | *54.7%* | | | *54.7%* | | | | | | | | *67.2%* | | | | *68.5%* |
| Total media | $4,920 | $0 | $0 | $4,920 | $0 | $0 | $0 | $1,047 | $0 | $0 | $0 | $5,967 | $0 | $0 | $0 | $5,967 |
| Consumer promotions | $2,484 | $0 | $0 | $2,484 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $2,484 | $0 | $0 | $0 | $2,484 |
| Other trade spending | $3,489 | $0 | $0 | $3,489 | ($107) | $0 | $0 | $0 | $0 | $0 | $0 | $3,382 | $0 | $0 | $0 | $3,382 |
| Other advertising & consumer promotion | $3,315 | $0 | $0 | $3,315 | $0 | $0 | $0 | $757 | $0 | $0 | $0 | $4,072 | $0 | $0 | $0 | $4,072 |
| Total A&CP | $14,208 | $0 | $0 | $14,208 | ($107) | $0 | $0 | $1,804 | $0 | $0 | $0 | $15,905 | $0 | $0 | $0 | $15,905 |
| *$ net sales* | *22.2%* | | | *22.2%* | | | | | | | | *34.4%* | | | | *34.4%* |
| Product contribution | $18,783 | $1,179 | ($833) | $19,129 | $0 | $0 | ($1,846) | ($1,804) | $0 | ($1,179) | $0 | $15,132 | $1,179 | ($833) | $0 | $15,740 |
| *$ net sales* | *31.4%* | | | *31.4%* | | | | | | | | *32.8%* | | | | *34.1%* |
| SG&A includes other per reporting | $9,757 | $0 | $339 | $10,096 | $0 | $0 | $0 | $0 | $794 | $0 | $0 | $10,890 | $0 | $0 | $0 | $10,890 |
| Other expense / (income) | $12 | $0 | $313 | ($301) | $0 | $0 | $0 | $0 | $0 | $0 | $313 | $12 | $0 | ($5,241) | $0 | ($5,229) |
| Know-how license expense | $4,628 | $0 | $0 | $4,628 | $0 | $0 | ($4,628) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| EBT | $4,386 | $1,179 | ($859) | $4,706 | $0 | $0 | $0 | ($1,804) | ($5,794) | ($51,179) | $520 | $4,230 | $1,179 | ($5,592) | $262 | $5,079 |
| *% margin* | *7.7%* | | | *7.7%* | | | | | | | | *9.2%* | | | | *11.0%* |
| Depreciation expense | $1,646 | $1,183 | $235 | $3,064 | $0 | $0 | $0 | $0 | $0 | ($51,183) | $235 | $1,646 | $1,183 | $235 | $0 | $3,064 |
| EBITDA | $6,032 | $2,362 | ($624) | $7,770 | $0 | $0 | ($1,804) | ($1,804) | ($5,794) | ($52,362) | $285 | $5,876 | $2,362 | ($357) | $262 | $8,143 |
| *% margin* | *12.8%* | | | *12.8%* | | | | | | | | *12.7%* | | | | *17.6%* |

## Description of adjustments:

1. Reclassification of trade spending from A&CP to net sales (line as required by EITF No. 00-25 and 00-14)
2. Reclassification of inventory obsolescence expense out of COGS
3. Third Party Royalty Expense added to COGS (4% of sales); Know-How license expense (the internal change from COTY Inc) removed from the P&L
4. Central marketing costs incurred in Paris were charged in other consumer promotion and in total media
5. Addition of allocation of sales and marketing ($527) and administrative expense ($267) for Ma Promesse
6. Results of operations for 082MS were mistakenly excluded from DM results
7. Results of operations for 06ILD and 06IHW were mistakenly excluded from DM results; includes results from 06IHD, technical brand development (local R&D expenses) of $139
8. Included results of operations for 082MS including depreciation; affects consolidated COGS
9. Included results of operations for 061 including depreciation (Excluding 06IHD 'Tech. Brand Develop' previously included in the DM - adj 7); affects consolidated COGS and adjusts other income/expense line for intercompany items
10. Of the COGS recorded in 06IHW (adjustment number 9), $262 relates to the Adidas and Rimmel brands and therefore eliminated from COGS

