# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

In the Matter of Arbitration Between

COTY, INC.,

                          Petitioner,

                                          05 CV 3845 (KMW)

        -against-                         ORDER

L'ORÉAL S.A.,

                          Respondent.
---------------------------------x

WOOD, U.S.D.J.:


## I. Overview

     Petitioner, Coty, Inc., and respondent, L'Oréal S.A.,
entered into an agreement pursuant to which respondent would
purchase certain companies from petitioner.  The parties agreed
to a purchase price – based on an opening balance sheet and
related financial statements provided by petitioner – subject to
a post-closing purchase price adjustment, based on a closing
financial statement also provided by petitioner.  Respondent
objected to certain aspects of this closing statement and
resulting adjustments; the parties were unable to resolve their
disputes and therefore submitted them, pursuant to their

1

agreement, to an arbitrator. The arbitrator found in favor of respondent. Petitioner petitions this Court to vacate or modify the arbitral award insofar as it addresses how the sum of RMB 44,810,000 (or $5.4 million), which was reflected as an "intercompany payable" in the opening balance sheet, should be treated in determining the post-closing purchase price adjustment; petitioner claims that in deciding this issue, the arbitrator exceeded the scope of its authority by effectively changing the accounting of the opening balance sheet. Respondent cross-petitions this Court to confirm the arbitral award. For the reasons set forth below, petitioner's petition to modify or vacate the arbitration award is granted, and respondent's cross-petition to confirm the arbitration award is denied.

## II. Background[1]

On January 23, 2004, petitioner Coty, Inc., and respondent L'Oréal S.A. executed a Master Assignment and Transfer Agreement (the "Master Agreement," attached as Exhibit A to the Declaration

---

[1] The following recitation of facts is based on the statements of facts in Petitioner's Memorandum of Law in Support of the Motion of Petitioner Coty Inc. to Modify or Vacate an Arbitration Award ("Pet.'s Memo.") and Respondent L'Oréal S.A.'s Memorandum of Law in Opposition to Petitioner's Motion to Modify or Vacate an Arbitration Award and in Support of Cross-Petition for an Order Confirming the Award ("Resp.'s Memo."). Unless otherwise noted, the facts are undisputed.

of Michael Fishoff, dated April 14, 2005 ("Fishoff Decl."), and the Declaration of Yann Jaffré, dated May 25, 2005 ("Jaffré Decl.")), pursuant to which petitioner agreed to sell to respondent, and respondent agreed to purchase, two of Petitioner's wholly-owned Chinese subsidiaries, Yue-Sai Kan Cosmetics (Shenzhen) Ltd. ("YSK Shenzhen") and Yue-Sai Kan-Coty Cosmetics (Shanghai) Ltd. ("YSK Shanghai") (collectively, the "YSK Companies"). The Master Agreement provided for a purchase price of $250,000,000, subject to a post-closing purchase price adjustment to be based on the difference between the consolidated net worth of the YSK Companies shown in a Consolidated China Balance Sheet, dated June 30, 2003, prepared by Petitioner (the "June 20, 2003 Balance Sheet," attached as Exhibit B to the Fishoff Decl.) and the closing net worth of the companies as reflected in a Closing Statement of Consolidated Net Worth ("Closing Statement"), to be prepared by petitioner within sixty days after closing. Master Agreement §§ 1.01(b), 1.05. The June 30, 2003 Balance Sheet provided by Petitioner was annexed as Schedule 2.07 to the Master Agreement, along with an adjusted consolidated income statement of the YSK Companies for the fiscal years ended June 30, 2003, 2002, and 2001; the Master Agreement refers to the June 30, 2003 Balance Sheet and the consolidated income statement collectively as the "Financial Statements." The

3

June 30, 2003 Balance Sheet was unaudited, but Petitioner represented and warranted that it had been prepared in accordance with United States Generally Accepted Accounting Principles ("US GAAP").[2]  Master Agreement § 2.07(a).  According to the Master Agreement, the Closing Statement was also to be "calculated in accordance with U.S. GAAP (and also in a manner consistent with [Coty's] past practices)."  Master Agreement § 1.05(a).

