**Exhibit 1**
**Part 2**
**(Exhibit A to the Complaint)**

**Exhibit A**

MASTER ASSIGNMENT AND TRANSFER AGREEMENT

BETWEEN

COTY INC.

AND

L'ORÉAL S.A.


DATED AS OF JANUARY 23, 2004

TABLE OF CONTENTS

PAGE

ARTICLE I       ASSIGNMENT, PURCHASE AND SALE; PURCHASE PRICE AND
                CLOSING ...................................................................................................2

Section 1.01.   Assignment, Purchase and Sale; Purchase Price.........................................2
Section 1.02.   Closing ....................................................................................................2
Section 1.03.   Deliveries by Seller ..................................................................................2
Section 1.04.   Deliveries by Buyer ..................................................................................3
Section 1.05.   Post-Closing Purchase Price Adjustment..................................................3
Section 1.06.    Foreign Enterprise Income Tax ...............................................................4
Section 1.07.   Post-Closing Books and Records ..............................................................5
Section 1.07.   Further Assurances....................................................................................5

ARTICLE II      REPRESENTATIONS AND WARRANTIES OF SELLER........................5

Section 2.01.   Organization..............................................................................................5
Section 2.02.   Authorization ............................................................................................6
Section 2.03.   No Conflicts or Violations; No Consents or Approvals Required...............6
Section 2.04.   The Equity Interests ..................................................................................7
Section 2.05.   Organization and Standing of the Companies............................................7
Section 2.06.   Capitalization ............................................................................................7
Section 2.07.   Financial Statements .................................................................................8
Section 2.08.   Personal Property ......................................................................................8
Section 2.09.   Real Property ............................................................................................9
Section 2.10.   Contracts...................................................................................................9
Section 2.11.   Absence of Material Adverse Effect.........................................................10
Section 2.12.   Compliance with Law and Permits ..........................................................10
Section 2.13.   Environmental Matters............................................................................11
Section 2.14.   Litigation.................................................................................................11
Section 2.15.   Intellectual Property ...............................................................................11
Section 2.16.   Employees and Pension Plans..................................................................12
Section 2.17.   Taxes ......................................................................................................12
Section 2.18.   Brokers and Finders ................................................................................13
Section 2.19.   Insurance .................................................................................................13
Section 2.20.   Relationship with Suppliers and Customers .............................................13
Section 2.21.   Corporate Services and Benefits ..............................................................13
Section 2.22.   Absence of Changes.................................................................................13
Section 2.23.   Information Provided ...............................................................................13

ARTICLE III     REPRESENTATIONS AND WARRANTIES OF BUYER............................13

Section 3.01.   Organization............................................................................................13
Section 3.02.   Authorization ..........................................................................................14
Section 3.03.   No Violations; No Consents or Approvals Required..................................14
Section 3.04.   Litigation.................................................................................................14
Section 3.05.   Brokers and Finders ................................................................................14

i

Section 3.06.    Investment Representation ........................................................15
Section 3.07.    Knowledge of Misrepresentations or Omissions ...............................15

ARTICLE IV    COVENANTS AND ADDITIONAL AGREEMENTS ......................................15

Section 4.01.    Access .............................................................................15
Section 4.02.    Conduct of the Business............................................................15
Section 4.03.    Efforts .............................................................................17
Section 4.04.    Approvals and Consents; Cooperation; Notification ............................17
Section 4.05.    Antitrust Regulations; Reasonable Efforts......................................17
Section 4.06.    Confidentiality .....................................................................18
Section 4.07.    Certain Services and Benefits ....................................................19
Section 4.08.    Access to Information ............................................................19
Section 4.09.    Public Announcements ...........................................................19
Section 4.10.    Use of Coty Name.................................................................20
Section 4.11.    Securities ...........................................................................20
Section 4.12.    Use of Intellectual Property .....................................................20
Section 4.13.    Transition Services.................................................................20

ARTICLE V    CONDITIONS TO CLOSING.......................................................20

Section 5.01.    Conditions to Buyer's Obligation to Close.....................................20
Section 5.02.    Conditions to Seller's Obligation to Close .....................................21
Section 5.03.    Frustration of Closing Conditions...............................................22

ARTICLE VI    TERMINATION ....................................................................22

Section 6.01.    Termination........................................................................22
Section 6.02.    Effect of Termination.............................................................24

ARTICLE VII    INDEMNIFICATION ................................................................24

Section 7.01.    Obligation of Parties to Indemnify..............................................24
Section 7.02.    Indemnification Procedures ......................................................24
Section 7.03.    Limitations on Indemnification..................................................26
Section 7.04.    Survival of Representations, Warranties and Covenants .....................27

ARTICLE VIII    TAX MATTERS....................................................................27

Section 8.01.    Tax Returns........................................................................27
Section 8.02.    Transfer Taxes.....................................................................28
Section 8.03.    Tax Indemnification...............................................................28
Section 8.04.    Tax Claims.........................................................................29
Section 8.05.    Refunds............................................................................30
Section 8.06.    Termination........................................................................30
Section 8.07.    Post-Closing Elections ...........................................................30

ARTICLE IX    MISCELLANEOUS ................................................................30

Section 9.01.    Expenses ...........................................................................30

ii

Section 9.02.    Notices ................................................................................30
Section 9.03.    Entire Agreement; Amendment; Waiver ...............................31
Section 9.04.    Severability ...........................................................................32
Section 9.05.    Assignment ...........................................................................32
Section 9.06.    Interpretation.........................................................................32
Section 9.07.    Limitations on Damages .......................................................33
Section 9.08.    Governing Law ......................................................................33
Section 9.09.    Jurisdiction............................................................................33
Section 9.10.    Service of Process .................................................................34
Section 9.11.    WAIVER OF JURY TRIAL...................................................34
Section 9.12.    No Third Party Beneficiaries .................................................34
Section 9.13.    Counterparts...........................................................................34

iii

<u>Schedules</u>

| | |
|---|---|
| 1.01(a) | Transferred Contracts |
| 1.01(b) | Allocation of Purchase Price |
| 1.03 | Director Resignations |
| 1.06 | Calculation of FEI Tax |
| 2.03 | Conflicts, Consents and Approvals |
| 2.07 | Financial Statements |
| 2.08 | Leased Real Property |
| 2.09 | Land Use Rights |
| 2.10(a) | Contracts |
| 2.10(b) | Other Contracts |
| 2.10(c) | Exceptions to Contracts |
| 2.10(d) | Exceptions to Transferred Contracts |
| 2.11 | Absence of Material Adverse Effect |
| 2.12 | Compliance with Law and Permits |
| 2.13 | Environmental Matters |
| 2.14 | Litigation |
| 2.15 | Intellectual Property |
| 2.16(a) | Employees |
| 2.16(b) | Pension Plans |
| 2.16(d) | Labor Matters |
| 2.17 | Taxes |
| 2.19 | Insurance Policies |
| 2.21 | Corporate Services and Benefits |
| 2.22 | Absence of Changes |
| 2.23 | Information Provided |
| 4.11 | Securities |

<u>Exhibits</u>

| | |
|---|---|
| A | YSK Shanghai Agreement |
| B | YSK Shenzhen Agreement |
| C | License Assignment |
| D | Technology License Agreement |
| E | Transition Services Agreement |
| F | Assignment and Assumption Agreement |
| G | Trademark License |

iv

INDEX OF DEFINED TERMS

Actual FEI Tax ............................................5
Affiliate..................................................34
Agreement ...............................................1
Antitrust Laws ........................................18
Assignment and Assumption Agreement ....3
Assumption Notice ..................................26
Balance Sheet ..........................................8
Business ...................................................1
business day ...........................................34
Buyer .......................................................1
Buyer Indemnified Parties .......................25
Chinese Approvals....................................3
Chinese Approving Authority ..................34
Claim Notice...........................................26
Closing.....................................................2
Closing Date .............................................2
Closing Date Payment ..............................3
Closing Net Worth....................................3
Closing Statement of Consolidated Net
    Worth...................................................3
Company...................................................1
Company Intellectual Property ................12
Confidentiality Agreement ......................20
Contracts..................................................7
Environmental Laws................................11
Equity Interests .........................................1
Equity Transfer Agreements......................1
Estimated FEI Tax ....................................5
FEI Tax Overpayment ...............................5
FEIT Law..................................................5
Final Closing Statement of Consolidated Net
    Worth...................................................4
Financial Statements .................................8
Governmental Entity.................................7
including .................................................34
Income Taxes..........................................34
Indemnified Party ...................................26
Indemnifying Party .................................26
Independent Auditor .................................4
Judgment..................................................7
knowledge...............................................34
Land Use Rights .......................................9
Law ..........................................................7
License Assignment...................................1
Licensed Marks.........................................1
Liens ........................................................7

Losses .....................................................25
Material Adverse Effect...........................35
Ms. Kan....................................................1
Notice of Objection ..................................3
Ownership Certificates .............................9
P.R.C........................................................1
party ......................................................35
Permits .....................................................7
Permitted Liens.........................................9
person......................................................35
Personal Property......................................9
plan ........................................................13
Post-Closing Tax Period..........................30
Post-Closing Tax Return .........................29
Pre-Closing Tax Period ...........................29
Property Leases.........................................9
Property Taxes.........................................30
Provisional M&A Rules ..........................18
Purchase Price...........................................2
Purchase Price Adjustment........................4
Required Consents ...................................23
Retained Business......................................1
Seller........................................................1
Seller Indemnified Parties .......................26
Service Agreement ..................................22
Straddle Period .......................................30
Sublicenses ...............................................1
Tax .........................................................35
Tax Claim ...............................................30
Tax Claim Notice ...................................31
Taxing Authority ....................................13
Technology License Agreement.................1
Third Party Claim ...................................26
Trademark License ...................................3
Transaction Agreements ...........................6
Transfer Taxes.........................................29
Transferred Contracts ...............................2
US GAAP .................................................8
YSK L.P....................................................1
YSK License Agreement ...........................1
YSK Limited...........................................22
YSK Shanghai ..........................................1
YSK Shanghai Agreement.........................1
YSK Shenzhen...........................................1
YSK Shenzhen Agreement.........................1

v

MASTER ASSIGNMENT AND TRANSFER AGREEMENT dated as of January 23, 2004 (this "*Agreement*"), by and between Coty Inc., a corporation organized under the laws of the State of Delaware ("*Seller*"), and L'Oréal S.A., a corporation organized under the laws of France ("*Buyer*").

## INTRODUCTION

Seller is the beneficial owner of 100% of the registered share capital (the "*Equity Interests*") of Yue-Sai Kan-Coty Cosmetics (Shanghai) Ltd. ("*YSK Shanghai*") and Yue-Sai Kan Cosmetics (Shenzhen) Ltd. ("*YSK Shenzhen*"; each of YSK Shanghai and YSK Shenzhen being a "*Company*"). The Companies are in the business of manufacturing, distributing, marketing and selling personal care and cosmetics products under the "Yue-Sai" and "Ma Promesse" brands in the People's Republic of China (the "*P.R.C.*") (such business, the "*Business*") as well as under other brands licensed by Seller or its Affiliates to the Companies (the "*Retained Business*").

Buyer wishes to purchase from Seller, and Seller wishes to sell to Buyer, the Equity Interests as more fully provided in this Agreement and Buyer and Seller will become parties to an equity transfer agreement in the form of <u>Exhibit A</u> (the "*YSK Shanghai Agreement*"), with respect to the transfer of the Equity Interests of YSK Shanghai, and an equity transfer agreement in the form of <u>Exhibit B</u> (the "*YSK Shenzhen Agreement*" and, together with the YSK Shanghai Agreement, the "*Equity Transfer Agreements*"), with respect to the transfer of the Equity Interests of YSK Shenzhen.

Seller is a party to a License Agreement, dated as of May 14, 1996 (the "*YSK License Agreement*"), among Ms. Yue-Sai Kan ("*Ms. Kan*"), Yue-Sai Kan Cosmetics, Ltd. (USA) and Seller (as successor to Yue-Sai Kan Cosmetics, Ltd. (USA), L.P. ("*YSK L.P.*")) pursuant to which Seller is the licensee of certain trademarks and trade names relating to the name and likeness of Ms. Kan (such trademarks and trade names, the "*Licensed Marks*"). Pursuant to certain license agreements between Seller (as successor to YSK L.P.) and YSK Shenzhen (the "*Sublicenses*"), YSK Shenzhen manufactures, markets and sells certain cosmetic products bearing certain of the Licensed Marks. Seller wishes to assign, and Buyer wishes to assume, all of Seller's rights, title and interests under the YSK License Agreement on the terms set forth in the license assignment in the form of <u>Exhibit C</u> (the "*License Assignment*").

Seller licenses to the Companies certain patents and other intellectual property necessary for the operation of the Business. Buyer and Seller desire that Seller continue to license such patents and intellectual property to the Companies pursuant to the terms and conditions of a technology license agreement in the form of <u>Exhibit D</u> (the "*Technology License Agreement*").

At the Closing (as defined below), Seller and the Companies will terminate the Sublicenses. Buyer, Seller and the Companies will enter into a transition services agreement substantially in the form of <u>Exhibit E</u> (the "*Transition Services Agreement*") pursuant to which the Companies will provide certain manufacturing, distribution and marketing services to Seller (or its Affiliates) in connection with the continued operation of the Retained Business by Seller after the Closing Date.

In consideration of the premises and the mutual covenants and agreements contained in this Agreement, Seller and Buyer agree as follows:

ARTICLE I

ASSIGNMENT, PURCHASE AND SALE; PURCHASE PRICE AND CLOSING

Section 1.01. Assignment, Purchase and Sale; Purchase Price.

(a)    Assignment, Purchase and Sale.    On the terms and subject to the conditions set forth in this Agreement, at the Closing (as defined below), Seller shall sell, transfer, assign and deliver to Buyer, and Buyer shall purchase, acquire and accept from Seller, all of Seller's right, title and interest in (i) the Equity Interests, (ii) the YSK License Agreement and (iii) the additional contracts and agreements of Seller set forth on Schedule 1.01(a) (the "*Transferred Contracts*").

(b)    Purchase Price.    The aggregate purchase price for the Equity Interests, the License Assignment and the Transferred Contracts is Two Hundred Fifty Million Dollars ($250,000,000), payable in cash as set forth below in Section 1.04 and plus or minus the amount determined pursuant to Section 1.05 (the "*Purchase Price*").    The Purchase Price shall be allocated as set forth on Schedule 1.01(b).    All amounts referred to in this Agreement, unless otherwise specified, shall be United States dollar amounts.

Section 1.02.    Closing.    The closing of the transactions contemplated by this Agreement and the Equity Transfer Agreements (the "*Closing*") shall be held at the offices of Covington & Burling, 1330 Avenue of the Americas, New York, New York 10019, at 10:00 a.m. on the second business day after all the conditions set forth in Article V hereof and set forth in each Equity Transfer Agreement have been satisfied (or, to the extent permitted, waived), or at such other place or on such other date and time upon which the parties may agree.    The date on which the Closing takes place is referred to in this Agreement as the "*Closing Date*."    The Closing shall be deemed to be effective as of the close of business on the Closing Date.