# Reconciliation of FY02 to DM and actual results

| $ thousands | 082LC | 082MS | 061 | Consolidated | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | As per DM FY02 | 9 | 10 | Actual results FY02 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross sales | $46,471 | $0 | $0 | $46,471 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $46,471 | $0 | $0 | $46,471 |
| Intercompany sales | $0 | $11,157 | $3,280 | $14,437 | $0 | $0 | $0 | $0 | $0 | $0 | ($3,280) | ($11,157) | $0 | $0 | $0 | $0 |
| Returns | $898 | $0 | $0 | $898 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $898 | $0 | $0 | $898 |
| Discounts/allowances | $1,150 | $0 | $0 | $1,150 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,150 | $0 | $0 | $1,150 |
| Direct trade spending | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net sales | $44,423 | $11,157 | $3,280 | $58,860 | $0 | $0 | $0 | $0 | $0 | $0 | ($3,280) | ($11,157) | $44,423 | $0 | $0 | $44,423 |
| COGS | $12,433 | $10,004 | $3,949 | $26,386 | $0 | $0 | $0 | $0 | $0 | $0 | ($3,949) | ($10,004) | $12,433 | ($484) | ($200) | $11,749 |
| Inventory obsolescence | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Royalties | $0 | $0 | $0 | $0 | $0 | $0 | $1,815 | $0 | $0 | $0 | $0 | $0 | $1,815 | $0 | $0 | $1,815 |
| Gross profit | $31,990 | $11,153 | ($669) | $32,474 | $0 | $0 | ($1,815) | $0 | $0 | $0 | $669 | ($1,153) | $30,175 | $484 | $200 | $30,859 |
| % margin | | | | 55.2% | | | | | | | | | 67.9% | | | 69.5% |
| Total media | $6,553 | $0 | $0 | $6,553 | $0 | $0 | $0 | $1,437 | $0 | $0 | $0 | $0 | $7,990 | $0 | $0 | $7,990 |
| Consumer promotions | $2,199 | $0 | $0 | $2,199 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $2,199 | $0 | $0 | $2,199 |
| Other trade spending | $3,823 | $0 | $0 | $3,823 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $3,823 | $0 | $0 | $3,823 |
| Other advertising & consumer promotion | $2,545 | $0 | $0 | $2,545 | $0 | $0 | $0 | $132 | $0 | $0 | $0 | $0 | $2,677 | $0 | $0 | $2,677 |
| Total A&CP | $15,120 | $0 | $0 | $15,120 | $0 | $0 | $0 | $1,569 | $0 | $0 | $0 | $0 | $16,689 | $0 | $0 | $16,689 |
| % net sales | | | | 25.7% | | | | | | | | | 37.6% | | | 37.6% |
| Product contribution | $16,870 | $11,153 | ($669) | $17,354 | $0 | $0 | ($1,815) | ($1,569) | $0 | $0 | $669 | ($1,153) | $13,486 | $484 | $200 | $14,170 |
| % margin | | | | 29.5% | | | | | | | | | 30.4% | | | 31.9% |
| SG&A | $10,708 | $0 | $710 | $11,418 | $0 | $0 | $0 | $0 | $0 | $0 | ($349) | $0 | $11,069 | $0 | $0 | $11,069 |
| Other expense / (income) | ($213) | $0 | ($296) | ($509) | $0 | $0 | $0 | $0 | $0 | $0 | $296 | $0 | ($213) | ($241) | $0 | ($454) |
| Know-how license expense | $4,442 | $0 | $0 | $4,442 | $0 | $0 | ($4,442) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| EBIT | $1,933 | $1,153 | ($1,083) | $2,003 | $0 | $0 | $2,627 | ($1,569) | $0 | $0 | $722 | ($1,153) | $2,630 | $725 | $200 | $3,555 |
| % margin | | | | 3.4% | | | | | | | | | 5.9% | | | 8.0% |
| Depreciation expense | $1,261 | $1,212 | $274 | $2,747 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,261 | $1,486 | $0 | $2,747 |
| EBITDA | $3,194 | $2,365 | ($809) | $4,750 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $3,891 | $2,211 | $200 | $6,302 |
| % margin | | | | 8.1% | | | | | | | | | 8.8% | | | 14.2% |