The Master Agreement further provided that respondent had to notify petitioner of any objections to the Closing Statement within 45 days of its receipt, and that any objections could be based only on: "(A) mathematical errors in the computation of the Closing Net Worth or (B) the Closing Net Worth not having been calculated in accordance with US GAAP (and also in a manner consistent with [Coty's] past practices and the preparation of the Financial Statements)."  Master Agreement § 1.05(b)(i).  The parties further

> acknowledge[d] that (1) the sole purpose of the determination of the Closing Net Worth is to adjust the Purchase Price so as to reflect the difference between the consolidated net worth of the Companies as of June 30, 2003 and the consolidated net worth of the Companies as of the Closing Date and (2) such difference can be measured only if the calculation is done using the same accounting principles, practices, methodologies, and

---

[2] Petitioner made a similar representation as to the consolidated income statement.

4

> policies used in the preparation of the
> Financial Statements.

Master Agreement § 1.05(b)(i).

The June 2003 Balance Sheet contained an "intercompany payable" owed by YSK Shenzhen to petitioner, in the amount of RMB 44,810,000.  The background to this intercompany payable is as follows: In 1998, petitioner directed YSK Shenzhen to create a reserve for a possible Chinese consumption tax that might be imposed on the company.  Between 1998 and 2001, this reserve grew to RMB 44,810,000 (about $5,400,000).  In April 2003, however, petitioner decided to eliminate that tax reserve because petitioner believed that it was now unlikely that such a tax would be imposed; instead, petitioner included the amount of the accrued tax reserve as an intercompany payable from YSK Shenzhen to petitioner in the June 30, 2003 Balance Sheet.  Petitioner states that this elimination of the tax reserve and the establishment, instead, of an intercompany payable from YSK Shenzhen to Coty in that amount was also in keeping with petitioner's obligation to indemnify the purchaser of the YSK Companies for any possible tax liability, under Section 8.03(a) of the Master Agreement.

In April 2004, petitioner decided to reverse the intercompany payable into income on the Closing Statement because, according to petitioner, petitioner would then realize

5

the value of the intercompany payable through the post-closing purchase price adjustment provided for in the Master Agreement.[3] Thus, the Closing Statement reflected an elimination of the intercompany payable and an increase of RMB 44,810,000 in the total stockholders' equity of YSK Shenzhen – resulting in an increase, in that amount, in the net worth of the YSK Companies, and therefore a positive purchase price adjustment of RMB 44,810,000 in petitioner's favor.

On May 12, 2004, the closing took place; thereafter, petitioner delivered the Closing Statement to respondent.  On July 21, 2004, respondent sent petitioner a timely Notice of Objection (attached as Exhibit C to Jaffré Decl.); on August 25, 2004, respondent sent petitioner an Amendment and Completion of Notice of Objection (attached as Exhibit D to Jaffré Decl.). Respondent objected to, <u>inter alia</u>, the elimination in the Closing Statement of the RMB 44,810,000 intercompany payable. Respondent argued that the intercompany payable in this amount, reflected in the June 30, 2003 Balance Sheet, had actually been an accrual for consumption tax corresponding to a reserve provided for in petitioner's consolidated statements prior to June 2003, and that the elimination of this accrual in the

---

[3] Petitioner informed respondent of its intent to reverse the income payable, but respondent maintains that it never agreed to it, although respondent did agree to certain other proposed adjustments.

6

Closing Statement was not justified by any changes in Chinese tax laws. <u>See</u> Amendment and Completion of Notice of Objection 2 (noting that "L'Oréal's position with respect to [the April 2004 reversal of the RMB 44.8 million] is as follows: In substance, the balance of RMB 44.8 million was not an inter-company payable to Coty Inc.  It is a provision on the tax exposure which must appear in the local book balance in compliance with the requirements of US GAAP. . . . Between June 30, 2003 and May 12, 2004, there have been no changes in regulations or any changes in YSK Shenzhen's tax status that would justify removal of the tax exposure.").  Respondent therefore contended that "[t]he reversal of the accrual in April 2004 changes 'past practice,'" in contravention of Section 1.05 of the Master Agreement, and "[t]he balance should be adjusted back to the Closing Statement of Consolidated Net Worth."  <u>Id.</u>  Respondent further stated that "[t]he tax indemnity in Section 8.03 of the Master Agreement should cover the pre-closing tax costs in excess of the amount established in the Closing Statement of Consolidated Net Worth" and "should not be the reason to remove the provision that has already been established in the balance sheet."  <u>Id.</u>