Section 1.03.    Deliveries by Seller.    At the Closing, Seller shall deliver or cause to be delivered to Buyer (i) certificates of approval, approval reply letters and amended business licenses from each of the Chinese Approving Authorities with respect to the transfer of ownership of the Equity Interests from Seller to Buyer (together with any approval or early termination by any Governmental Entity under the Antitrust Laws, the "*Chinese Approvals*"), (ii) a duly executed counterpart of the License Assignment, (iii) a duly executed counterpart of the assignment and assumption agreement in the form of Exhibit F (the "*Assignment and Assumption Agreement*"), (iv) a counterpart of the Technology License Agreement duly executed by Seller, the other licensors party thereto and YSK Shenzhen, (v) a counterpart of the transitional and non-transitional trademark license agreement in the form of Exhibit G (the "*Trademark License*") duly executed by Seller, Coty Deutschland GmbH and YSK Shenzhen, and (vi) copies of the resolutions of the Board of Directors of each Company, certified by the Chairman of such Company, authorizing the transfer of the Equity Interests from Seller to Buyer.    Seller shall use commercially reasonable efforts to deliver at the Closing unconditional resignation letters of the

2

directors of the Companies, effective from the Closing Date, a list of which is included on Schedule 1.03.

Section 1.04. Deliveries by Buyer. At the Closing, Buyer shall deliver to Seller (i) payment, by wire transfer to Seller's bank account designated in writing by Seller at least two business days prior to the Closing Date, in immediately available funds of an amount equal to Two Hundred Fifty Million Dollars ($250,000,000), less the Estimated FEI Tax as determined in accordance with Section 1.06(a) (the amount so paid to the Seller being the "*Closing Date Payment*"), (ii) a duly executed counterpart of the License Assignment, (iii) a duly executed counterpart of the Assignment and Assumption Agreement, (iv) a duly executed counterpart of the Technology License Agreement, (v) a duly executed counterpart of the Transition Services Agreement and (vi) a duly executed counterpart of the Trademark License.

Section 1.05. Post-Closing Purchase Price Adjustment.

(a)    Closing Statement of Consolidated Net Worth.  As soon as practicable following the Closing, but in no event later than 60 days after the Closing Date, Seller shall deliver to Buyer a statement (the "*Closing Statement of Consolidated Net Worth*") of the consolidated net worth of YSK Shenzhen and YSK Shanghai on the Closing Date calculated in accordance with U.S. GAAP (and also in a manner consistent with Seller's past practices) as total assets minus total liabilities and provisions of the Companies as at such date (such amount, the "*Closing Net Worth*").  Buyer shall cause the Companies to provide Seller with reasonable access to the books and records of each Company to the extent necessary for the preparation of the Closing Statement of Consolidated Net Worth.

(b)    Objections; Resolution of Disputes.

(i)    Unless Buyer notifies Seller in writing within 45 days following Buyer's receipt of the Closing Statement of Consolidated Net Worth of any objection to the computation of the Closing Net Worth set forth therein (the "*Notice of Objection*"), the Closing Statement of Consolidated Net Worth shall be final and binding.  During such 45-day period, Buyer and its representatives shall be permitted to review the working papers of Seller and Seller's accountants relating to the Closing Statement of Consolidated Net Worth.  Any Notice of Objection shall specify in reasonable detail the basis for the objections set forth therein and shall include only objections based on (A) mathematical errors in the computation of the Closing Net Worth or (B) the Closing Net Worth not having been calculated in accordance with US GAAP (and also in a manner consistent with Seller's past practices and the preparation of the Financial Statements).  Any components or calculations in the Closing Statement of Consolidated Net Worth not objected to in the Notice of Objection shall be final and binding on the parties.  Seller and Buyer acknowledge that (1) the sole purpose of the determination of the Closing Net Worth is to adjust the Purchase Price so as to reflect the difference between the consolidated net worth of the Companies as of June 30, 2003 and the consolidated net worth of the Companies as of the Closing Date and (2) such difference can be measured only if the calculation is done using the same accounting principles, practices, methodologies, and policies used in the preparation of the Financial Statements.

3

(ii)     If Buyer provides such Notice of Objection to Seller within such 45-day period, then Buyer and Seller shall, during the 30-day period following Buyer's delivery of such Notice of Objection to Seller, attempt in good faith to resolve Buyer's objections. During such 30-day period, Seller and its representatives shall be permitted to review the working papers of Buyer and Buyer's accountants relating to the Notice of Objection and the basis therefor.  If Buyer and Seller are unable to resolve all such objections within such period, the matters remaining in dispute shall be submitted to KPMG (or, if such firm declines to act, to another internationally recognized public accounting firm mutually agreed upon by Buyer and Seller and, if Buyer and Seller are unable so to agree within 10 days after the end of such 30-day period, then Buyer and Seller shall each request that their regular audit firms select a third internationally recognized public accounting firm to resolve the disputed matters) (such designated, agreed or selected firm being the "*Independent Auditor*").  The parties shall instruct the Independent Auditor to render its decision within 45 days of its selection.  The resolution of disputed items by the Independent Auditor shall be final and binding, and the determination of the Independent Auditor shall constitute an arbitral award that is final, binding and not subject to appeal and upon which a judgment may be entered by a court having jurisdiction with respect thereto.  The fees and expenses of the Independent Auditor shall be borne equally by Buyer and Seller.  After final determination of the Closing Net Worth, Buyer shall have no further right to make any claims against Seller in respect of any element of the Closing Statement of Consolidated Net Worth that Buyer raised, or could have raised, in the Notice of Objection.

(iii)     The Closing Statement of Consolidated Net Worth as delivered by Seller, if there is no dispute, or as determined in accordance with the procedures set forth in Section 1.05(b), as the case may be, shall be the "*Final Closing Statement of Consolidated Net Worth*".

(c)     Adjustment Payment.  The Purchase Price shall be either increased by the amount by which Closing Net Worth shown on the Final Closing Statement of Consolidated Net Worth exceeds the amount of RMB 137,463,000 or decreased by the amount by which the Closing Net Worth is less than RMB 137,463,000 (such amount, the "*Purchase Price Adjustment*").  Within 10 business days after the determination of Closing Net Worth on the Final Closing Statement of Consolidated Net Worth, any increase in the Purchase Price pursuant to this Section (less any additional FEI Tax to be withheld pursuant to Section 1.06(c)) shall be paid by Buyer to Seller or any reduction in the Purchase Price pursuant to this Section 1.05 (less any FEI Tax Overpayment credited to Seller pursuant to Section 1.06(c)) shall be paid by Seller to Buyer.  The Purchase Price Adjustment shall be calculated using the U.S. dollar to RMB exchange rate published by the New York City edition of *The Wall Street Journal* on the Closing Date.

Section 1.06.     Foreign Enterprise Income Tax.

(a)     Withholding and Payment of Estimated FEI Tax by Buyer.  At the Closing, Buyer shall withhold from the Purchase Price an amount equivalent to the estimated tax (such amount, the "*Estimated FEI Tax*") determined by Seller to be payable by Seller pursuant to Article 19 of the P.R.C. Foreign Enterprise Income Tax Law and Article 61 of the Detailed Implementation Rules thereunder (the "*FEIT Law*").  The Estimated FEI Tax shall be determined

by Seller in accordance with the procedures set forth on Schedule 1.06. As promptly as practicably following the Closing, Buyer shall pay the withheld Estimated FEI Tax to the relevant tax authorities on behalf of Seller and provide to Seller the tax completion certificate or the relevant original receipts within 30 days after the date of such payment.

(b)    Determination of FEI Tax.    Within 10 business days following the determination of Closing Net Worth on the Final Closing Statement of Consolidated Net Worth, Seller shall notify buyer of Seller's calculation of the aggregate tax liability under the FEIT Law using the procedures set forth on Schedule 1.06 (such amount, the "*Actual FEI Tax*").

(c)    Withholding and Payment of Actual FEI Tax.    Notwithstanding anything in this Agreement to the contrary, in the event that Buyer is required to pay a Purchase Price Adjustment pursuant to Section 1.05(c), then (i) Buyer shall withhold from the Purchase Price Adjustment an amount equal to the FEI Tax payable on such Purchase Price Adjustment. As promptly as practicably following the payment of any Purchase Price Adjustment to Seller, Buyer shall pay such withheld FEI Tax to the relevant tax authorities on behalf of Seller and provide to Seller the tax completion certificate or the relevant original receipts within 30 days after the date of such payment. In the event that Seller is required to pay a Purchase Price Adjustment to Buyer pursuant to Section 1.05(c), Seller may set-off against such Purchase Price Adjustment, that amount by which the Estimated FEI Tax exceeds the Actual FEI Tax (such excess, the "*FEI Tax Overpayment*"). Seller shall use commercially reasonable efforts to seek a refund from the relevant tax authorities of any FEI Tax Overpayment and, upon receipt of such refund, promptly pay such amount to Buyer.

Section 1.07.    Post-Closing Books and Records.    Except for the consummation of the Closing and the other transactions contemplated by this Agreement, Buyer and Seller agree that on the Closing Date itself the Business shall be conducted in the ordinary course in a manner substantially consistent with past practice. Following the Closing and until the Closing Date, Buyer shall not take any action with respect to the accounting books and records of the Companies on which the Closing Statement of Consolidated Net Worth is to be based that would affect the Balance Sheet or the Closing Statement of Closing Net Worth.

Section 1.08.    Further Assurances.    From time to time following the Closing, upon the request of either party, the other party shall execute and deliver, or cause to be executed and delivered, such other documents and instruments as shall be reasonably necessary or desirable to more effectively transfer and evidence the transfer of the Business to Buyer and to evidence the termination of the Sublicenses.

ARTICLE II

REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer as follows:

Section 2.01.    Organization.    Seller is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware. Seller is the parent company of the business units constituting the Coty group of companies.

5

Section 2.02. <u>Authorization</u>.    Seller has the requisite corporate power and authority to execute and deliver this Agreement and the Equity Transfer Agreements, the License Assignment, the Technology License Agreement, the Transition Services Agreement, the Assignment and Assumption Agreement and the Trademark License (such agreements referred to collectively as the *"Transaction Agreements"*) and all other agreements, certificates and documents contemplated by this Agreement to be executed and delivered by Seller and to consummate the transactions contemplated hereby and thereby. Seller has taken all corporate action required by its certificate of incorporation and by-laws and under applicable Law to authorize the execution and delivery of this Agreement, the Transaction Agreements and all other agreements, certificates and documents contemplated by this Agreement to be executed and delivered by Seller and to authorize the consummation of the transactions contemplated hereby and thereby. This Agreement has been duly and validly executed and delivered by Seller and is the legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally or by general principles of equity (whether considered in a proceeding in equity or at law). The Transaction Agreements, when executed and delivered, will be legal, valid and binding obligations of Seller, enforceable against it in accordance with their respective terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally or by general principles of equity (whether considered in a proceeding in equity or at law).

Section 2.03. <u>No Conflicts or Violations; No Consents or Approvals Required</u>.

(a)    Except as set forth on Schedule 2.03, neither the execution and delivery of this Agreement or any of the other Transaction Agreements nor the consummation of the transactions contemplated by this Agreement (including, without limitation, a change of control of the Companies) or the Transaction Agreements will (i) conflict with or violate any provision of the certificate of incorporation or by-laws of Seller or the articles of association of either of the Companies, (ii) conflict with or violate any judgment, order or decree (each, a *"Judgment"*) or any statute, law, rule, regulation or ordinance (each, a *"Law"*), applicable to Seller or the Companies or their respective properties or assets, (iii) result in a violation or breach of, or constitute a default (or an event that with notice or lapse or time or both would constitute a default) under any of the terms, conditions or provisions of the YSK License Agreement, the Sublicenses or any Transferred Contract or under any note, bond, mortgage, indenture, deed of trust, license, lease, contract, commitment, agreement or arrangement (collectively, *"Contracts"*) to which Seller or either Company is a party or by which any of their respective properties or assets are bound, (iv) result in the termination or cancellation of any licenses or approvals of any Governmental Entity (collectively *"Permits"*) applicable to Seller or any of the Companies or (v) result in the creation or imposition of any mortgage, pledge, lien, security interest or other similar encumbrance (collectively, *"Liens"*) on the Equity Interests or on any properties or assets of either Company other than Permitted Liens or Liens caused by Buyer, except, in the case of clauses (ii) through (v), for violations, breaches, defaults, terminations, cancellations, accelerations, creations, impositions, suspensions or revocations that would not have a Material Adverse Effect.

6

(b)     Except as set forth in Schedule 2.03, no consent, approval or authorization of, or registration, declaration or filing with, any national (including Federal), state or local court of competent jurisdiction, governmental, provincial, regional or other local agency, authority, instrumentality or regulatory body, domestic or foreign (a "*Governmental Entity*"), is required to be obtained or made by or with respect to Seller or the Companies in connection with the execution, delivery and performance of this Agreement by Seller or the consummation by Seller of the transactions contemplated by this Agreement (including, without limitation, the assignment to Buyer of the YSK License Agreement, the Transferred Contracts and any and all rights and obligations thereunder), other than (i) the Chinese Approvals, (ii) the registrations required for Buyer to assume Seller's rights, title and interest under the YSK License Agreement, (iii) those that may be required solely by reason of Buyer's (as opposed to any other third party's) participation in the transactions contemplated by this Agreement and the agreements contemplated by this Agreement and (iv) those the failure of which to obtain or make would not have a Material Adverse Effect.

Section 2.04.  The Equity Interests.  Prior to receipt of the Chinese Approvals, Seller will have good and valid title to the Equity Interests, free and clear of any Liens or any options, and Seller will be properly registered with the Chinese Approving Authorities as the sole foreign investor with ownership of the Equity Interests.  The Equity Interests are not subject to any voting trust agreement or other contract, agreement, arrangement, commitment or understanding, including any such agreement, arrangement, commitment or understanding restricting or otherwise relating to the voting, dividend rights or disposition of the Equity Interests.

Section 2.05.  Organization and Standing of the Companies.

(a)     Each Company is a wholly foreign-owned enterprise duly organized, validly existing and in good standing under the laws of the P.R.C. Each Company possesses all Permits necessary to carry on the Business as presently conducted (including, without limitation, Permits for the products it manufactures or sells, as the case may be).  Seller has, prior to the execution of this Agreement, made available to Buyer true and complete copies of the articles of association, resolutions of the Board of Directors (to the extent such resolutions are available), the approval certificates and business licenses of each Company.

(b)     Since May 14, 1996, neither of the Companies has taken action to voluntarily become subject to any bankruptcy, insolvency, dissolution, liquidation or similar proceeding, and to Seller's knowledge, no third party has filed any proceeding to make either of the Companies subject to such a proceeding.