### Description of adjustments:

1. Reclassification of trade spending from A&CP to net sales line as required by EITF No. 00-25 and 00-14
2. Reclassification of inventory obsolescence expense out of COGS
3. Third Party Royalty Expense added to COGS (4% of sales); Know How license expense (the internal charge from COTY Inc. removed from the P&L
4. Central marketing costs incurred in Paris were charged in other consumer promotion and total media
5. Note : AA Promesse financial results already included in their reporting entities; no adjustment necessary in FY02
6. Results of operations for 082MS were mistakenly excluded from DM results
7. Results of operations for 061LD and 061MW were mistakenly excluded from DM results; includes results from 061MD, technical brand development (local R&D expense) of $361
8. Included results of operations for 082MS including depreciation; affects consolidated COGS
9. Included results of operations for 061 including depreciation (excluding 061MD Tech. Brand Develop' previously included in the DM - adj 7); affects consolidated COGS and adjusts other income/expense line for intercompany items
10. Of the COGS recorded in 061MW (adjustment number 9), $200 relates to the Adidas and Rimmel brands and therefore eliminated from COGS

# Reconciliation of FY01 to DM and actual results

| $ thousands | 082LC | 082MS | 061 | Consolidated | Adjustments 1 | 2 | 3 | 4 | 5 | 6 | 7 | As per DM FY01 | Adjustments 8 | 9 | 10 | Actual results FY01 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross sales | $39,384 | $0 | $0 | $39,384 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $39,384 | $0 | $0 | $0 | $39,384 |
| Intercompany sales | $0 | $9,324 | $2,504 | $11,828 | $0 | $0 | $0 | $0 | $0 | ($9,324) | ($2,504) | $0 | $0 | $0 | $0 | $0 |
| Returns | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Discounts/allowances | $523 | $0 | $0 | $523 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $523 | $0 | $0 | $0 | $523 |
| Direct trade spending | $0 | $0 | $0 | $0 | $281 | $0 | $0 | $0 | $0 | $0 | $0 | $281 | $0 | $0 | $0 | $282 |
| Net sales | $38,861 | $9,324 | $2,504 | $50,689 | ($281) | $0 | $0 | $0 | $0 | ($9,324) | ($2,504) | $38,580 | $0 | $0 | $0 | $38,579 |
| COGS | $11,495 | $8,619 | $3,422 | $23,536 | $0 | ($300) | $0 | $0 | $0 | ($8,619) | ($3,422) | $11,195 | ($705) | $918 | ($223) | $11,185 |
| Inventory obsolescence | $0 | $0 | $0 | $0 | $0 | $300 | $0 | $0 | $0 | $0 | $0 | $300 | $0 | $0 | $0 | $300 |
| Royalties | $0 | $0 | $0 | $0 | $0 | $0 | $1,593 | $0 | $0 | $0 | $0 | $1,593 | $0 | $0 | $0 | $1,593 |
| Gross profit | $27,366 | $705 | ($918) | $27,153 | ($281) | $0 | ($1,593) | $0 | $0 | ($705) | $918 | $25,491 | $705 | ($918) | $223 | $25,501 |
| *% margin* | | | | *53.6%* | | | | | | | | *66.1%* | | | | *66.1%* |
| Total media | $4,161 | $0 | $0 | $4,161 | $0 | $0 | $0 | $1,429 | $0 | $0 | $0 | $5,590 | $0 | $0 | $0 | $5,590 |