Because the parties were unable to resolve this dispute as to the Closing Statement, they submitted the issue to KPMG LLP

("KPMG") for arbitration,[4] pursuant to Section 1.05(b)(ii) of the Master Agreement, which provides in relevant part that:

> If Buyer and Seller are unable to resolve all [of the Buyer's] objections [as to the Closing Statement] within [a 30-day] period, the matters remaining in dispute shall be submitted to KPMG [(or another firm), referred to as the Independent Auditor]. . . . . The resolution of disputed items by the Independent Auditor shall be final and binding, and the determination of the Independent Auditor shall constitute an arbitral award that is final, binding and not subject to appeal and upon which a judgment may be entered by a court having jurisdiction with respect thereto.

In a letter dated November 10, 2004, addressed to both parties, KPMG confirmed that it would serve as the arbitrator "to resolve the disputed items detailed in the document attached to this letter," including the "Settlement of Intercompany payable to Coty Inc.," which respondent listed as a negative RMB 44.81 million in a Purchase Price Adjustment schedule prepared by both parties. See Letter from Ronald P. Forster, Partner, KPMG LLP, to Steven Danatos, Senior Vice President, Coty Inc., and Yann Jaffré, Director of Financial Structures, L'Oréal (Nov. 10, 2004) ("KPMG Engagement Letter") 1, and attached Purchase Price

---

[4] The parties' dispute, as submitted to KPMG, involved other issues beyond the one discussed here; however, petitioner is challenging the arbitral award only as it relates to the issue of the treatment of the RMB 44.81 million reflected as an intercompany payable in the June 30, 2003 Balance Sheet and eliminated in the Closing Statement.

Adjustment and Issues Between Coty Inc. and L'Oréal SA (attached together as Exhibit E to Jaffré Decl.).  Both parties accepted KPMG's understanding of the arbitration engagement.[5]

On January 20, 2005, KPMG issued its decision.  See Letter from Ronald P. Forster, Partner, KPMG LLP, to Steven Danatos, Senior Vice President, Coty Inc., and Yann Jaffré, Director of Financial Structures, L'Oréal (Jan. 20, 2005) ("KPMG Decision") (attached as Exhibit F to Jaffré Decl. and as Exhibit G to Fishoff Decl.).  KPMG stated that:

> L'Oréal and Coty each submitted to KPMG a
> definitive statement of its position with
> respect to each disputed issue, together with
> a proposed dollar amount which each party
> believes should be determined by KPMG with
> respect to the issue.  L'Oréal and Coty have
> agreed that issues which are ultimately
> resolved by KPMG can be decided by KPMG only
> upon the selection of one of the two proposed
> dollar amounts or an amount that falls within
> the range of proposed dollar amounts.

KPMG Decision 1.  KPMG then quoted Section 1.05(b)(i) of the Master Agreement, stating that it reviewed that provision "as part of [its] analysis."  Id.  Regarding the issue of the "settlement of intercompany payable," KPMG stated that "[t]he reserve amount of RMB 44.810M for Consumption Tax was first established for the fiscal year ending June 30, 1998" and that

---

[5] The copy of KPMG's Engagement Letter provided by respondent is signed only by petitioner, but it is undisputed that both parties accepted KPMG's engagement as described in the letter.

"[a]t June 30, 2003 (the contract balance sheet date), the books

of YSK included an Intercompany Payable to Coty in the amount of

RMB 44.810M." Id. at 3. After summarizing each party's

position, KPMG made the following determination:

> An amount was established as a tax provision
> or reserve for potential challenge by the
> Chinese tax authorities regarding the
> calculation and payment of Consumption Tax. .
> . .
> . . .
> Under Section 1.05(a) of the Master
> Agreement, ". . . the consolidated net worth
> of YSK Shenzhen and YSK Shanghai on the
> Closing Date calculated in accordance with US
> GAAP (and also in a manner consistent with
> Seller's past practice) as total assets minus
> total liabilities and provisions of the
> Companies as at such date". [sic]
> The RMB 44.810M was included as a "tax
> reserve" on YSK Shenzhen's book prior to June
> 30, 2003. There was no change in the
> Consumption Tax regulation between the
> periods June 30, 2003 through the Closing
> Date. In consideration of US GAAP and based
> on Coty's past practice, KPMG has determined
> that a Consumption Tax provision in the
> amount of RMB 44.810M should be included on
> the books. . . .
> KPMG noted that Section 8.03 of the Master
> Agreement provided that the Seller shall
> indemnify the Buyer Indemnified Parties from
> and against liabilities for Taxes of the
> Companies "calculated in accordance with the
> principles of Section 8.03(c) but only to the
> extent in excess of the amount reflected as a
> liability for Taxes on the Final Closing
> Statement of Consolidated Net Worth". Such
> tax indemnification article should not
> override the US GAAP principles in terms of
> determining whether the tax reserve should be
> accrued.

10

> Based on our understanding of US GAAP, it
> appears that there should have been a reserve
> for Consumption Tax at the Closing Date in
> the amount of RMB 44.810M.  The RMB 44.810M
> should be reflected as a tax reserve rather
> than an intercompany payable.  KPMG is
> unaware of the existence of any intercompany
> tax sharing agreement among group members in
> China covering the assessment and payment of
> the Consumption Tax liabilities.  Therefore,
> the Consumption Tax Liability is properly
> reflected as a direct liability to the
> Chinese tax authority.  According to Section
> 8.03 of the Master Agreement, if the Chinese
> tax authority assesses any tax liability
> associated with Consumption Tax, Coty shall
> be only responsible to indemnify for an
> amount in excess of the RMB 44.810M.

Id. at 4-5.  Based on this rationale, KPMG found that the Closing

Statement should include a subtraction in the amount of RMB

44,810,000.  Id. at 2.  After determining the other disputed

issues, KPMG concluded that the difference between YSK Companies'

consolidated net worth on June 30, 2003, and their consolidated

net worth at the closing date was a negative RMB 15,830,000,

i.e., $1,912,000, to be paid by petitioner to respondent.  Id. at

2.

On April 15, 2005, petitioner filed a petition with this

Court to modify or vacate the arbitration award, insofar as it

related to the treatment of the RMB 44,810,000 (or $5.4 million),

on the grounds that "[t]he arbitrator, KPMG, exceeded its

authority by issuing an award that effectively changed the

accounting of the *opening balance sheet* [i.e., the June 30, 2003

11

Balance Sheet], which was the inviolable baseline from which the purchase price adjustment was to [be] measured," when the arbitrator's "exclusive purview under the governing contract [i.e., the Master Agreement] was to decide only disputes about the treatment of the closing balance sheet [i.e., the Closing Statement]." Petitioner's Petition to Modify or Vacate an Arbitration Award ("Petition to Modify or Vacate") 1-2. On May 27, 2005, respondent filed a Cross-Petition for an Order to Confirm an Arbitration Award.

## III. Legal Standard

The Second Circuit "accord[s] a high degree of deference to an arbitrator's decision." 187 Concourse Assocs. v. Fishman, 399 F.3d 524, 526 (2d Cir. 2005) (per curiam). Thus, an "'arbitration award should be enforced, despite a court's disagreement with it on the merits, if there is a barely colorable justification for the outcome reached.'" Banco de Seguros del Estado v. Mutual Marine Office, Inc., 344 F.3d 255 (2d Cir. 2003)(quoting Landy Michaels Realty Corp. v. Local 32B-32J, Serv. Employees Int'l Union, AFL-CIO, 954 F.2d 794, 797 (2d Cir. 1992); further internal quotation marks omitted). "'[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a

court is convinced he committed serious error does not suffice to overturn his decision.'" Fishman, 399 F.3d at 526-27 (quoting and altering United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987)). "A party petitioning a federal court to vacate an arbitral award bears the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law." Duferco Intern. Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d 383, 388 (2d Cir. 2003).