Section 2.06.  Capitalization .  The total registered capital of YSK Shanghai and YSK Shenzhen is $7,100,000 and $7,400,000, respectively, all of which has been fully paid.  The Equity Interests are not subject to any purchase option, call, right of first refusal, preemptive, subscription or similar rights or Liens under any provision of applicable Law, the articles of association of either Company or any Contract to which either Company is subject, bound or a party or otherwise.  There are no outstanding warrants, options, rights, "phantom" stock rights, agreements, convertible or exchangeable securities or other commitments (other than this

7

Agreement and the Equity Transfer Agreements) pursuant to which Seller or either Company is or may become obligated to issue, sell, purchase, return or redeem any securities of either Company.

Section 2.07. <u>Financial Statements</u>.

(a)     <u>Schedule 2.07</u> sets forth the unaudited adjusted consolidated balance sheet of the Companies as of June 30, 2003 (the "*Balance Sheet*") and the unaudited adjusted consolidated income statement of the Companies for the fiscal years ended June 30, 2003, 2002 and 2001 (collectively with the Balance Sheet, the "*Financial Statements*"). The Financial Statements have been prepared in conformity with generally accepted accounting principles in the United States ("*US GAAP*") (and also in a manner consistent with Seller's past practices), except for the absence of footnotes and other presentation items, and fairly present in all material respects the consolidated financial condition, results of operations and stockholders' equity of the Companies at or for the respective periods then ended. The Financial Statements are consolidated based on the individual unaudited adjusted balance sheets and unaudited adjusted income statements of the Companies, each of which have been prepared in conformity with US GAAP.

(b)     To the knowledge of Seller, the Companies do not have any liabilities or obligations (whether accrued, absolute, contingent, unasserted or otherwise) of a nature required by US GAAP to be reflected on a consolidated balance sheet of the Companies or in the notes thereto, except (i) as disclosed, reflected or reserved against in the Balance Sheet, (ii) for items set forth in <u>Schedule 2.07</u> and (iii) for liabilities and obligations incurred in the ordinary course of business consistent with past practice since the date of the Balance Sheet and not in violation of this Agreement. This representation shall not be deemed breached as a result of a change in any Law after the Closing Date.

Section 2.08. <u>Personal Property</u>. The Companies own, lease or otherwise possess adequate rights to use the items of personal property that are being used in the conduct or operation of the Business (the "*Personal Property*"). Each Company has good and marketable title to all Personal Property owned by it, free and clear of all Liens, except for Permitted Liens, and all such Personal Property is reflected on the Balance Sheet (except such as have been disposed of since the date of the Balance Sheet in the ordinary course of business), including without limitation machinery, equipment, vehicles and inventory. All Personal Property leased by either Company either as lessor or lessee is set forth on <u>Schedule 2.08</u>. All material machinery and equipment owned or leased by each Company or used primarily in the operation of the Business is usable in the ordinary course of business and has been maintained in a reasonably prudent manner in the ordinary course of business. As used in this Agreement, "*Permitted Liens*" means and includes (i) Liens for Taxes, assessments or governmental charges or levies not yet due and delinquent, (ii) Liens of carriers, warehousemen, mechanics, materialmen, workmen and the like arising in the ordinary course of business or being contested in good faith, (iii) Liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business, (iv) in the case of leased property, all matters, whether or not of record, affecting the title of the lessor (and any underlying lessor) of the leased property and (v) Liens that, individually or in the aggregate, would not have a Material Adverse Effect.

8

Section 2.09. <u>Real Property</u>. Set forth on <u>Schedule 2.09</u> is a list of the land use rights held by each of the Companies (the "*Land Use Rights*"), the ownership certificates of the real property associated with the Land Use Rights (the "*Ownership Certificates*") and all real property leased by the Companies (the "*Property Leases*"). Such Land Use Rights, Ownership Certificates and Property Leases are sufficient to enable the Companies to carry on the Business as presently conducted in all material respects. Except as set forth on <u>Schedule 2.09</u>, the Land Use Rights, Ownership Certificates and Property Leases are in full force and effect and no proceedings are pending, or to the Seller's knowledge, threatened, that could reasonably be expected to affect the peaceful use of all the premises covered by the Land Use Rights and Property Leases or result in the revocation, cancellation or suspension thereof. The Land Use Rights are "granted" (*chu rang* in pinyin) land use rights under applicable P.R.C. law, and each Company has satisfied all of the terms and conditions set forth in the original contract for such Company to obtain such Land Use Rights. Each Company has paid all grant fees for the Land Use Rights. The Land Use Rights and the Ownership Certificates are free and clear of any Liens other than Permitted Liens.

Section 2.10. <u>Contracts</u>.

(a)     <u>Schedule 2.10(a)</u>, as such schedule may be updated from time to time to reflect changes permitted pursuant to Section 4.02, lists or describes all unexpired Contracts to which either Company is a party or to which any of their respective assets or properties are bound, except those Contracts:

(i)     that were entered into in the ordinary course of business by either Company and that may be terminated by such Company with not more than three months' notice without an obligation in excess of $100,000 being incurred by such Company by Contract; *provided* that any agreements to which either of the Companies is a party related solely to maintaining the confidentiality of information shall be included on <u>Schedule 2.10(a)</u>;

(ii)     for the purchase by either Company of any materials, supplies, equipment or services from a single supplier for not more than $100,000 per year;

(iii)     for the sale by either Company of any product or service to a single distributor for not more than $100,000 per year;

(iv)     for the purchase or improvement of any fixed or capital assets for not more than $100,000;

(v)     for the sale of any fixed or capital assets after June 1, 2003 for not more than $50,000 as to any individual item or $50,000 as to any group of items in the aggregate;

(vi)     entered into after the date hereof in accordance with Section 4.02; and

9

(vii)    not otherwise required to be listed in any other Schedule and obligating either Company to pay not more than $100,000 in remaining payment obligations and containing no material non-monetary obligations of, or restrictions applicable to, such Company.

(b)    Except as set forth on Schedule 2.10(b), neither Company is a party to (i) any contract or commitment limiting or restraining such Companies from engaging or competing in any manner or in any business; (ii) any contract relating to joint ventures or agreements involving a sharing of profits or (iii) any other contract entered into with Seller or any of its Affiliates or any contract entered into with Ms. Kan or, to Seller's knowledge, an Affiliate of Ms. Kan.

(c)    True and complete copies of all Contracts listed on Schedule 2.10(a) and Schedule 2.10(b) (other than employment agreements, contracts with distributors or customers and leases) have been made available to Buyer. Except as set forth in Schedule 2.10(c), (i) each such Contract listed on Schedule 2.10(a) and Schedule 2.10(b) is a valid and binding obligation of the Company that is a party to such Contract, as the case may be, enforceable in accordance with its terms except as may be limited by any bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally or by general principles of equity (whether considered in a proceeding in equity or at law), and are in full force and effect and (ii) the Companies, and, to the knowledge of Seller, any other party to any of such Contracts, are not (with or without the lapse of time or the giving of notice, or both, but without giving effect to the transactions contemplated by this Agreement) in violation thereof or default thereunder, except for any failures to be so valid, binding, enforceable or in full force and effect or any such violations or defaults that in each case or in the aggregate would not have a Material Adverse Effect.

(d)    Except as set forth in Schedule 2.10(d), (i) each Transferred Contract is a valid and binding obligation of Seller, enforceable in accordance with its terms except as may be limited by any bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally or by general principles of equity (whether considered in a proceeding in equity or at law), and are in full force and effect and (ii) neither Seller nor, to the knowledge of Seller, any other party to any of such Transferred Contracts is (with or without the lapse of time or the giving of notice, or both, but without giving effect to the transactions contemplated by this Agreement) in violation thereof or default thereunder, except for any failures to be so valid, binding, enforceable or in full force and effect or any such violations or defaults that in each case or in the aggregate would not have a Material Adverse Effect.

Section 2.11.    Absence of Material Adverse Effect.    Except as set forth in Schedule 2.11, since June 30, 2003, there has not been any Material Adverse Effect.

Section 2.12.    Compliance with Law and Permits.    Except as set forth in Schedule 2.12, (i) each Company has complied in all material respects with all applicable Laws (including, without limitation, all applicable Laws concerning cosmetic products) and the terms of all Permits and (ii) except as would not have a Material Adverse Effect, all Permits held by the Companies are in full force and effect and no proceedings are pending or, to Seller's knowledge, threatened that could be reasonably expected to result in the revocation, cancellation or

10

suspension thereof. This Section shall not apply to environmental matters, which are exclusively the subject of Section 2.13.

Section 2.13. <u>Environmental Matters</u>. Except as set forth in <u>Schedule 2.13</u>, to the knowledge of Seller, each Company is in compliance in all material respects with all applicable Laws relating to the protection of the environment in effect prior to the date hereof ("*Environmental Laws*"), except where the failure to so comply would not be expected to have a Material Adverse Effect.

Section 2.14. <u>Litigation</u>. Except as set forth on <u>Schedule 2.14</u>, there is no suit, action, proceeding or investigation (whether at law or equity, before any Governmental Entity or before any arbitrator) pending or, to the knowledge of Seller, threatened against either Company, the outcome of which, if adverse to the Companies, would have a Material Adverse Effect.

Section 2.15. <u>Intellectual Property</u>.

(a)    The YSK License Agreement is a valid and binding obligation of Seller, enforceable in accordance with its terms except as may be limited by any bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally or by general principles of equity (whether considered in a proceeding in equity or at law), and is in full force and effect. Neither Seller nor, to the knowledge of Seller, any other party to the YSK License Agreement is (with or without the lapse of time or the giving of notice, or both, but without giving effect to the transactions contemplated by this Agreement) in violation of or default under the YSK License Agreement.

(b)    As of the date hereof, the Sublicenses are (and immediately prior to their termination at the Closing the Sublicenses will be) valid and binding obligations of Seller and YSK Shenzhen, enforceable in accordance with their respective terms except as may be limited by any bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally or by general principles of equity (whether considered in a proceeding in equity or at law), and are in full force and effect and neither Seller nor YSK Shenzhen is (with or without the lapse of time or the giving of notice, or both, but without giving effect to the transactions contemplated by this Agreement) in violation of or default under the Sublicenses. Other than the Sublicenses, Seller has neither sublicensed nor granted any other rights to any person other than the Companies with respect to any of the trademarks or trade names covered by the YSK License Agreement.

(c)    Except as set forth on <u>Schedule 2.15</u>, the Companies own or possess (and immediately following the Closing will own or possess) rights to all copyrights, know-how, methods and processes, inventions, discoveries, secrets, improvements and other intellectual property rights used or held for use exclusively in the conduct of the Business as now operated (such rights, the "*Company Intellectual Property*"), except where the failure to own or possess any such Company Intellectual Property would not have a Material Adverse Effect. Except as set forth in <u>Schedule 2.15</u>, no claim is pending or, to the knowledge of Seller, threatened against either Company asserting that the Companies' use of the Company Intellectual Property infringes the patent, trademark or copyright rights of any person and, to the knowledge of Seller, such use of the Company Intellectual Property does not so infringe any such rights. To the

11

knowledge of Seller, no person or entity is infringing either Company's rights in the Company Intellectual Property other than any such infringement that would not be expected to have a Material Adverse Effect.

Section 2.16.  Employees and Pension Plans.

(a)    Schedule 2.16(a) contains a list of the employees of each Company and their respective salaries and notice period for termination of their respective employment contracts as of January 14, 2004.  All salaries, benefits, severance payments and related taxes with respect to the Companies' employees have been paid by the Companies when due for all periods through the date hereof, and, as of the Closing Date, will have been paid by the Companies when due for all periods through the Closing Date, except where the failure to make such payments would not, individually or in the aggregate, have a Material Adverse Effect.

(b)    Except as set forth on Schedule 2.16(b), there is no pension, retirement, savings, deferred compensation, or profit-sharing, stock option, stock appreciation, stock purchase, performance share, bonus or other incentive plan, severance plan, health, group insurance, worker's compensation or other welfare plan, or plans under the P.R.C.'s mandatory social insurance scheme or other similar plan under which either Company has any current or future obligation or liability or under which any employee or former employee (or beneficiary or alternate payee of any employee or former employee) of either Company has or may have any current or future right to benefits.   The term "*plan*" shall include any plan, program, arrangement, contract, agreement, policy or understanding, whether formal or informal, written or unwritten.  Each of the plans listed in Schedule 2.16(b), including the plans under the P.R.C.'s mandatory social insurance scheme, has been maintained in all material respects, by its terms and operation, in accordance with applicable Laws.  Except as separately listed on Schedule 2.16(b), neither of the Companies is a party to any agreements or arrangements relating to special or other compensation payable to any of its employees or to any director of either Company who is not an employee in connection with the sale of the equity interests in the Companies or otherwise upon a termination of employment, whether voluntary or involuntary, or resignation or termination as a director, in either case following a change in control of either of the Companies.

(c)    There are no pending, or, to the knowledge of Seller, threatened, labor litigations or labor disputes that would have a Material Adverse Effect.

(d)    Except as set forth on Schedule 2.16(d) and except to the extent mandated by applicable Law, neither Company is a party to any collective labor agreement or any agreement or arrangement with any trade union or other body representing its employees.

Section 2.17.  Taxes.  Except as otherwise set forth on Schedule 2.17, (i) each Company has timely filed with the appropriate Taxing Authorities all material Tax returns required to be filed on or prior to the date hereof, (ii) all Taxes due with respect to such returns have been paid in full, (iii) no Taxing Authority is conducting any audit or investigation or has made any claim or raised any issues relating to Taxes that relate to either Company or their business that has not been resolved and paid in full, and to the knowledge of Seller no such audit, investigation or claim is threatened, and (iv) neither Company has any outstanding contingent liabilities for Taxes that may result in the cancellation or subrogation of any transaction entered

12

into by such Company, except where such cancellation or subrogation would not have a Material Adverse Effect. As used in this Agreement, *"Taxing Authority"* shall mean any Governmental Entity exercising any Taxing authority or any Tax regulatory authority.

Section 2.18. <u>Brokers and Finders</u>. There is no investment banker, broker, finder, financial advisor or other intermediary who has been retained by or is authorized to act on behalf of Seller who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement from Buyer, other than J.P. Morgan Securities, Inc., whose fees and expenses shall be paid by Seller.

Section 2.19. <u>Insurance</u>. The Companies are covered by the insurance policies, duly renewed where appropriate, for sufficient amounts and covering such risks as are customary for businesses comparable to the Business. <u>Schedule 2.19</u> lists all insurance policies that are currently held by each Company. No claims are currently pending under such policies.

Section 2.20. <u>Relationship with Suppliers and Customers</u>. No supplier or significant customer of the Companies has cancelled any material contract, and, to the knowledge of Seller, there has been no threat by any material supplier not to provide products, supplies, or services (including utilities) to the Companies within the 12 months prior to the date of this Agreement.

Section 2.21. <u>Corporate Services and Benefits</u>. <u>Schedule 2.21</u> contains a list of all of the administrative and corporate services and benefits, including certain information technology support and insurance services, currently received by the Companies from Seller and its Affiliates.