| Consumer promotions | $4,151 | $0 | $0 | $4,151 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $4,151 | $0 | $0 | $0 | $4,151 |
| Other trade spending | $3,331 | $0 | $0 | $3,331 | ($281) | $0 | $0 | $0 | $0 | $0 | $0 | $3,050 | $0 | $0 | $0 | $3,050 |
| Other advertising & consumer promotion | $1,328 | $0 | $0 | $1,328 | $0 | $0 | $0 | $74 | $0 | $0 | $0 | $1,402 | $0 | $0 | $0 | $1,402 |
| Total A&CP | $12,971 | $0 | $0 | $12,971 | ($281) | $0 | $0 | $1,503 | $0 | $0 | $0 | $14,193 | $0 | $0 | $0 | $14,193 |
| *% net sales* | | | | *25.6%* | | | | | | | | *36.8%* | | | | *36.8%* |
| Product contribution | $14,395 | $705 | ($918) | $14,182 | $0 | $0 | ($1,593) | ($1,503) | $0 | ($705) | $918 | $11,298 | $705 | ($918) | $223 | $11,308 |
| *% margin* | | | | *28.0%* | | | | | | | | *29.3%* | | | | *29.3%* |
| SG&A | $10,243 | $0 | $437 | $10,680 | $0 | $0 | $0 | $0 | $0 | $0 | ($186) | $10,494 | $0 | $0 | $0 | $10,494 |
| Other expense / (income) | $88 | $0 | ($522) | ($434) | $0 | $0 | $0 | $0 | $0 | $0 | $522 | $88 | $0 | ($241) | $0 | ($153) |
| Know-how license expense | $3,886 | $0 | $0 | $3,886 | $0 | $0 | ($3,886) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| EBIT | $178 | $705 | ($833) | $50 | $0 | $0 | $2,293 | ($1,503) | $0 | ($705) | $582 | $716 | $705 | ($677) | $223 | $967 |
| *% margin* | | | | *0.1%* | | | | | | | | *1.7%* | | | | *2.5%* |
| Depreciation expense | $873 | $1,151 | $241 | $2,265 | $0 | $0 | $0 | $0 | $0 | ($1,151) | ($241) | $873 | $1,151 | $241 | $0 | $2,265 |
| EBITDA | $1,051 | $1,856 | ($592) | $2,315 | $0 | $0 | $2,293 | ($1,503) | $0 | ($1,856) | $341 | $1,589 | $1,856 | ($436) | $223 | $3,232 |
| *% margin* | | | | *4.6%* | | | | | | | | *4.1%* | | | | *8.4%* |

**Description of adjustments:**

1. Reclassification of trade spending from A&CP to net sales line as required by EITF No. 00-25 and 00-14
2. Reclassification of inventory obsolescence expense out of COGS
3. Third Party Royalty Expense added to COGS (4% of sales); Know-how license expense (the internal change from COTY Inc. removed from the P&L
4. Central marketing costs incurred in Paris were charged in other consumer promotion and total media
5. Note: Ma Promesse financial results already included in these reporting entities; no adjustment necessary in FY02
6. Results of operations for 082MS were mistakenly excluded from DM results
7. Results of operations for 061LD and 061MW were mistakenly excluded from DM results; includes results from 061MD, technical brand development (local R&D expense) of $151
8. Included results of operations for 082MS including depreciation; affects consolidated COGS
9. Included results of operations for 061 including depreciation (Excluding 061MD 'Tech. Brand Develop' previously included in the DM - adj 7); affects consolidated COGS and adjusts other income/expense line for intercompany items
10. Of the COGS recorded in 061MM (adjustment number 9), $223 relates to the Adidas and Rimmel brands and therefore eliminated from COGS