Under Section 10 of the Federal Arbitration Act ("FAA"), however, a federal court may vacate an arbitration award "where the arbitrators exceeded their powers," 9 U.S.C. § 10(a)(4) - a provision that has generally been read very narrowly, Banco de Seguros del Estado, 344 F.3d at 262. In addition, under Section 11, a court may modify the award "[w]here the arbitrators have awarded upon a matter not submitted to them," 9 U.S.C. § 11(b). When a party to the arbitration moves for vacatur of the arbitral award, a federal court's "inquiry 'focuses on whether the arbitrators had the power based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue.'" Banco de Seguros del Estado, 344 F.3d at 262 (quoting Westerbeke Corp., 304 F.3d

at 220; further internal citation omitted).[6]  Thus, a court "must
determine 'whether the arbitrator[s] acted within the scope of
[their] authority,' or whether the arbitral award is merely the
'arbitrator[s'] own brand of justice.'"  Id. (quoting and
altering Local 1199 v. Brooks Drug Co., 956 F.2d 22, 25 (2d Cir.
1992)).  "The determination of the scope of arbitration is
ordinarily one for the Court to make," unless the parties submit
that question itself to the arbitrator.  Katz v. Feinberg, 167 F.

---

[6] Respondent states that "the Second Circuit has held that if an
arbitrator offers even a barely colorable justification for the
decision, the Court will not vacate the award on the basis that
the arbitrator exceeded his authority by misinterpreting the
parties' contract."  Resp. Memo 13.  The case cited by
respondent, Agarwal v. Agrawal, 775 F. Supp. 558 (E.D.N.Y.
1191), itself cites, in relevant part, United States Steel v.
Dickinson, 753 F.2d 250 (2d Cir. 1985).  But later decisions
indicate that although an "arbitration award must be upheld when
the arbitrator offers even a barely colorable justification for
the outcome reached," Fishman, 399 F.3d at 526 (quoting Wackenhut
Corp. v. Amalgamated Local 515, 126 F.3d 29, 31-32 (2d Cir. 1997)
(further internal quotation marks and brackets omitted), a court
may vacate an arbitral award if the arbitrator exceeded the scope
of his authority, Fishman, 399 F.3d at 527.  Indeed, in the case
in which the latter language originally appeared, In the Matter
of Andros Compania Maritima, S.A., Marc Rich & Co., A.G., 579
F.2d 691, 704 (2d Cir. 1978), and which is consistently quoted in
subsequent cases, "the arbitrators' authority to decide the
question presented to them [was] not disputed," id. at 703; the
Court of Appeals concluded that "[w]hen arbitrators explain their
conclusions . . . in terms that offer even a barely colorable
justification for the outcome reached, confirmation of the award
cannot be prevented by litigants who merely argue, however
persuasively, for a different result," id. at 704.  Here,
petitioner does not merely argue for a different result, and the
Court does not examine the merits of the arbitrator's decision.

Supp. 2d 556, 563-64 (S.D.N.Y. 2001), aff'd, 290 F.3d 95 (2d Cir.

2002).  "The scope of authority of arbitrators generally depends

on the intention of the parties to an arbitration, and is

determined by the agreement or submission." Brooks Drug Co., 956

F.2d at 25 (internal quotation marks and brackets omitted);

accord Fishman, 399 F.3d at 527.


**IV. Analysis**

    A. Scope of Arbitrator's Authority as Provided in Master

Agreement

    As KPMG recognized, the scope of the arbitrator's authority

is defined in this case by Section 1.05 of the Master Agreement.

Under Section 1.05, KPMG was allowed to resolve objections by the

respondent based only on: "(A) mathematical errors in the

computation of the Closing Net Worth or (B) the Closing Net Worth

not having been calculated in accordance with US GAAP (and also

in a manner consistent with [Coty's] past practices and the

preparation of the Financial Statements)."  Master Agreement §

1.05(b)(i).  Furthermore, KPMG was constrained by the parties'

"acknowledge[ment]" that "the difference between the consolidated

net worth of the Companies as of June 30, 2003 and the

consolidated net worth of the Companies as of the Closing Date .