Section 2.22. <u>Absence of Changes</u>. Except as set forth on <u>Schedule 2.22</u>, since June 30, 2003, the Companies have not taken any action that, if taken after the date of this Agreement, would constitute a material breach of any of the covenants set forth in Section 4.02.

Section 2.23. <u>Information Provided</u>. All documents provided to Buyer in the data room, copies of which are attached to <u>Schedule 2.23</u>, are in all material respects correct and complete copies of the original documents. To the knowledge of Seller, no representation or warranty of Seller contained in this Agreement, and no statement contained in any document, certificate or Schedule furnished by or on behalf of Seller to Buyer pursuant to this Agreement, omits to state any material fact necessary, in light of the circumstances under which it was made (and taken together with all other information presented to Buyer in such documents, certificates or Schedules), in order to make the statements herein or therein not misleading.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

Section 3.01. <u>Organization</u>. Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation.

13

Section 3.02. Authorization.  Buyer has the requisite corporate power and authority to execute and deliver this Agreement, the Transaction Agreements and all other agreements, certificates and documents contemplated by this Agreement to be executed and delivered by Buyer, and to consummate the transactions contemplated hereby and thereby. Buyer has taken all corporate action required by its certificate or articles of incorporation and by-laws to authorize the execution and delivery of this Agreement, the Transaction Agreements and all other agreements, certificates and documents contemplated by this Agreement to be executed and delivered by Buyer, and to authorize the consummation of the transactions contemplated hereby and thereby. This Agreement has been duly and validly executed and delivered by Buyer and this Agreement is the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally or by general principles of equity (whether considered in a proceeding in equity or at law).  The Transaction Agreements will on the Closing Date be legal, valid and binding obligations of Buyer, enforceable against it in accordance with their respective terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally or by general principles of equity (whether considered in a proceeding in equity or at law).

Section 3.03. No Violations; No Consents or Approvals Required.  Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement or the Transaction Agreements will (i) conflict with or violate any provision of the certificate or articles of incorporation or by-laws of Buyer, (ii) conflict with or violate any Judgment or Law applicable to Buyer or (iii) conflict with or result in any breach of, or constitute a default (or an event that with notice or lapse of time or both would constitute a default) under any Contract to which Buyer is a party or to which it is subject, except, in the case of clauses (ii) or (iii), for violations, breaches or defaults that would not have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement.  No consent, approval or authorization of, or registration, declaration or filing with, any Governmental Entity is required to be obtained or made by or with respect to Buyer in connection with the execution, delivery and performance of this Agreement by Buyer or the consummation by Buyer of the transactions contemplated by this Agreement, other than (A) the Chinese Approvals, (B) those that may be required solely by reason of Seller's (as opposed to any other third party's) participation in the transactions contemplated by this Agreement and the agreements contemplated by this Agreement and (C) those the failure of which to obtain or make would not have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement.

Section 3.04. Litigation.  There is not any action, suit or proceeding pending or, to the knowledge of Buyer, threatened against Buyer before any arbitrator or Governmental Entity, and Buyer is not a party or subject to or in default under any unsatisfied Judgment, other than those that would not have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement.

Section 3.05. Brokers and Finders.  There is no investment banker, broker, finder, financial advisor or other intermediary who has been retained by or is authorized to act on behalf of Buyer who might be entitled to any fee or commission in connection with the transactions

14

contemplated by this Agreement from Seller, other than Lazard Freres & Co. LLC, whose fees and expenses shall be paid by Buyer .

Section 3.06. <u>Investment Representation</u>. Buyer acknowledges that the Equity Interests are not registered under the securities laws of any jurisdiction and that Buyer is acquiring the Equity Interests for its own account, and not with a view to the distribution thereof.

Section 3.07. <u>Knowledge of Misrepresentations or Omissions</u>. As of the date hereof, Buyer is not aware of any material inaccuracy in any Schedule or any of the representations or warranties of Seller set forth in this Agreement.

ARTICLE IV

COVENANTS AND ADDITIONAL AGREEMENTS

Section 4.01. <u>Access</u>. From the date of this Agreement until the Closing Date, Seller shall, or shall cause the Companies to, give Buyer and its representatives reasonable access during normal business hours to the Companies' properties, personnel, premises, books and records (in each case upon reasonable prior notice by Buyer to Seller and to the applicable Company and in a reasonable manner so as to minimize disruption to the Business). Nothing contained in this Section 4.01 shall obligate Seller or either Company to breach any duty of confidentiality owed by any of them to any person whether such duty arises contractually, statutorily or otherwise.

Section 4.02. <u>Conduct of the Business</u>.

(a) From the date of this Agreement until the Closing Date, the Seller agrees that, except as otherwise contemplated by this Agreement or the Schedules hereto, or as the Buyer shall otherwise consent:

(i) The Business shall be conducted in all material respects in the ordinary course consistent with past practice. Seller shall use commercially reasonable efforts to preserve intact the Business, the business organization and customer relationships of the Business and goodwill with third parties and keep available the services of key employees of the Companies without modifying terms and conditions of their employment.

(ii) The Companies will not amend their articles of association, other than those amendments that are necessary in connection with the registration of Seller as the holder of the Equity Interests and the transfer of the Equity Interests to Buyer.

(iii) The Companies will not (i) split, combine or reclassify the Equity Interests, (ii) declare, set aside or pay any dividend or other distribution payable in cash, stock or property with respect to the Equity Interests that is not reflected in the Final Closing Statement of Consolidated Net Worth, (iii) issue, transfer, sell or dispose of, or authorize or agree to the issuance, transfer, sale or disposition of (whether through the issuance or granting of options, rights, warrants, or otherwise), any additional equity interests or any options, rights, warrants or other securities convertible into or exchangeable or exercisable for any such equity interests or

15

other voting securities or amend any of the terms of any securities or agreement relating to the Equity Interests, or (iv) pledge or otherwise encumber the Equity Interests.

(iv)    The Companies will not acquire or agree to acquire, by merging or consolidating with, or by purchasing a substantial equity interest in or a substantial portion of the assets of, any business or any corporation, partnership, association or other business organization or division thereof or otherwise acquire or agree to acquire any material assets, in any such case.

(v)    Neither Company will sell, lease, license, encumber or otherwise dispose of or create any material mortgage, lien, pledge, charge, security interest or encumbrances of any kind with respect to any of its assets other than in the ordinary course of business or pursuant to contractual obligations existing on the date of this Agreement.

(vi)    The Companies will continue to maintain and repair all property material to the operation of the Business in a manner consistent in all material respects with past practice and will cause all existing insurance to be maintained so as to continue to comply with Section 2.19.

(vii)    Except in the ordinary course of business, consistent with past practice, neither Company will incur any indebtedness for borrowed money, or assume, guarantee, endorse or otherwise become responsible for the obligations of any other Person or make any loans or advances to any Person.

(viii)    Except in the ordinary course of business, consistent with past practice, neither Company will (i) terminate any Contract listed (or required to be listed) on Schedule 2.10(a) or Schedule 2.10(b) or (ii) make any material change in any Contract listed (or required to be listed) from time to time on Schedule 2.10(a) or Schedule 2.10(b). In addition, neither Company will enter into any contract of a type required to be listed on Schedule 2.10(a) or Schedule 2.10(b), except in the ordinary course of business, it being understood that contracts relating to distribution arrangements consistent with past practice or new products currently under development are considered to be in the ordinary course of business. Seller shall update Schedule 2.10(a) or Schedule 2.10(b) to reflect any of the foregoing actions by the Companies taken prior to the Closing.

(ix)    The Companies shall not adopt a plan of complete or partial liquidation or resolution providing for or authorizing such liquidation or a dissolution, merger, consolidation, restructuring, recapitalization or other reorganization.

(x)    The Companies shall not substantially change any of the accounting methods used by them unless required by applicable Laws.

(xi)    Other than with respect to Section 4.02(a)(vi) and as permitted by Section 4.02(a)(vii), neither Seller nor either of the Companies shall authorize or enter into any agreement to do any of the foregoing.

16

(b)    Notwithstanding anything in this Agreement to the contrary, on or prior to the Closing Date, Seller shall be permitted to settle all or any portion of any inter-company obligation as between Seller (together with its Affiliates) and the Companies.

Section 4.03. Efforts.    On the terms and subject to the conditions of this Agreement, each of Seller and Buyer will use all commercially reasonable efforts to take or cause to be taken all actions and to do or cause to be done all things necessary or appropriate to perform its obligations hereunder, to satisfy the conditions to the Closing, to consummate the transactions contemplated by this Agreement and to comply promptly with all legal requirements that may be imposed on it or any of its Affiliates with respect to the Closing.

Section 4.04. Approvals and Consents; Cooperation; Notification.

(a)    The parties shall use their respective reasonable efforts, and cooperate with each other, to obtain as promptly as practicable all governmental and third party authorizations, approvals, consents or waivers required in order to consummate the transactions contemplated by this Agreement.

(b)    As promptly as practicable following the execution of this Agreement, Buyer and Seller will execute and deliver the Equity Transfer Agreements in accordance with applicable Law and required formalities in the P.R.C.  Seller and Buyer shall take all actions necessary and use their best reasonable efforts to file as soon as practicable all notifications, filings and other documents required to obtain all governmental authorizations, approvals, consents or waivers, including the Chinese Approvals, and to respond as promptly as practicable to any inquiries and requests received from any Governmental Entity in connection therewith.

(c)    Seller shall give prompt notice to Buyer of the occurrence of any event that could reasonably be expected to result in a Material Adverse Effect.  Each of Seller and Buyer shall give prompt notice to the other of the occurrence or failure to occur of an event that would or, with the lapse of time would, cause any condition to the consummation of the transactions contemplated hereby not to be satisfied.

Section 4.05. Antitrust Regulations; Reasonable Efforts.

(a)    Each of Seller and Buyer will (i) promptly make or cause to be made the filings required of such party under any applicable Law that is designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, *"Antitrust Laws"*), including, without limitation, the *Provisional Rules on Mergers with and Acquisitions of Domestic Enterprises by Foreign Investors* (the *"Provisional M&A Rules"*) with respect to the transactions contemplated by this Agreement, (ii) comply at the earliest practicable date with any request under any Antitrust Law for additional information, documents or other materials received by such party or any of its Affiliates or representatives from any Governmental Entity in respect of such filings and (iii) cooperate with the other party in connection with any such filing and in connection with resolving any investigation or other inquiry of any such Governmental Entity under any Antitrust Law with respect to any such filing.  Buyer and Seller shall promptly inform the other party of, and consult the other party in connection with, any communication with, and any proposed understanding, undertaking or

17

agreement with, any Governmental Entity regarding any such filing. Neither party shall participate in any meeting with any Governmental Entity in respect of any such filing, investigation or other inquiry without giving the other party notice of the meeting and, to the extent permitted by such Governmental Entity, the opportunity to attend and participate.

(b)    Each of Buyer and Seller shall use all reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Entity with respect to the transactions provided for in this Agreement under any Antitrust Law. In connection therewith, if any administrative or judicial action or proceeding is instituted (or threatened to be instituted) challenging any of the transactions provided for in this Agreement as violative of any Antitrust Law, and if by mutual agreement Buyer and Seller decide that litigation is in their best interests, each of Buyer and Seller shall cooperate and use all reasonable efforts to vigorously contest and resist any injunction or other order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation of the transactions contemplated by this Agreement. Each of Buyer and Seller shall use all reasonable efforts to take such action as may be required to cause the expiration of notice periods under any Antitrust Laws as promptly as possible following the execution of this Agreement.

(c)    Notwithstanding anything to the contrary in Section 4.05(a) and Section 4.05(b), in connection with seeking any approval under any Antitrust Law (i) neither Seller nor Buyer shall be required to divest any of their respective businesses or product lines (other than a non-material portion of the Business), (ii) neither Buyer nor any of its subsidiaries shall be required to take, or be required to agree to take, any other action or agree to any limitation that would involve a change in or limitation on the methods or arrangements by which products of Buyer and its Affiliates are or may in the future be distributed in the P.R.C. or on the methods or arrangements by which products of the Companies are or may in the future be distributed in the P.R.C., which, in the case of products of the Companies, would reasonably be expected to have a material adverse effect on the business, assets, condition or results of operations of the Companies taken as a whole and (iii) neither Seller nor any of its subsidiaries shall be required to take, or be required to agree to take, any other action or agree to any limitation that would involve a change in or limitation (other than immaterial changes or limitations) on the methods or arrangements by which products of Seller and its Affiliates are or may in the future be distributed in the P.R.C., which would reasonably be expected to have a material adverse effect on the business, assets, condition or results of operations of Seller and its subsidiaries taken as a whole.

Section 4.06. Confidentiality.

(a)    Buyer acknowledges that the information being provided to it in connection with the transactions contemplated by this Agreement is subject to the terms of a Confidentiality Agreement dated August 12, 2003 between Buyer and Seller (the "Confidentiality Agreement"), the terms of which are incorporated in this Agreement by reference. Effective upon, and only upon, the Closing, the Confidentiality Agreement shall terminate, with respect to information relating exclusively to the Companies; provided, however, that Buyer acknowledges that any and all other information provided to it by Seller, the Companies or their respective representatives concerning Seller or any of its Affiliates shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing.

18

(b)    From and after the Closing Date, Seller shall keep confidential, and cause its Affiliates and instruct its and their officers, directors, employees and advisors to keep confidential, all information relating to the Companies and the Business, except as required by law or administrative process and except for information that is available to the public on the Closing Date, or thereafter becomes available to the public other than as a result of a breach of this Section 4.06(b); provided that the foregoing shall not restrict Seller from disclosing historical information regarding the Companies as part of the preparation and distribution of its historical financial statements.

Section 4.07. <u>Certain Services and Benefits</u>.    Buyer acknowledges that the Companies currently receive from Seller and its Affiliates certain administrative and corporate services and benefits, including certain information technology support and insurance services. Buyer further acknowledges that all such services and benefits shall cease, and any agreement in respect thereof shall terminate, with respect to the Companies as of the Closing Date and thereafter Seller's sole obligation with respect to the provision of any services with respect to the Companies shall be as set forth in the Transition Services Agreement.

Section 4.08. <u>Access to Information</u>.    After the Closing Date, each of the parties shall grant to the other such access to financial records and other information in their possession related to their conduct of the Business and such cooperation and assistance as shall be reasonably required to enable each of them to complete their legal, regulatory and financial reporting requirements and to complete their Tax returns and for any other reasonable business purpose, including in respect of litigation and insurance matters.    In the event that any such Tax return becomes the subject of any audit or investigation, each of the parties shall give the other all reasonable cooperation, access and assistance as needed during normal business hours with respect to books and records and other financial data of the Companies to enable such first party to defend any such audit or investigation.    Buyer and its Affiliates shall, for a period of three years after the Closing Date (six years in the case of materials relating to Taxes) plus any additional time during which Seller advises Buyer that there is an ongoing Tax audit or investigation with respect to such periods, keep such materials reasonably accessible and not destroy or dispose of such materials without the written consent of Seller.    Each party shall promptly reimburse the other for such other party's reasonable out-of-pocket expenses associated with requests made by such first party under this Section 4.08, but no other charges shall be payable by the requesting party to the other party in connection with such requests.