. . can be measured only if the calculation is done using the

15

same accounting principles, practices, methodologies, and policies used in the preparation of the Financial Statements [i.e., the June 30, 2003 Balance Sheet and the adjusted consolidated income statement of the YSK Companies for the fiscal years ended June 30, 2003, 2002, and 2001]." Id. Thus, under the Master Agreement, KPMG's arbitration authority did not allow it to question the June 30, 2003 Balance Sheet itself, but rather established that Balance Sheet as an unalterable starting point for the calculation of any subsequent changes in the net worth of the YSK companies. Indeed, respondent does not claim that KPMG could, within the scope of its arbitration authority, in any way alter the June 30, 2003 Balance Sheet.

In resolving the parties' dispute as to the "intercompany payable," KPMG was primarily guided by Section 1.05(a) of the Master Agreement, stating that the Closing Statement would represent "the consolidated net worth of YSK Shenzhen and YSK Shanghai on the Closing Date calculated in accordance with US GAAP (and also in a manner consistent with Seller's past practice) as total assets minus total liabilities and provisions of the Companies as at such date." Master Agreement § 1.05(a), quoted in KPMG Decision 4-5. Thus, KPMG concluded that, in order to be consistent with US GAAP and petitioner's "past practice" prior to June 30, 2003, "there should have been a reserve for

16

Consumption Tax at the Closing Date in the amount of RMB 44.810M." KPMG Decision 5.

But KPMG seems to have failed to take into account the facts that, under Section 1.05(b)(i) of the Master Agreement, it could resolve objections based only on "the Closing Net Worth not having been calculated in accordance with US GAAP (and also in a manner consistent with [Coty's] past practices <u>and the preparation of the Financial Statements</u>)," and that it was further limited by the parties' "acknowledge[ment]" that the calculation of the purchase price adjustment had to "us[e] the same accounting principles, practices, methodologies, and policies used in the preparation of the Financial Statements." Master Agreement § 1.05(b)(i) (emphasis added). Indeed, KPMG did not specifically address the fact that the June 30, 2003 Balance Sheet itself included the RMB 44,810,000 as an "intercompany payable" rather than as a tax reserve. Furthermore, although KPMG's determination focused on what should be reflected in the Closing Statement – and did not explicitly state that the June 30, 2003 Balance Sheet should be changed – KPMG's finding that "[t]he RMB 44.810M should be reflected as a tax reserve rather than an intercompany payable" implicitly rejected this aspect of

17

the June 30, 2003 Balance Sheet.[7]  Thus, although KPMG did abide

by the scope of its authority as stated in <u>part</u> of Section 1.05 –

insofar as it determined whether or not the Closing Statement, in

its treatment of the RMB 44,810,000, was consistent with US GAAP

and petitioner's past practice – it went beyond the <u>further</u>

restriction stated in that Section concerning calculating the

---

[7] In a similar case, <u>In the Matter of Arbitration Between Melun
Inds. Inc. v. Strange</u>, 898 F. Supp. 990 (S.D.N.Y. 1990), the
arbitrator's role, according to the arbitration clause in the
agreement between the buyer and seller of all of the shares of a
company, "did not relate to the Original Book Value as of August
31, 1986" – which provided the basis of the purchase price, set
at 80% of the Original Book Value – "but related solely to a
Post-Closing Adjustment, made to bring the accounts up to date to
reflect the company's operations from August 31, 1986 to the
Closing Date." <u>Id.</u> at 993.  Thus, the Court concluded that, to
the extent that the adjustment awarded by the arbitrator
"involved assertions that would also have impugned the August 31
balance sheet," <u>id.</u> at 994, it was "outside the arbitrator's
powers and represented a fundamental alteration of the Agreement
between the parties," <u>id.</u>  Here, although KPMG did not state that
the June 30, 2003 Balance Sheet itself should be changed, its
recommended adjustment as to the RMB 44,810,000 similarly
involved an assertion – that it "should be reflected as a tax
reserve rather than an intercompany payable" – that would also
have impugned the June 30, 2003 Balance Sheet.
    The respondent's argument that <u>Melun Industries</u> is
distinguishable or even supports respondent's position is
unpersuasive.  Although, in <u>Melun</u>, the agreement between the
parties provided that the buyer could reject the August 31, 1986
statement's of the Original Book Value , whereas the Agreement
involved here did not provide such a safeguard, respondent was
still bound by the terms of the Agreement.  As in <u>Melun
Industries</u>, "[w]hile [respondent] conceivably may have valid
claims about the inaccuracy of the [opening balance sheet]
figures and the accounting practices underlying those figures,
the arbitration agreement did not cover that dispute." <u>Id.</u> at
994.