Section 4.09. <u>Public Announcements</u>.    Neither party will issue any press release or other public announcement with respect to this Agreement or the transactions contemplated by this Agreement without the prior consent of the other party (which consent shall not be unreasonably withheld or delayed, it being acknowledged that Buyer has the right to refuse to consent to the disclosure of the Purchase Price), except as may be required by applicable Laws (in which case the party required to make the release or statement shall allow the other party reasonable time to comment on such release or statement in advance of such issuance); *provided, however,* that each of the parties may make internal announcements to their respective employees that are consistent with the parties' prior public disclosures regarding the transactions contemplated by this Agreement (*provided,* in any such case, that the Purchase Price shall not be disclosed).

19

Section 4.10. <u>Use of Coty Name</u>. Within 30 days following the Closing Date, Buyer shall, or shall cause YSK Shanghai to, submit an application to the applicable Chinese Approving Authority to effect a change of the name of YSK Shanghai such that it no longer contains the word "Coty" or any variation thereof. Buyer shall, and shall cause YSK Shanghai to, use commercially reasonable efforts to effect such name change on the earliest practicable date, but in any event not later than 90 days following the Closing Date.

Section 4.11. <u>Securities</u>. Except as set forth on <u>Schedule 4.11</u>, prior to the Closing Date, any and all kinds of guarantees or other forms of security provided by either Company in favor of any third party (including the Seller or any of its Affiliates) shall be duly released, terminated and discharged.

Section 4.12. <u>Use of Intellectual Property</u>. After the Closing Date, Seller agrees not to use, reproduce or employ any Company Intellectual Property; *provided, however*, that the foregoing shall not in any way prohibit Seller from using, reproducing or employing the "Stay Young" trademark or any intellectual property licensed to Buyer pursuant to the Technology License Agreement.

Section 4.13. <u>Transition Services</u>. Promptly after the date hereof Seller and Buyer shall negotiate in good faith certain economic terms of the Transition Services Agreement, including the fees to be paid to Buyer and any sharing of profits from the sale of products subject to the Transition Services Agreement. Such economic terms shall not result in the Companies incurring any loss as a result of the provision of the services under the Transition Services Agreement and the production volume shall not be materially different from that indicated in the Annex to the Transition Services Agreement.

## ARTICLE V

## CONDITIONS TO CLOSING

Section 5.01. <u>Conditions to Buyer's Obligation to Close</u>. The obligation of Buyer to purchase the Equity Interests and to assume the YSK License Agreement and the Transferred Contracts and otherwise consummate the transactions contemplated by this Agreement shall be subject to the satisfaction (or waiver by Buyer), at or before the Closing, of the following conditions:

(a)    No Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated or enforced any statute, rule, regulation, executive order, decree, judgment, preliminary or permanent injunction or other order that is in effect and that prohibits, enjoins or otherwise restrains the transfer of ownership of the Equity Interests or the assignment and assumption of the YSK License Agreement or any portion of the assumption of the Transferred Contracts.

(b)    Any waiting period imposed by any Governmental Authority under the Provisional M&A Rules with respect to the transfer of the Equity Interests to Buyer shall have expired or been terminated.

20

(c)     Seller's obligations under Section 1.03 shall have been satisfied.

(d)     The Chinese Approvals, which shall not be conditioned upon Buyer being required to take or agree to take any of the actions or accept any of the limitations referred to in Section 4.05(c)(i) or (ii), shall have been received.

(e)     Ms. Kan and Yue-Sai Kan Cosmetics, Ltd. (USA), a Delaware corporation ("*YSK Limited*"), shall have delivered duly executed counterparts to the License Assignment.

(f)     Ms. Kan shall have consented to the assignment to Buyer of the Service Agreement, dated as of May 14, 1996 (the "*Service Agreement*"), between Yue-Sai Kan and Coty Inc. (as successor to Lancaster Group Worldwide, Inc.), as amended by a letter agreement, dated April 30, 2003.

(g)     Seller shall have performed or complied with in all material respects the obligations required under this Agreement to be performed or complied with by it at or prior to the Closing.

(h)     The representations and warranties of Seller shall be true and correct in all material respects (except those representations and warranties of Seller that are qualified by materiality or Material Adverse Effect or similar qualifiers, which shall be true and correct in all respects) as of the date of this Agreement and as of the Closing Date as if made on and as of the Closing Date.

(i)     Seller shall have delivered to Buyer a certificate, dated the Closing Date and signed by an officer of Seller, as to the satisfaction of the conditions set forth in Sections 5.01(g) and 5.01(h).

(j)     Each Equity Transfer Agreement shall have become effective and the conditions to closing set forth in each such Agreement shall have been satisfied or waived.

(k)     Seller shall have received all third party consents listed on Schedule 2.03 (the "*Required Consents*").

(l)     The Sublicenses shall have been terminated effective as of the Closing Date.

Section 5.02.  Conditions to Seller's Obligation to Close.  The obligation of Seller to sell the Equity Interests and to assign the YSK License Agreement and the Transferred Contracts and otherwise consummate the transactions contemplated by this Agreement shall be subject to the satisfaction (or waiver by Seller), at or before the Closing, of the following conditions:

(a)     No Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated or enforced any statute, rule, regulation, executive order, decree, judgment, preliminary or permanent injunction or other order that is in effect and that prohibits, enjoins or otherwise restrains the transfer of ownership of the Equity Interests or the assignment and assumption of the YSK License Agreement or any portion of the Transferred Contracts.

21

(b)     Any waiting period imposed by any Governmental Authority under the Provisional M&A Rules with respect to the transfer of the Equity Interests to Buyer shall have expired or been terminated.

(c)     Buyer's obligations under Section 1.04 shall have been satisfied.

(d)     The Chinese Approvals, which shall not be conditioned upon Seller being required to take or agree to take any of the actions or accept any of the limitations referred to in Section 4.05(c)(i) or (iii), shall have been received.

(e)     Ms. Kan and YSK Limited shall have delivered duly executed counterparts to the License Assignment.

(f)     Ms. Kan shall have consented to the assignment of the Service Agreement to Buyer.

(g)     Buyer shall have performed or complied with in all material respects the obligations required under this Agreement to be performed or complied with by it at or prior to the Closing.

(h)     The representations and warranties of Buyer shall be true and correct in all material respects (except those representations and warranties of Buyer that are qualified by materiality or Material Adverse Effect or similar qualifiers, which shall be true and correct in all respects) as of the date of this Agreement and as of the Closing Date as if made on and as of the Closing Date.

(i)     Buyer shall have delivered to Seller a certificate, dated the Closing Date and signed by an officer of Buyer, as to the satisfaction of the conditions set forth in Sections 5.02(g) and 5.02(h).

(j)     Each Equity Transfer Agreement shall have become effective and the conditions to closing set forth in each such Agreement shall have been satisfied or waived.

(k)     Seller shall have received the Required Consents.

(l)     The Sublicenses shall have been terminated effective as of the Closing Date.

Section 5.03. <u>Frustration of Closing Conditions</u>.  Buyer and Seller may not rely on the failure of any condition set forth in this Article V to be satisfied if such failure was caused by such party's failure to act in good faith or to use commercially reasonable efforts to cause the satisfaction of such condition.

ARTICLE VI

TERMINATION

Section 6.01. <u>Termination</u>.

22

(a)    This Agreement may be terminated and the transactions contemplated by this Agreement abandoned at any time prior to the Closing:

(i)    by mutual written consent of Buyer and Seller;

(ii)    by Seller if any of the conditions set forth in Section 5.02 shall have become incapable of fulfillment, and shall not have been waived by Seller;

(iii)    by Buyer if any of the conditions set forth in Section 5.01 shall have become incapable of fulfillment, and shall not have been waived by Buyer;

(iv)    by either of the parties if the Closing shall not have occurred on or prior to May 31, 2004; *provided, however*, that such date shall be extended to August 31, 2004 if the Closing shall not have occurred due exclusively to the failure of the parties to receive the Chinese Approvals, including, without limitation, the approval of any Governmental Entity under any Antitrust Law prior to May 31, 2004;

(v)    if any Governmental Entity shall have issued an order, decree or ruling or taken any other action (which order, decree, ruling or other action the parties hereto shall use their best effort to lift), in each case permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such order, decree, ruling or other action shall have become final and not subject to appeal;

*provided, however*, that the party seeking termination pursuant to clause (ii), (iii), (iv) or (v) is not then in material breach of any of its representations, warranties, covenants or agreements contained in this Agreement.

(b)    In the event of termination by Seller or Buyer pursuant to this Section 6.01, written notice thereof shall forthwith be given to the other party and the transactions contemplated by this Agreement shall be terminated, without further action by any party.  If the transactions contemplated by this Agreement are terminated as provided in this Agreement:

(i)    each party shall, and shall cause each of its directors, officers, employees, agents, representatives and advisors to, return to the other party all documents and other material received from such other party or any of their respective Affiliates or representatives relating to the transactions contemplated by this Agreement, whether obtained before or after the execution hereof, except as provided under the Confidentiality Agreement;

(ii)    all confidential, proprietary or nonpublic information received by Buyer, its directors, officers, employees, agents, representatives or advisors with respect to the Business, Seller, the Companies, and their respective Affiliates, shall be treated in accordance with the Confidentiality Agreement, which shall remain in full force and effect notwithstanding the termination of this Agreement; and

23

(iii)    immediately following such termination, Buyer shall take all steps reasonably requested by Seller to again register Seller (or Seller's designee) as the sole foreign investor holding the Equity Interests.

Section 6.02.  Effect of Termination.   Upon termination of this Agreement, the undertakings of the parties set forth in this Agreement shall forthwith be and become of no further force and effect; *provided, however,* that Sections 4.06, 6.01, 6.02 and 9.01 and rights and remedies for any breaches of this Agreement prior to its termination shall survive any such termination.

ARTICLE VII

INDEMNIFICATION

Section 7.01.  Obligation of Parties to Indemnify.

(a)    Indemnification by Seller.  Subject to the limitations set forth in Section 7.03, Seller shall indemnify, defend and hold Buyer and its Affiliates, officers and directors (the *"Buyer Indemnified Parties"*) harmless from and against any and all claims, losses, damages, liabilities, obligations or out-of-pocket costs or expenses, including reasonable legal fees and expenses, other than claims, losses, damages, liabilities, obligations, out-of-pocket costs or expenses relating to Taxes, which shall be governed solely by Section 8.03 (collectively, *"Losses"*), but net of any insurance recoveries received or receivable or tax benefits actually received by the Buyer Indemnified Parties because of such Losses, to the extent arising out of or resulting from any (i) breach of any representation or warranty (it being agreed that for the purposes of Buyer's right to indemnification pursuant to this Section 7.01(a) the representations and warranties of Seller contained herein shall not be deemed qualified by any materiality standard, including without limitation references to materiality generally or to whether or not any such breach results in a Material Adverse Effect), other than a representation or warranty contained in Section 2.17, made by Seller in this Agreement or (ii) breach of any covenant or undertaking, other than a covenant contained in Article VIII, of Seller contained in this Agreement.

(b)    Indemnification by Buyer.   Subject to the limitations set forth in Section 7.03, Buyer shall indemnify, defend and hold Seller and its Affiliates, officers and directors (the *"Seller Indemnified Parties"*) harmless from and against any and all Losses, but net of any insurance recoveries received or receivable or tax benefits actually received by the Seller Indemnified Parties because of such Losses, to the extent arising out of or resulting from any (i) breach of any representation or warranty made by Buyer contained in this Agreement or (ii) breach of any covenant, other than a covenant contained in Article VIII, of Buyer contained in this Agreement that survives the Closing Date, including without limitation Buyer's obligations under Section 1.06(c).

Section 7.02.  Indemnification Procedures.  If any party (the *"Indemnified Party"*) receives written notice of the commencement of any action or proceeding or the assertion of any claim by a third party or the imposition of any penalty or assessment for which indemnity may be sought under this Article VII (a *"Third Party Claim"*) and such Indemnified Party intends to seek

24

indemnity pursuant to this Article VII, the Indemnified Party shall promptly provide the other party (the "*Indemnifying Party*") with written notice of such Third Party Claim (such Notice, a "*Claim Notice*") stating the nature, basis and the amount thereof, to the extent known, along with copies of the relevant documents evidencing such Third Party Claim and the basis for indemnification sought. If the Indemnified Party determines in good faith (and based on the opinion of its counsel) that immediate action by the Indemnified Party with respect to such Third Party Claim is required, then the Claim Notice shall also include (i) a detailed description of any action proposed to be taken by the Indemnified Party and (ii) a copy of any correspondence or any pleading, motion, appearance or other filing proposed to be sent, made or filed by the Indemnified Party in connection with such Third Party Claim. Failure of the Indemnified Party to give a complete and accurate Claim Notice will not relieve the Indemnifying Party of its indemnification obligations hereunder, except if and to the extent that the Indemnifying Party is actually prejudiced by either (i) the Indemnified Party's failure to give such a complete and accurate Claim Notice or (ii) any action taken by the Indemnified Party in connection with such Third Party Claim. The Indemnifying Party shall not be liable for any expenses incurred during the period prior to the Indemnified Party giving a Claim Notice. The Indemnifying Party will have 30 days from receipt of a Claim Notice to give notice to assume the defense, appeal or settlement proceedings thereof (such notice, an "*Assumption Notice*"). If an Assumption Notice is given by the Indemnifying Party, the Indemnifying Party will have the right to assume and control the defense, appeal or settlement proceedings of the Indemnified Party against the Third Party Claim, at its sole cost and expense, with counsel of the Indemnifying Party's choice. Should the Indemnifying Party so elect to assume the defense of a Third Party Claim, the Indemnifying Party shall not be liable to the Indemnified Party for expenses of legal counsel subsequently incurred by the Indemnified Party in connection with the defense thereof. In any case, the Indemnifying Party shall have the right to participate in such defense, appeal or settlement proceedings. So long as the Indemnifying Party has assumed the defense, appeal or settlement proceedings of the Third Party Claim in accordance with this Agreement, (i) the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense, appeal or settlement of the Third Party Claim, (ii) the Indemnified Party will not file any papers or consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party and (iii) the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed) if (A) such judgment or settlement does not include as an unconditional term thereof the giving by each claimant or plaintiff to such Indemnified Party of a release from all liability in respect of such claim, (B) such judgment or settlement would result in the finding against or admission by such Indemnified Party of any violation of Law, (C) as a result of such consent or settlement injunctive or other equitable relief would be imposed against the Indemnified Party or (D) such judgment or settlement would reasonably be expected to materially adversely affect the business, operations or assets of the Indemnified Party. The parties will use reasonable efforts to minimize Losses from Third Party Claims and will act in good faith in responding to, defending against, settling or otherwise dealing with such claims. The parties will also cooperate in any such defense, appeal or settlement proceedings and give each other reasonable access to all information relevant thereto. Whether or not the Indemnifying Party has assumed the defense, appeal or settlement proceedings, such Indemnifying Party will not be obligated to indemnify the

Indemnified Party hereunder for any settlement entered into or any judgment that was consented to without the Indemnifying Party's prior written consent.