purchase price adjustment based on "the same accounting principles, practices, methodologies, and policies used in the preparation of the Financial Statements," Master Agreement § 1.05(b)(i).[8]

KPMG's approach can perhaps be explained by the fact that Section 1.05 of the Master Agreement carries the potential for an inherent internal tension.  The provision seems to assume that petitioner's June 30, 2003 Balance Sheet (as well as the consolidated income statement of the YSK Companies for the fiscal years ended June 30, 2003, 2002, and 2001) is itself consistent with petitioner's "past practice" and US GAAP, but KPMG's findings imply that the June 30, 2003 Balance Sheet was not consistent with petitioner's practice of including the RMB 44,810,000 as a "tax reserve" on YSK Shenzhen's books prior to June 30, 2003, or with US GAAP.  But, when addressing the parties' dispute regarding the RMB 44,810,000 which was included as an "intercompany payable" in the June 30, 2003 Balance Sheet,

---

[8] Respondent argues that "KPM[G] as arbitrator was not in any way locked in by the June 2003 Balance Sheet in making its determination as to what US GAAP would dictate in respect of the Closing Statement."  Resp.'s Memo. 19.  But KPMG was "locked in," in calculating the purchase price adjustment, by "the same accounting principles, practices, methodologies, and policies used in the preparation of the Financial Statements," Master Agreement § 1.05(b)(i), including the June 30, 2003 Balance Sheet.

KPMG appears to have simply ignored the provision in Section 1.05(b)(i) requiring the purchase price adjustment calculation to be based on "the same accounting principles, practices, methodologies, and policies used in the preparation of the Financial Statements," Master Agreement § 1.05(b)(i). In doing so, it overstepped the boundaries of its arbitration authority.[9]

Respondent argues that, "[w]hile [petitioner] attempts to make much of the fact that KPMG concluded, as a matter of US GAAP, that the Closing Statement should have shown the subtraction as a tax reserve, as opposed to being part of an intercompany payable (as it was carried in June 2003), this is a distinction without substance that misses and attempts to mask the fundamental point . . . . *that there had to be a subtraction in the Closing Statement*." Resp.'s Memo. 16 (emphasis in original). Respondent contends that, even if KPMG had treated the RMB 44,810,000 as an intercompany payable, "the *calculation* would have been the same," resulting in the same subtraction in

_____

[9] It is undisputed that the issue here is whether or not KPMG went beyond the scope of its authority, not whether it correctly calculated the adjustment. In going beyond the restrictions concerning <u>how</u> a post-closing adjustment could be calculated, and reaching a conclusion that impugned the opening statement on which the original purchase price was based, KPMG overstepped the scope of its arbitration authority. However, the Court expresses no opinion as to – and the parties do not address – the merits of KPMG's findings.

the Closing Statement and therefore the same post-closing purchase price adjustment in respondent's favor. Id. at 17.[10] But the reasons given by KPMG for its determination focused entirely on treating the RMB 44,810,000 as a tax reserve; indeed, KPMG found that that amount should be subtracted from the Closing Statement because: 1) "There was no change in the Consumption Tax regulation between the periods June 30, 2003 through the Closing Date"; 2) Section 8.03 of the Master Agreement concerning "tax indemnification . . . should not override the US GAAP principles in terms of determining whether the tax reserve should be accrued"; and 3) "the Consumption Tax Liability is properly reflected as a direct liability to the Chinese tax authority" because "KPMG is unaware of the existence of any intercompany tax sharing agreement among group members in China covering the assessment and payment of the Consumption Tax liabilities." KPMG Decision 5. Thus, KPMG's determination that the RMB 44,810,000

---

[10] Respondent also argues that, "assuming arguendo the June 2003 44.81 million RMD subtraction accrual was properly characterized as an intercompany payable . . . the supposed intercompany payable would then have had to have been a debt which had to be paid," but "Coty made no such payment as the logic of the June 2003 Balance Sheet and the dictates of the Master Agreement would have required." Resp.'s Memo. 21 (emphasis in original); see also id. at 7 n.3. (arguing that "Coty's unilateral election simply to reverse the intercompany payable, wihtout any offsetting adjustment, stands in marked contrast to the normal situation where payables, if valid, are actually paid.").