Section 7.03. Limitations on Indemnification.

(a) Notwithstanding anything in this Agreement to the contrary, (i) Seller shall not have any liability under Section 7.01(a) to the extent arising from a breach of any representation or warranty of Seller or a breach of any covenant contained in Section 4.02 (other than with respect to subsections (a)(ii), (iii), (iv) and (ix) of such section) or any liability under Article VIII (excluding, for purposes of this clause (i), any Losses that represent payments required to be made to Buyer by Seller in respect of Post-Closing Tax Returns pursuant to Section 8.01) unless the aggregate liability for Losses suffered by the Buyer Indemnified Parties exceeds in respect of such matters $1,500,000, and then only to the extent of the excess of such Losses over $750,000, (ii) the aggregate liability of Seller under Section 7.01, Article VIII and the other Transaction Agreements shall not in either case exceed $25,000,000, (iii) no party shall be responsible, pursuant to Sections 7.01(a) and (b), for any indemnifiable Losses suffered by the Buyer Indemnified Parties or the Seller Indemnified Parties, as applicable, to the extent arising out of any breach of any representation or warranty or covenant or agreement of such party in this Agreement unless a claim therefor is asserted with specificity in writing by the Indemnified Party, (iv) Seller shall not be responsible for any indemnifiable Loss suffered by the Buyer Indemnified Parties to the extent of that amount relating to such matter that has been specifically reserved or provided for in the Financial Statements or the Final Closing Statement of Consolidated Net Worth, (v) Seller shall not be liable for any indemnifiable Loss to the extent arising out of any action taken or omitted to be taken by any Buyer Indemnified Party, and Buyer shall not be liable for any indemnifiable Loss to the extent arising out of any action taken or omitted to be taken by any Seller Indemnified Party, (vi) no party shall be responsible for any indemnifiable Loss suffered by an Indemnified Party to the extent arising from (A) a change in accounting or taxation law, policy or practice made after Closing, other than a change required to comply with any Law, policy or practice in effect at the date hereof, or (B) any legislation not in force at Closing or any change of Law or administrative practice that takes effect retroactively or occurs as a result of any increase in the rates of taxation in force at the date hereof and (vii) no party shall be responsible for any indemnifiable Loss suffered by an Indemnified Party with respect to any claim that is contingent unless and until such contingent claim becomes an actual liability of the Indemnified Party and is due and payable, so long as such claim was timely submitted pursuant to the provisions of this Article VII. The foregoing limitations shall not apply to any breach of the representations and warranties set forth in Sections 2.01, 2.02, 2.04, 2.05(a) (first and third sentences) and 2.06 or in the case of fraud.

(b) Buyer acknowledges and agrees that, other than the representations and warranties and covenants of Seller specifically contained in Article II and Article IV, there are no representations or warranties or covenants of Seller or any other person either expressed or implied with respect to the Business, the Companies, the transactions contemplated by this Agreement, the YSK License or the Transferred Contracts, individually or collectively. Without limiting the foregoing, Buyer acknowledges that it, together with its advisors, has made its own investigation of the Companies and the Business and is not relying on any implied warranties or upon any representation or warranty whatsoever as to the prospects (financial or otherwise), or the viability or likelihood of success, of the Business, except as expressly provided in this

26

Agreement. Buyer acknowledges that it and its representatives have been given access to (i) the data room and the documents presented therein, (ii) management presentations with respect to the Companies and (iii) site visits of the facilities of the Companies. Subject to Section 3.07, such access and any due diligence by Buyer shall not affect Buyer's entitlement to rely on the representations and warranties of Seller set forth in this Agreement.

(c)     Buyer further acknowledges and agrees that, should the Closing occur, its sole and exclusive remedy with respect to any and all claims relating to this Agreement, the Companies, the transactions contemplated by this Agreement, the Transaction Agreements and the Transferred Contracts (other than claims of, or causes of action arising from, fraud) shall be pursuant to the indemnification provisions set forth in this Article VII and Section 8.03. In furtherance of the foregoing, Buyer waives, from and after the Closing, any and all rights, claims and causes of action (other than claims of, or causes of action arising from, fraud) that it or any other Buyer Indemnified Party may have against Seller or any of its Affiliates arising under or based upon any Law including with respect to environmental matters generally and any matters under the Comprehensive Environmental Response, Compensation, and Liability Act (except pursuant to the indemnification provisions set forth in this Article VII and Section 8.03).

Section 7.04. Survival of Representations, Warranties and Covenants.   For purposes of Section 7.01(a) and 7.01(b) and Article VIII, the representations, warranties, covenants and undertakings contained in this Agreement shall survive the Closing, *provided* that such representations and warranties and the covenants contained in Section 4.02 (other than subsections (a)(ii), (iii), (iv) and (ix) of such section) shall terminate at the close of business two years following the Closing, except that any representations or warranties relating to Tax matters shall terminate at the close of business six years following the Closing. It is expressly agreed that any claim made under this Agreement by an Indemnified Party may be validly filed with the Indemnifying Party, notwithstanding the fact that the final amount of such claim may only be determined in a final manner after such time periods.  No party shall have any liability or obligation of any nature with respect to any representation, warranty, agreement or covenant after the termination thereof unless a claim has been timely made prior to the applicable expiration date.

## ARTICLE VIII

## TAX MATTERS

Section 8.01. Tax Returns.  Buyer will prepare any Tax return of a Company that includes a Pre-Closing Tax Period and that is required to be filed after the Closing Date (a "*Post-Closing Tax Return*") and pay any such Tax reflected thereon. Buyer shall provide Seller with a copy of each Post-Closing Tax Return no later than 30 days before the due date (or, if later, the filing date) of such Post-Closing Tax Return. All Post-Closing Tax Returns shall be filed in accordance with applicable Law and consistent with past practice. Buyer shall permit Seller to review and comment on each Post-Closing Tax Return and shall make any revisions reasonably requested by Seller. Subject to the foregoing, Seller shall pay to Buyer the portion of any Tax (except for Transfer Taxes described in Section 8.02 and Taxes resulting from any transaction that is out of the ordinary course of business that occurs on the Closing Date but after the Closing) reflected on any Post-Closing Tax Return that is attributable to a Pre-Closing Tax Period

27

calculated in accordance with the principles of Section 8.03(c) below but only to the extent in excess of the amount reflected as a current liability for Taxes on the Final Closing Statement of Consolidated Net Worth and for purposes of Section 7.03 and Section 7.04, amounts payable by Seller pursuant to this Section 8.01 shall be considered to be Losses. "*Pre-Closing Tax Period*" shall mean any taxable period or portion thereof ending on or before the Closing Date. If a taxable period begins on or before the Closing Date and ends after the Closing Date, then the portion of the taxable period that ends on the Closing Date shall constitute a Pre-Closing Tax Period.

Section 8.02. Transfer Taxes. Any registration, transfer, documentary, sales, use or other similar Taxes ("*Transfer Taxes*") imposed on either Company with respect to transfer of the Equity Interests as contemplated herein will be borne by such Company. Any stamp duty imposed by any P.R.C. Taxing Authorities on a contract, agreement or other document in connection with the transfer of the Equity Interests shall be paid and borne by Seller and Buyer, respectively, in accordance with the requirements of applicable Law. Any other Transfer Taxes imposed in connection with the transfer of the Equity Interests or the Equity Transfer Agreements shall be borne 50% by Buyer and 50% by Seller. For the avoidance of doubt, "Transfer Taxes" does not include FEI Tax.

Section 8.03. Tax Indemnification.

(a)    Subject to Section 8.04, Seller shall indemnify the Buyer Indemnified Parties from and against (i) all liability for Taxes of the Companies for any Pre-Closing Tax Period (except for Transfer Taxes described in Section 8.02, Taxes paid by Seller pursuant to Section 8.01, and Taxes resulting from any transaction that is out of the ordinary course of business that occurs on the Closing Date but after the Closing), calculated in accordance with the principles of Section 8.03(c) below but only to the extent in excess of the amount reflected as a liability for Taxes on the Final Closing Statement of Consolidated Net Worth and (ii) all liability for reasonable third party legal fees and expenses incurred in connection with any item in clause (i) (for purposes of Section 7.03 and Section 7.04, such items shall be considered to be Losses); *provided, however,* that any indemnity payments shall be net of any tax benefits actually received by the Buyer Indemnified Parties because of such indemnity payments.

(b)    Buyer shall, and shall cause the Companies to, indemnify the Seller Indemnified Parties from and against (i) all liability for Taxes of the Companies for any Post-Closing Tax Period (calculated in accordance with the principles of Section 8.03(c) below), (ii) a breach of any covenant contained in Section 8 by Buyer or any of its Affiliates (including, after the Closing Date, any of the Companies) and (iii) all liability for reasonable third party legal fees and expenses and incurred in connection with any item in clause (i) or (ii) of this Section 8.03(b) (for purposes of Section 7.03 and 7.04, such items shall be considered to be Losses); *provided, however,* that any indemnity payments shall be net of any tax benefits actually received by the Seller Indemnified Parties because of such indemnity payments. "*Post-Closing Tax Period*" means any taxable period or portion thereof beginning after the Closing Date. If a taxable period begins on or before the Closing Date and ends after the Closing Date, then the portion of the taxable period that begins on the day after the Closing Date shall constitute a Post-Closing Tax Period.

28

(c)    In the case of any taxable period that includes (but does not end on) the Closing Date (a "*Straddle Period*"):

(i)    real, personal and intangible property Taxes ("*Property Taxes*") of the Companies for the Pre-Closing Tax Period shall be equal to the amount of such Property Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days during the Straddle Period that are in the Pre-Closing Tax Period and the denominator of which is the number of days in the Straddle Period; and

(ii)    the Taxes of the Companies (other than Property Taxes) for the Pre-Closing Tax Period shall be computed as if such taxable period ended as of the close of business on the Closing Date.

Section 8.04.  Tax Claims.

(a)    In order for an Indemnified Party to be entitled to any indemnification provided for with respect to the items under Section 8.03(a) or Section 8.03(b) (each, a "*Tax Claim*"), the Indemnified Party must send reasonably prompt notice to the Indemnifying Party in writing of the Tax Claim (a "*Tax Claim Notice*"); *provided, however*, that failure to give such notification shall not affect the indemnification provided hereunder except to the extent the Indemnifying Parties have been actually prejudiced as a result of such failure.

(b)    With respect to any Tax Claim relating to a Pre-Closing Tax Period (other than a Tax Claim relating to Taxes of a Company for a Straddle Period), Seller may control all proceedings taken in connection with such Tax Claim (including selection of counsel) and, without limiting the foregoing, may in its sole discretion pursue or forego any and all administrative appeals, proceedings, hearings and conferences with any Taxing Authority with respect thereto, and may, in its sole discretion, either pay the Tax claimed and sue for a refund where applicable law permits such refund suits or contest the Tax Claim in any permissible manner.

(c)    The Seller shall control all proceedings taken in connection with any Tax Claim relating to Taxes of a Company for a Straddle Period; *provided, however*, that Seller shall not settle a Tax Claim relating to Taxes of a Company for a Straddle Period without Buyer's prior written consent, which consent shall not be unreasonably withheld or delayed.

(d)    Prior to the Indemnifying Party notifying the Indemnified Party of its intention to defend the Tax Claim, the Indemnified Party will defend against such Tax Claim as the Indemnified Party deems appropriate in good faith. Buyer, the Companies and each of their respective Affiliates shall cooperate with Seller in contesting any Tax Claim, which cooperation shall include, without limitation, the retention and (upon Seller's request) the provision to Seller of records and information or copies thereof that are reasonably relevant to such Tax Claim, and making employees available on a mutually convenient basis to provide additional information or explanation of any material provided hereunder or to testify at proceedings relating to such Tax Claim.

29

Section 8.05. <u>Refunds</u>. Buyer agrees to pay (and cause the Companies to pay) to the Seller all refunds of any Taxes with respect to any Pre-Closing Tax Period. At the expense of Seller, the parties shall cooperate in order to take all reasonably necessary steps to claim any such refund. Any such refund shall be paid to Seller ten days after such refund is received.

Section 8.06. <u>Termination</u>.    Notwithstanding anything to the contrary in this Agreement, the provisions of this Article VIII shall terminate at the close of business six years following the Closing Date and the provisions of Section 7.04 shall apply to this Article VIII.

Section 8.07. <u>Post-Closing Elections</u>. Neither the Buyer nor any of its Affiliates (including, after the Closing, any of the Companies) shall make any election pursuant to Section 338 of the U.S. Internal Revenue Code with respect to any of the Companies.

ARTICLE IX

MISCELLANEOUS

Section 9.01. <u>Expenses</u>.    Each of the parties hereto shall pay its own legal, accounting and other fees and expenses incurred in connection with the preparation, execution and delivery of this Agreement and all documents and instruments executed pursuant hereto and the consummation of the transactions contemplated by this Agreement and the Transaction Agreements and any other costs and expenses incurred by such party, except as otherwise expressly set forth in this Agreement. None of the foregoing expenses shall be borne by the Companies, except for incidental disbursements and other immaterial expenses.

Section 9.02. <u>Notices</u>.    All notices, requests, permissions, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) five business days following sending by registered or certified mail, postage prepaid, (b) when sent, if sent by facsimile, provided that the facsimile transmission is promptly confirmed by telephone, (c) when delivered, if delivered personally to the intended recipient and (d) one business day following sending by overnight delivery via a national or international courier service and, in each case, addressed to a party at the following address for such party:

Notices to Seller:

Coty Inc.
1325 Avenue of the Americas
34th Floor
New York, NY 10019
Attention: Chief Financial Officer
Facsimile: (212) 479-4508

30

with copies to:

> Coty Inc.
> 1325 Avenue of the Americas
> 34th Floor
> New York, NY 10019
> Attention:  General Counsel
> Facsimile:  (212) 479-4328

> and

> Covington & Burling
> 1330 Avenue of the Americas
> New York, New York  10019
> Attention:  Scott F. Smith
> Facsimile: (212) 841-1010

Notices to Buyer:

> L'Oréal S.A.
> 41, rue Martre
> 92117 Clichy
> Attention: Bruno Wirth, Finance Manager
> Facsimile: (33) 1.47.56.42.02

with copies to:

> L'Oréal S.A.
> 41, rue Martre
> 92117 Clichy
> Attention: Yannick Chalmé, General Counsel
> Facsimile: (33) 1.47.56.82.34

> and

> Coudert Brothers LLP
> 1114 Avenue of the Americas
> New York, New York 10036
> Attention:  Andrew S. Hedden
> Facsimile:  (212) 626-4422

Either party may, by notice given in accordance with this Section 9.02, specify a new address for notices under this Agreement.