should be treated as a tax reserve rather than an intercompany payable was not an incidental part of KPMG's resolution of the dispute between the parties.  In deciding whether or not an arbitrator exceeded its authority, a court "cannot simply ignore the arbitral opinion."  <u>Harry Hoffman Printing, Inc. v. Graphic Commc'ns Int'l Union, Local 261</u>, 950 F.2d 95 (2d Cir. 1991).  The question whether KPMG might have reached the same ultimate result based on a different rationale is not properly before the Court.

Because the Court finds that the arbitrator, KPMG, exceeded its authority, as delineated by the Master Agreement, including Section 1.05(b)(i), in making an adjustment of RMB 44,811,000 in respondent's favor based on a rationale that inherently impugns the June 30, 2003 Balance Sheet, the Court need not address the parties' arguments as to whether or not the award unjustly enriches respondent.


<u>B. Parties' Submissions to Arbitrator</u>

Respondent argues that "[t]he parties clearly jointly agreed to submit the issue of the alleged intercompany payable to KPMG and therefore, must have intended such issue to be within the scope of KPMG's authority as provided in the engagement letter." Resp. Memo 12.  The fact that the parties submitted the issue of the "Settlement of Intercompany Payable to Coty Inc." to KPMG for

22

arbitration, as stated in the "Issues Between Coty and L'Oréal SA," attached to KPMG's engagement letter, does not clearly indicate that petitioner thereby intended that the scope of KPMG's authority be expanded beyond the constraints imposed in Section 1.05(b)(i).  The Purchase Price Adjustment schedule prepared by both parties and also attached to KPMG's engagement letter describes the issue as: "Settlement of Intercompany Payable," with the comment "Payable to Coty Inc. on closing balance sheet," and which respondent listed as a negative RMB 44.81 million in its claimed adjustments.  See KPMG Engagement Letter and attached Purchase Price Adjustment and Issues Between Coty Inc. and L'Oréal SA (Jaffré Decl. Exh. E).  This characterization of the issue focuses only on the Closing Statement and does not suggest that KPMG had the authority to effectively question the June 30, 2003 Balance Sheet.

It is true that petitioner was aware that respondent's objection to the treatment of the intercompany payable on the Closing Statement (i.e., its removal) was based in part on respondent's position that the RMB 44.81 million "was not an inter-company payable to Coty Inc." but was rather "a provision on the tax exposure which must appear in the local book balance in compliance with the requirements of US GAAP."  Amendment and Completion of Notice of Objection 2 (Jaffré Decl. Exh. D).

Petitioner does not state that it ever argued to KPMG that respondent's objection involved an issue that was beyond the scope of KPMG's arbitration authority – namely, whether the June 30, 2003 Balance Sheet correctly characterized the RMB 44.81 million as an intercompany payable. But its position remained that "[t]he amount was shown as an Intercompany Payable on the contract balance sheet dated June 30, 2003, which was the basis for L'Oréal's purchase offer." KPMG Decision 3 (Jaffré Decl. Exh. F). Thus, petitioner did not clearly evince an intent, through its submissions, to extend KPMG's arbitration authority to allow it to question the June 30, 2003 Balance Sheet itself.

## V. Conclusion

For the reasons stated above, petitioner's petition to modify or vacate the arbitration award is granted, and respondent's cross-petition to confirm the arbitration award is denied. The action is remanded to the arbitrator to make findings as to the disputed RMB 44,811,000, and whether any adjustment to the Closing Statement involving that amount is warranted, in accordance with the constraints upon the scope of arbitration authority imposed by the Master Agreement,

particularly Section 1.05(b)(i).[11]

The Clerk of the Court is directed to close this case.  Any
pending motions are moot.


SO ORDERED.

Dated:    New York, New York
          March 27, 2006

_____
Kimba M. Wood
United States District Judge


---

[11] The Court finds that, given the nature of the dispute, the
award must be vacated rather than modified because any
modification would have to be based on new findings which the
Court cannot undertake to make.

25