Section 9.03. <u>Entire Agreement; Amendment; Waiver</u>.  This Agreement and the Exhibits and Schedules and the Confidentiality Agreement constitute the entire understanding between the parties with respect to the subject matter hereof, and supersede all other understandings and negotiations with respect thereto. This Agreement may be amended only in a

writing signed by the parties hereto. Any provision of this Agreement may be waived only in a writing, which writing may be signed only by the party granting such waiver. No course of dealing between the parties shall be effective to amend or waive any provision of this Agreement. Notwithstanding anything in the Equity Transfer Agreements to the contrary, in the event of any inconsistency or conflict between the terms of this Agreement and those of the Equity Transfer Agreements, the terms of this Agreement shall control.

Section 9.04. _Severability_. In the event that any provision contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any jurisdiction, such provision shall be ineffective as to such jurisdiction to the extent of such invalidity, illegality or unenforceability without invalidating or affecting the remaining provisions hereof or affecting the validity, legality or enforceability of such provision in any other jurisdiction.

Section 9.05. _Assignment_. Neither this Agreement nor any of the rights and obligations of the parties hereunder may be assigned by any party hereto without the prior written consent of the other parties hereto. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Any attempted assignment or transfer in violation of this Section 9.05 shall be void.

Section 9.06. _Interpretation_. Any matter set forth on any of the Schedules hereto shall be deemed set forth for all purposes of the other Schedules to the extent relevant. Any capitalized terms used in any Schedule or Exhibit, but not otherwise defined therein, shall have the meanings as defined in this Agreement. References to defined terms in the singular shall include the plural and references to defined terms in the plural shall include the singular. The descriptive headings of the several Articles and Sections of this Agreement and the Exhibits, Schedules and Table of Contents to this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement. All references in this Agreement to "Articles," "Sections," "Exhibits" or "Schedules" shall be deemed to be references to Articles or Sections of this Agreement or Exhibits or Schedules to this Agreement, unless otherwise indicated.

For all purposes hereof:

"_Affiliate_" of any person means any person or entity controlling, controlled by or under common control with such person.

"_business day_" means any day on which banks are not required or authorized to close for business in New York City or Paris other than Saturday or Sunday.

"_Chinese Approving Authority_" means any competent governmental agencies of the P.R.C. charged by Law or delegated by the P.R.C. Ministry of Commerce (which has the authority to examine and approve the transactions contemplated by this Agreement in accordance with the relevant Laws concerning foreign investment) and by the State Administration for Industry and Commerce (which has the authority to duly register on the business licenses of the Companies any changes in connection with this Agreement and the transactions contemplated hereby in accordance with relevant Laws concerning foreign investment), respectively..

"_including_" means including, without limitation.

32

"*Income Taxes*" means income, finances or other taxes measured by or based upon income or profits.

"*knowledge*" of Seller means the actual knowledge of Michael Fishoff (Chief Financial Officer of Seller), Steven Danatos (Senior Vice President, Taxes and External Development of Seller), Stephen Ford (Senior Vice President, General Counsel and Secretary of Seller), Leo Lui (Chief Executive Officer of the Companies), Peter Ip (Finance Director of the Companies) and Hua Shan (General Manager, Operations of the Companies).

"*Material Adverse Effect*" means a material adverse effect on the financial condition or results of operations of the Business or the ability of Seller to consummate the transactions contemplated by this Agreement, excluding in any case any effects to the extent resulting from (i) changes in the economy in general, (ii) changes in the Chinese cosmetics industry in general and not specifically relating to the Companies or (iii) the execution of the Agreement (including the identity of Buyer) or any of the agreements or other documents contemplated by this Agreement and the consummation of the transactions contemplated by this Agreement.

"*party*" means a signatory to this Agreement, except there the context requires otherwise.

"*person*" means any individual, firm, corporation, partnership, limited liability company, trust, joint venture, Governmental Entity or other entity.

"*Tax*" means any Income Tax, corporate tax, capital gains tax, securities transfer tax, real estate transfer tax, other asset transfer tax, value-added tax, social security taxes or charges, professional tax, salary tax, franchise tax, payroll tax, customs tax or charges, sales tax, use tax, registration tax, capital duty and all other forms of tax and all penalties, charges and interest relating to any of the foregoing either in the P.R.C. or in another country.

Section 9.07. <u>Limitations on Damages</u>. Notwithstanding anything to the contrary in this Agreement, in no event shall either party be liable for special, indirect, incidental, punitive or consequential damages of the other party (including, without limitation, damages for loss of business profits, lost opportunities business interruption or any other loss), whether or not caused by or resulting from the actions of such party or the breach of its covenants, agreements, representations or warranties hereunder, even if such party has been advised of the possibility of such damages; *provided* that nothing in this Section 9.07 shall affect the application of Section 1.05 or preclude any recovery by an Indemnified Party against an Indemnifying Party for third party claims.

Section 9.08. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, United States of America, without regard to principles of conflicts of law.

Section 9.09. <u>Jurisdiction</u>. Each party irrevocably agrees that any legal action, suit or proceeding against either of them with respect to its obligations or liability under or arising out of or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise) may be

33

brought only in the United States District Court for the Southern District of New York or, if such court does not have jurisdiction, the state courts of New York located within New York County, and irrevocably accepts and submits to the exclusive jurisdiction and venue of the aforesaid courts *in personam*, with respect to any such action, suit or proceeding.

Section 9.10. <u>Service of Process</u>. Each of the parties hereto irrevocably consents to the service of any and all legal process, summonses, notices and other documents that may be served in any action, suit or proceeding referred to in Section 9.09 above in the United States District Court for the Southern District of New York or the state courts of New York located in New York County, which service may be made by mailing a copy of such process by certified or registered mail, postage prepaid, to the party to be served at its address as provided in Section 9.02 hereof, with such service to be effective upon receipt.

Section 9.11. <u>WAIVER OF JURY TRIAL</u>. EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR DISPUTES RELATING HERETO. EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.11.

Section 9.12. <u>No Third Party Beneficiaries</u>. Except as provided in Article VII, this Agreement is for the sole benefit of the parties hereto, and nothing in this Agreement expressed or implied shall give or be construed to give to any person, other than the parties hereto, any legal or equitable rights hereunder.

Section 9.13. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

34

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

COTY INC.

By: _____
Name: Michael Fishoff
Title: CFO

L'ORÉAL S.A.

By: _____
Name:
Title:

[SIGNATURE PAGE TO MASTER ASSIGNMENT AND TRANSFER AGREEMENT]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

COTY INC.

By: _____
    Name:
    Title:

L'ORÉAL S.A.

By: _____
    Name: Christian Mullier
    Title: Executive Vice President
    in charge of Administration
    and Finances.

[SIGNATURE PAGE TO MASTER ASSIGNMENT AND TRANSFER AGREEMENT]

## SCHEDULE 2.07

## FINANCIAL STATEMENTS

See attached unaudited adjusted consolidated balance sheet of the Companies as of June 30, 2003.

See attached unaudited consolidated income statement of the Companies for the fiscal years ended June 30, 2003, 2002 and 2001.

See Schedule 2.17.

Consolidated China Balance Sheet as of June 2003
From the US GAAP Management accounts presented during the Management Presentations
Excluding the YSK LP-Co 084 (USA) not included in the transaction
000 Rmb and 000 $ (1$ = 8.27715 Rmb)

| | Shenzhen In 000 Rmb | Shenzhen In 000$ | Shanghai In 000 Rmb | Shanghai In 000$ | Intra - China elimination In 000 Rmb | Intra - China elimination In 000$ | Consolidated China In 000 Rmb | Consolidated China In 000$ |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | |
| **Current Assets** | | | | | | | | |
| Cash and Marketable Securities | 48,425 | 5,850 | 2,552 | 308 | | | 50,977 | 6,159 |
| Trade Receivables | 58,952 | 7,122 | | | | | 58,952 | 7,122 |
| Inventory | 36,945 | 4,463 | 903 | 109 | -4,796 | (579) | 33,052 | 3,993 |
| Intercompany - interest free | 6,421 | 776 | | | | | 6,421 | 776 |
| Intercompany - interest bearing | 95,500 | 11,538 | | | 95,500 | (11,538) | 0 | 0 |
| Current Deferred Tax Asset | 12,335 | 1,490 | | | | | 12,335 | 1,490 |
| Prepaid Expences and other Current Assets | 11,035 | 1,333 | 786 | 95 | | | 11,821 | 1,428 |
| Total Current Assets | 269,613 | 32,573 | 4,241 | 512 | (100,296) | (12,117) | 173,558 | 20,968 |
| Property Plant and Equipment | 41,882 | 5,060 | 102,238 | 12,352 | | | 144,120 | 17,412 |
| **Total Assets** | 311,495 | 37,633 | 106,479 | 12,864 | (100,296) | (12,117) | 317,678 | 38,380 |
| **Liabilities and Stockholders Equity** | | | | | | | | |
| **Current Liability** | | | | | | | | |
| Accounts Payable | 51,607 | 6,235 | 1,321 | 160 | | | 52,928 | 6,394 |
| Income Taxes and Other Taxes Payables | 4,708 | 569 | | | | | 4,708 | 569 |
| Accrued Expenses and other Current Liabilities | 51,100 | 6,174 | 11,251 | 1,359 | | | 62,351 | 7,533 |
| Total Current Liabilities | 107,416 | 12,978 | 12,572 | 1,519 | | | 119,987 | 14,496 |
| **Long Term Debt** | | | | | | | | |
| Intercompany-interest free | 48,003 | 5,799 | 4,891 | 591 | | | 52,894 | 6,390 |
| Intercompany-interest bearing | | | 95,500 | 11,538 | (95,500) | (11,538) | 0 | 0 |
| Intercompany-interest accruals | 7,335 | 886 | | | | | 7,335 | 886 |
| **Total Liabilities** | 162,753 | 19,663 | 112,963 | 13,648 | (95,500) | (11,538) | 180,216 | 21,773 |
| **Stockholders Equity** | | | | | | | | |
| Common Shares | 40,795 | 4,929 | 60,687 | 7,332 | | | 101,482 | 12,261 |
| Retained Earnings | 105,488 | 12,744 | (67,087) | (8,105) | (4,796) | (579) | 33,605 | 4,060 |
| Accumulated Other Comprehensive Loss | 2,460 | 297 | (84) | (10) | | | 2,376 | 287 |
| Total Stockholders Equity | 148,743 | 17,970 | (6,484) | (783) | (4,796) | (579) | 137,463 | 16,608 |
| **Total Liabilities and Stockholders Equity** | 311,495 | 37,633 | 106,479 | 12,864 | (100,296) | (12,117) | 317,679 | 38,380 |
| Balance Control | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |

## SUMMARY NOTES TO FINANCIAL RECONCILIATION

Financial Data presented in the Descriptive Memorandum ("DM") was prepared to reflect the results of operations and financial condition of the Yue Sai Kan and Ma Promesse brands in China. Current legal entity results of Yue Sai Kan Cosmetics (Shenzhen) Co., Ltd. and Yue Sai Kan Coly Cosmetics (Shanghai) Ltd. include additional brand operations not included in the subject transaction. Certain adjustments were made to the reported results of these legal entities to arrive at the information presented in the DM.

Subsequent to preparation of the DM, certain additional adjustments were identified which affect both the reported earnings before interest and taxes ("EBIT") and earnings before interest, taxes, depreciation and amortization ("EBITDA"). The schedules included in this folder summarize the adjustments made to reported legal entity results to arrive at the DM as presented, as well as adjustments necessary to obtain the actual results for the businesses being sold.

### Description of legal entities consolidated:

082LC: Lancaster China (Shenzhen): includes results of sales to third parties for the Lancaster Division. In FY01 through FY03, this included the results of operations for the Yue-Sai and Ma Promesse branded products (except for in FY03, certain overhead costs related to Ma Promesse were reported in 082CC). Beginning in FY04, Ma Promesse branded products included in reporting entity 082CC in their entirety.

082CC: includes the results of sales to third parties for the Coty China Division. In FY01 through FY03, this included the results of operations for the Adidas and Rimmel branded products (except for in FY03, certain overhead costs related to Ma Promesse were reported in 082CC). Beginning in FY04, Ma Promesse branded products are also included in this reporting entity in their entirety. This entity is not included in the consolidated results for the DM or actual combined results.

082MS: Manufacturing Shenzhen: includes results of operations for the plant operations in Shenzhen (very limited production includes production of Yue-Sai and Ma Promesse only).

061: Manufacturing Shanghai: includes results of operations for the plant operations in Shanghai (includes production of Yue-Sai, Ma Promesse, Rimmel and Adidas).
  - 061MM: manufacturing results
  - 061LD: technical brand development
  - 061MD: technical support (R&D)

Note: Financial statements as per reporting system can be found in A.1.12-14 and A.1.18-20

# Reconciliation of FY03 to DM and actual results

| $(thousands) | 097LC | 082MS | 061 | Consolidated | 1 | 2 | 3 | 4 | 5 | 6 | 7 | As per DM FY03 | 8 | 9 | 10 | Actual results FY03 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross sales | $48,361 | $0 | $0 | $48,361 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $48,361 | $0 | $0 | $0 | $48,361 |
| Intercompany sales | $0 | $11,371 | $3,280 | $14,651 | $0 | $0 | $0 | $0 | $0 | $(11,371) | $(3,280) | $0 | $0 | $0 | $0 | $0 |
| Returns | $749 | $0 | $0 | $749 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $749 | $0 | $0 | $0 | $749 |
| Discounts/allowances | $1,327 | $0 | $0 | $1,327 | $(107) | $0 | $0 | $0 | $0 | $0 | $0 | $1,327 | $0 | $0 | $0 | $1,327 |
| Direct trade spending | $0 | $0 | $0 | $0 | $107 | $0 | $0 | $0 | $0 | $0 | $0 | $107 | $0 | $0 | $0 | $107 |
| Net sales | $46,285 | $11,371 | $3,280 | $60,936 | $(107) | $(4,688) | $(50) | $0 | $0 | $(11,371) | $(1,179) | $46,178 | $(51,179) | $(833) | $(50) | $46,177 |
| COGS | $11,794 | $10,192 | $4,113 | $27,599 | $0 | $0 | $0 | $1,047 | $0 | $(101,192) | $(4,113) | $11,806 | $(51,179) | $0 | $(262) | $12,199 |
| Inventory obsolescence | $0 | $0 | $0 | $0 | $(688) | $0 | $0 | $0 | $0 | $0 | $0 | $688 | $0 | $0 | $0 | $688 |
| Royalties | $0 | $0 | $0 | $0 | $0 | $0 | $1,846 | $0 | $0 | $0 | $0 | $1,846 | $0 | $0 | $0 | $1,846 |
| Gross profit | $32,991 | $1,179 | $(833) | $33,337 | $(107) | $(1,846) | $0 | $(50) | $0 | $(101,192) | $(1,179) | $31,007 | $51,179 | $(833) | $262 | $31,045 |
| % margin | | | | 54.7% | | | | | | | | 67.2% | | | | 66.0% |
| Total media | $4,920 | $0 | $0 | $4,920 | $0 | $0 | $1,047 | $0 | $0 | $0 | $0 | $5,967 | $0 | $0 | $0 | $5,967 |
| Consumer promotions | $2,484 | $0 | $0 | $2,484 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $2,484 | $0 | $0 | $0 | $2,484 |
| Other trade spending | $3,489 | $0 | $0 | $3,489 | $(101) | $0 | $0 | $0 | $0 | $0 | $0 | $3,382 | $0 | $0 | $0 | $3,382 |
| Other advertising & consumer promotion | $3,315 | $0 | $0 | $3,315 | $0 | $0 | $0 | $757 | $0 | $0 | $0 | $4,072 | $0 | $0 | $0 | $4,072 |
| Total A&CP | $14,208 | $0 | $0 | $14,208 | $0 | $0 | $0 | $1,804 | $0 | $0 | $0 | $15,905 | $0 | $0 | $0 | $15,905 |
| % net sales | | | | 23.2% | | | | | | | | 34.4% | | | | 34.1% |
| Product contribution | $18,783 | $1,179 | $(833) | $19,129 | $0 | $(1,846) | $(1,804) | $(50) | $0 | $(1,179) | | $15,132 | $51,179 | $(833) | $262 | $15,740 |
| % margin | | | | 31.4% | | | | | | | | 32.8% | | | | 34.1% |
| SG&A includes other per reporting | $9,757 | $0 | $0 | $10,096 | $0 | $0 | $0 | $0 | $0 | $794 | $0 | $10,890 | $0 | $0 | $0 | $10,890 |
| Other expense / (income) | $512 | $0 | $0 | $(301) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $512 | $0 | $(241) | $0 | $(229) |
| Know-how license expense | $4,028 | $0 | $0 | $4,028 | $0 | $0 | $(4,028) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| EBIT | $4,396 | $1,179 | $(833) | $4,706 | $0 | $0 | $2,782 | $(1,804) | $0 | $(1,179) | | $4,120 | $51,179 | $(833) | $262 | $5,079 |
| % margin | | | | 7.7% | | | | | | | | 9.3% | | | | 11.0% |
| Depreciation expense | $1,646 | $1,103 | $235 | $3,064 | $0 | $0 | $0 | $0 | $0 | $(1,103) | $(235) | $1,646 | $1,103 | $235 | $0 | $3,064 |
| EBITDA | $6,032 | $2,282 | $(634) | $7,770 | $0 | $0 | $2,782 | $(1,804) | $0 | $(794) | $(1,242) | $5,876 | $2,282 | $(357) | $262 | $8,143 |
| % margin | | | | 12.6% | | | | | | | | 12.7% | | | | 17.6% |

## Description of adjustments:

1. Reclassification of trade spending from A&CP to net sales line as required by EITF No. 00-25 and 00-14
2. Reclassification of inventory obsolescence expense out of COGS
3. Third Party Royalty Expense added to COGS (4% of sales); Know How license expense (the internal charge from COTY Inc) removed from the P&L
4. Central marketing costs incurred in Paris were charged in other consumer promotion and total media
5. Addition of allocation of sales and marketing ($327) and administrative expense ($347) for Ma Fromesse
6. Results of operations for 082MS were mistakenly excluded from DM results
7. Results of operations for 061LD and 061MM were mistakenly excluded from DM results; includes results from 061MD, technical brand development (fiscal R&D expense) of $139
8. Included results of operations for 082MS including depreciation; affects consolidated COGS
9. Included results of operations for 061 including depreciation (Excluding 061MD Tech. Brand Develop' previously included in the DM - adj 7); affects consolidated COGS and adjusts other income/expense line for intercompany items
10. Of the COGS recorded in 061MM (adjustment number 9), $242 relates to the Adidas and Rimmel brands and therefore eliminated from COGS

# Reconciliation of FY02 to DM and actual results

| $ thousands | 002LC | OR24S | 061 | Consolidated | Adj 1 | Adj 2 | Adj 3 | Adj 4 | Adj 5 | Adj 6 | Adj 7 | As per DM FY02 | Adj 8 | Adj 9 | Adj 10 | Actual results FY02 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross sales | $46,471 | $0 | $0 | $46,471 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $46,471 | $0 | $0 | $0 | $46,471 |
| Intercompany sales | $0 | $11,157 | $3,280 | $14,437 | $0 | $0 | $0 | $0 | $0 | ($11,157) | ($3,280) | $0 | $0 | $0 | $0 | $0 |
| Returns | $898 | $0 | $0 | $898 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $898 | $0 | $0 | $0 | $898 |
| Discounts/Allowances | $1,150 | $0 | $0 | $1,150 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,150 | $0 | $0 | $0 | $1,150 |
| Direct trade spending | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net sales | $44,423 | $11,157 | $3,280 | $58,860 | $0 | $0 | $0 | $0 | $0 | ($11,157) | ($3,280) | $44,423 | ($50) | ($51,153) | ($50) | $44,423 |
| COGS | $12,433 | $10,004 | $3,949 | $26,386 | $0 | $0 | $1,815 | $0 | $0 | ($10,004) | ($11,157) | $12,433 | $0 | $0 | ($200) | $11,749 |
| Inventory obsolescence | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Royalties | $0 | $0 | $0 | $0 | $0 | $0 | $1,815 | $0 | $0 | $0 | $0 | $1,815 | $0 | $669 | $0 | $1,815 |
| Gross profit | $31,990 | $1,153 | ($669) | $32,474 | $0 | $0 | ($1,815) | $0 | $0 | ($1,153) | ($510,004) | $30,775 | $669 | ($5669) | $200 | $30,859 |
| % margin | | | | 55.2% | | | | | | | | 67.9% | | | | 69.5% |
| Total media | $6,553 | $0 | $0 | $6,553 | $0 | $1,437 | $0 | $0 | $0 | $0 | $0 | $7,990 | $0 | $0 | $0 | $7,990 |
| Consumer promotions | $2,199 | $0 | $0 | $2,199 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $2,199 | $0 | $0 | $0 | $2,199 |
| Other trade spending | $3,823 | $0 | $0 | $3,823 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $3,823 | $0 | $0 | $0 | $3,823 |
| Other advertising & consumer promotion | $2,545 | $0 | $0 | $2,545 | $0 | $132 | $0 | $0 | $0 | $0 | $0 | $2,677 | $0 | $0 | $0 | $2,677 |
| Total A&CP | $15,120 | $0 | $0 | $15,120 | $0 | $1,569 | $0 | $0 | $0 | $0 | $0 | $16,689 | $0 | $0 | $0 | $16,689 |
| % net sales | | | | 25.7% | | | | | | | | 27.8% | | | | 37.8% |
| Product contribution | $16,870 | $1,153 | ($669) | $17,354 | $0 | ($1,569) | ($1,815) | $0 | $0 | ($1,153) | ($510,004) | $13,486 | $669 | ($5669) | $200 | $14,170 |
| % margin | | | | 29.5% | | | | | | | | 20.4% | | | | 31.9% |
| SG&A | $10,708 | $0 | $710 | $11,418 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $11,069 | ($349) | $0 | $0 | $11,069 |
| Other expense / (income) | ($213) | $0 | ($396) | ($509) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($513) | $296 | ($513) | $0 | ($454) |
| Know-how license expense | $4,442 | $0 | $0 | $4,442 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| EBIT | $1,933 | $1,153 | ($1,081) | $2,003 | $0 | ($1,569) | $0 | $0 | $0 | ($1,153) | $722 | $2,430 | $722 | $51,153 | $200 | $3,555 |
| % margin | | | | 3.4% | | | | | | | | 5.5% | | | | 8.0% |
| Depreciation expense | $1,261 | $1,212 | $274 | $2,747 | $0 | $0 | $0 | $0 | $0 | ($1,212) | ($5274) | $1,261 | ($5274) | $274 | $0 | $2,747 |
| EBITDA | $3,194 | $2,365 | ($807) | $4,750 | $0 | ($1,569) | $0 | $0 | $0 | ($2,365) | $448 | $3,891 | $448 | $52,365 | $200 | $6,302 |
| % margin | | | | 8.1% | | | | | | | | 8.8% | | | | 14.2% |

Description of adjustments:

1. Reclassification of trade spending from A&CP to net sales line as required by EITF No. 00-25 and 00-14
2. Reclassification of inventory obsolescence expense out of COGS
3. Third Party Royalty Expense added to COGS (4% of sales); drawn from how license expense the internal charge from COTY Inc. removed from the P&L
4. Central marketing costs incurred in Paris were charged in other consumer promotion and total media
5. Note: No Promesse financial results already included in these reporting entities; no adjustment necessary in FY02
6. Results of operations for OR24S were mistakenly included from DM results
7. Results of operations for Oril D and 061444 were mistakenly excluded from DM results; includes results from 0s140, technical brand development (local R&D expense) of $361
8. Included results of operations for 081445 including depreciation; affects consolidated COGS
9. Included results of operations for 061 including depreciation (Excluding 061440 "Tech. Brand Develop" previously included in the DM - adj 7); affects consolidated COGS and adjusts other income/expense line for intercompany items
10. Of the COGS recorded in 061444 (adjustment number 9), $200 relates to the Adélas and Rimmel brands and therefore eliminated from COGS

# Reconciliation of FY01 to DM and actual results

| $ thousands | 082LC | 082MS | 061 | Consolidated | 1 | 2 | 3 | 4 | 5 | 6 | 7 | As per DM FY01 | 8 | 9 | 10 | Actual results FY01 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross sales | $39,384 | $0 | $0 | $39,384 | $0 | $0 | $0 | $0 | $0 | $0 | ($9,324) | $39,384 | ($9,324) | $0 | $0 | $39,384 |
| Intercompany sales | $0 | $9,324 | $2,504 | $11,828 | $0 | $0 | $0 | $0 | $0 | $0 | ($9,324) | $0 | ($9,324) | $0 | $0 | $0 |
| Returns | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Discounts/Allowances | $523 | $0 | $0 | $523 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $523 | $0 | $0 | $0 | $523 |
| Direct trade spending | $0 | $0 | $0 | $0 | ($281) | $0 | $0 | $281 | $0 | $0 | $0 | $282 | $0 | $0 | ($50) | $282 |
| Net sales | $38,861 | $9,324 | $2,504 | $50,689 | ($281) | $0 | $0 | ($50) | $0 | $0 | ($9,324) | $39,380 | ($9,324) | ($50) | ($50) | $38,579 |
| COGS | $11,495 | $8,619 | $3,422 | $23,536 | $0 | ($520) | $1,479 | $0 | $0 | ($58,619) | ($53,422) | $11,495 | ($5,705) | $918 | ($223) | $11,185 |
| Inventory obsolescence | $0 | $0 | $0 | $0 | $0 | $300 | $0 | $0 | $0 | $0 | $0 | $300 | $0 | $0 | $0 | $300 |
| Royalties | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,593 | $0 | $0 | $0 | $1,593 |
| Gross profit | $27,366 | $705 | ($918) | $27,153 | ($281) | ($1,593) | ($50) | ($50) | $0 | ($5,705) | ($5,705) | $25,491 | ($5,186) | ($918) | $223 | $25,501 |
| % margin | | | | 53.6% | | | | | | | | 66.1% | | | | 66.1% |
| Total media | $4,161 | $0 | $0 | $4,161 | $0 | $0 | $1,479 | $0 | ($50) | $0 | $0 | $5,590 | ($186) | $0 | $0 | $5,590 |
| Consumer promotions | $4,151 | $0 | $0 | $4,151 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $4,151 | $0 | $0 | $0 | $4,151 |
| Other trade spending | $53,331 | $0 | $0 | $53,331 | ($281) | $0 | $0 | $0 | $0 | $0 | $0 | $3,050 | $522 | $0 | $0 | $3,050 |
| Other advertising & consumer promotion | $1,328 | $0 | $0 | $1,328 | ($281) | $0 | $74 | $0 | $0 | $0 | $0 | $1,402 | $88 | $0 | $0 | $1,402 |
| Total A&CP | $12,971 | $0 | $0 | $12,971 | ($281) | $0 | $1,503 | $0 | ($50) | $0 | $0 | $14,193 | $716 | $0 | $0 | $14,193 |
| % net sales | | | | 25.6% | | | | | | | | 36.0% | 1.9% | | | 36.8% |
| Product contribution | $14,395 | ($918) | $437 | $14,182 | $0 | ($1,593) | ($1,503) | ($50) | $0 | ($5,705) | $918 | $11,298 | $5,705 | ($5,918) | $223 | $11,308 |
| % margin | | | | 28.0% | | | | | | | | 29.3% | | | | 29.3% |
| SG&A | $10,243 | $5437 | ($5,527) | $10,680 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $10,494 | $88 | $0 | $0 | $10,494 |
| Other expense / (income) | $88 | $0 | $0 | ($454) | $0 | $0 | $0 | $0 | $0 | $0 | $522 | $88 | $88 | ($5,241) | $0 | ($5,151) |
| Know-how license expense | $3,886 | $0 | $0 | $3,886 | $0 | $0 | ($3,886) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| EBIT | $178 | $705 | ($4833) | $50 | $0 | ($1,503) | $2,293 | $0 | ($50) | ($5705) | $582 | $716 | $705 | ($5677) | $223 | $567 |
| % margin | | | | 0.1% | | | | | | | | 1.9% | | | | 2.5% |
| Depreciation expense | $873 | $1,151 | $241 | $2,265 | $0 | $0 | $0 | $0 | $0 | ($51,151) | ($5,241) | $873 | $1,151 | $241 | $0 | $2,265 |
| EBITDA | $1,051 | $1,856 | ($5592) | $2,315 | $0 | ($1,503) | $2,293 | $0 | ($50) | ($51,856) | $341 | $1,589 | $1,856 | ($5436) | $223 | $3,232 |
| % margin | | | | 4.6% | | | | | | | | 4.7% | | | | 6.4% |

## Description of adjustments:

1. Reclassification of trade spending from A&CP to net sales line as required by EITF No. 00-25 and 00-14
2. Reclassification of inventory obsolescence expense out of COGS
3. Third Party Royalty Expense added to COGS (4% of sales); know how license expense (the internal charge from COTY Inc. removed from the P&L
4. Central marketing costs incurred in Paris were charged in other consumer promotion and total media
5. Note: Ma Promesse financial results already included in these reporting entities; no adjustment necessary in FY02
6. Results of operations for 082MS were mistakenly excluded from DM results
7. Results of operations for 061LD and 061MW were mistakenly excluded from DM results; includes results from 061MD, technical brand development (local R&D expense) of $231
8. Included results of operations for 082MS including depreciation; affects consolidated COGS
9. Included results of operations for 061 including depreciation (Excluding 061MD Tech. Brand Develop. previously included in the DM - adj 7); affects consolidated COGS and adjusts other income/expense line for intercompany items
10. Of the COGS recorded in 061MW (adjustment number 9), $223 relates to the Adidas and Rimmel brands and therefore eliminated from COGS